**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Suellen E. Beaulieu, et al | ) | No. 5 :06-CV-400-BR |
| | ) | |
| versus | ) | **This document relates to:** |
| | ) | **ALL CASES** |
| E.Q. Industrial Services, Inc., et al | ) | |

<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS'</u>

<u>MOTION FOR CLASS CERTIFICATION</u>

Plaintiffs submit this memorandum, and offer into evidence Plaintiffs' Exhibits 1 through 34 in support of their motion for class certification, pursuant to Fed. R. Civ. P. 23(b)(3) and 23(c)(4)(A).

<u>STATEMENT OF THE CASE AND RECITATION OF FACTS</u>

On October 5, 2006, a massive fire broke out at a hazardous waste facility in Apex, North Carolina, which was owned and operated by EQ.[1] The vast bulk of the materials involved in the fire were classified as hazardous waste by the U.S. Environmental Protection Agency, (EPA), and the North Carolina Department of Environment and Natural Resources, (DENR). As defined by North Carolina General Statutes §130A-290 (8):

> "Hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration or physical, chemical or infectious characteristics may:
>
> a. Cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness; or
>
> b. <u>Pose a substantial present or potential hazard to human health or the environment</u> when improperly treated, stored, transported, disposed of or otherwise managed.

---

[1] Defendants, EQ Holding Company and EQ Industrial Services, Inc., are the owner and operator, respectively, of the Apex, N.C. facility, and are referred to herein collectively as "EQ".

*Id.* (emphasis added).  EQ admits that over 60,000 gallons of hazardous liquid wastes were involved in the fire, and over 97,000 pounds of hazardous solid wastes were involved in the fire.[2] These included ignitable wastes (D001), corrosive wastes (D002), reactive wastes (D003), arsenic (D004), cadmium (D006), chromium (D007), Lead (D008), mercury (D009), benzene (D018), chloroform (D022), methyl ethyl ketone (D035) vinyl chloride (D043), chlordane (U036), DDT (U061), potassium cyanide (P098), sodium cyanide (P106).[3]

The fire blanketed the Town of Apex with a cloud of noxious fumes, potentially exposing the residents and businesses in Apex to serious harm.  In spite of their statutory duty to do so, EQ was unable to immediately identify the chemical constituency and quantity of all of the hazardous wastes burning in the fire.[4]  Apex Fire Chief, Mark Haraway, was the incident commander in charge of the emergency response to the fire.  Chief Haraway testified about the conditions with which he was faced: "It was dark.  There were explosions. There were flying projectiles.  There was an unknown chemical hazard and a chemical plume."[5]  Shortly after the fire started, he ordered an immediate evacuation of a portion of the Town of Apex, bounded by U.S. Highway 64 on the north, N.C. Highway 55 on the southeast, and U.S. Highway 1 on the southwest.[6]  The mayor of Apex issued an emergency evacuation order that was not lifted until October 7, at approximately 9:00 a.m.[7]

---

[2] See Memorandum Exhibits 1 and 2, which were identified as Deposition Exhibits 7 and 10 in the 30(b)(6) Deposition of EQIS, by Scott Maris.  See also Memorandum Exhibit 3, Vol. 1, p. 101, lines 4-11; p. 104, line 20 through p. 105, line 1; and p. 109, line 9 through p. 110, line 19.

[3] See Exhibit 4, Appendix B – EPA Hazardous Waste Codes.

[4] See Exhibits 5-7, 15A N.C.A.C. 13A.0109 (1999) [incorporating by reference 40 CFR § 264.56 (Ex. 6) and § 264.73 (Ex. 7)].  See also Exhibit 8, Haraway Deposition, Vol. 1, p. 95, lines 8-11; Exhibit 9 p. 145, line 10 through p. 146, line 5.

[5] See Exhibit 9, Haraway Deposition, Vol. 1, p. 145, lines 15 - 18.

[6] See Exhibit 10, Haraway Deposition, Vol. 1, p. 70, line 11 through p. 71, line 13; Exhibit 11, p. 100, line 23 through p. 101, line 11.

[7] See Exhibit 12, Haraway Deposition, Vol. 1, p. 116, line 20 through p. 117, line 22; and Exhibit 13.

As a result of the evacuation, thousands of Apex residents were forced out of their homes in the middle of the night[8] and remained evacuated for almost two days. Hundreds of businesses in Apex were forced to remain closed on Friday, 6 October, and Saturday, 7 October 2006. Over 100 elderly residents of a nursing home just outside of the boundary of the mandatory evacuation zone were also subject to a mandatory evacuation order out of concern for the approaching toxic fumes.[9] Notice of the evacuation was given by three methods: (1) a "route alert system", where police cars travel pre-determined routes through the neighborhoods announcing the evacuation by loudspeaker;[10] (2) a "reverse 911 system", where the Wake County Emergency Response Center initiated pre-recorded telephone calls to every home in the evacuation area;[11] and (3) hourly public information broadcasts over all TV and radio news media.[12] Residents just outside of the mandatory evacuation zone voluntarily evacuated upon seeing the news reports and smelling the noxious fumes.[13]

All of the named plaintiffs had a possessory interest in real estate in Apex at the time of the fire.[14] The damages suffered by the named plaintiffs include, but are not limited to, loss of the use and enjoyment of their real property, lost wages and lost profits as a result of being delayed and/or kept from entering and leaving homes, schools, factories, and stores, evacuation expenses, mental anguish, and inconvenience, plus other incidental and consequential damages arising from the incident. Thousands of other evacuees suffered the same damages.

---

[8] See Exhibit 14, Haraway Deposition, Vol. 1, p. 101, line 17 through p. 102, line 10.
[9] See Exhibit 15, Haraway Deposition, Vol. 1, p. 152, line 16 through p. 153, line 24.
[10] See Exhibit 16, Haraway Deposition, Vol. 1, p. 96, line 8 through p. 97, line 21.
[11] See Exhibit 17, Haraway Deposition, Vol. 1, p. 78, lines 7-12, p. 96, lines 16-18, p. 99, lines 10-17.
[12] See Exhibit 18, Haraway Deposition, Vol. 1, p. 99, line 18 through p. 100, line 5.
[13] *See, e.g.,* Affidavit of Nancy Hackney, Exhibit 19, p. 23-25.
[14] See Exhibit 19, Plaintiffs' Affidavits.

# I. CLASS CERTIFICATION REQUIREMENTS

Rule 23, Fed. R. Civ. P., governs the maintenance of class actions. Subsection (a) sets forth four prerequisites for all class actions:

> **(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>> **(1)** the class is so numerous that joinder of all members is impracticable;
>>
>> **(2)** there are questions of law or fact common to the class;
>>
>> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>>
>> **(4)** the representative parties will fairly and adequately protect the interests of the class.

These prerequisites are known by their common one-word denominations as: numerosity, commonality, typicality, and adequacy. A class action may be maintained if all four of the prerequisites set forth above are satisfied, in addition to one of the prerequisites contained in Subsection (b). *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 423 (4th Cir. 2003); *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). Here, Plaintiffs contend that a class should be certified under Subsection (b)(3):

> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
> ...
>> **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>>
>>> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>>> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>> **(D)** the likely difficulties in managing a class action.

The Subsection (b)(3) requirements are known by their common one-word denominations as: predominance and superiority.

The Fourth Circuit in *Gunnells v. Healthplan Services, Inc.* said:

> If a lawsuit meets these requirements, certification of a class action serves important public purposes. In addition to promoting judicial economy and efficiency, class actions also "afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions." 5 James Wm. Moore et al., *Moore's Federal Practice* § 2302 (3d ed. 1999). Thus federal courts should "give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case 'best serve the ends of justice for the affected parties and promote judicial efficiency.'" *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989).

*Gunnells*, 348 F.3d at 423. In this case, it is clear that all of the requirements of Subsections (a) and (b)(3) have been met, and that common issues should be certified under Rule 23(c)(4)(A). Each requirement will be discussed in turn below.

## A. NUMEROSITY

In order to meet the numerosity criterion, there must be a large enough group of plaintiffs to make joinder of all class members impracticable. Professor Newberg states: "*Impracticable* does not mean *impossible.* Plaintiffs need not show that joinder cannot be accomplished; a showing of strong litigational hardship or inconvenience should be sufficient." Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §3:4 (4th Ed. 2002) (hereinafter *Newberg*). "In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone." *Id.* § 3:5.

The Fourth Circuit in *Kelley v. Norfolk & W. Ry. Co.*, 584 F2d 34, 35 (4th Cir. 1978), said:

There is no mechanical test for determining whether in a particular case the requirement for numerosity has been satisfied. The issue is one primarily for the District Court, to be resolved in light of the facts and circumstances of the particular case.

In *Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993), the Fourth Circuit affirmed a class certification of 480 potential class members, stating that this number "would easily satisfy the numerosity requirement." *Id.* at 183. Similarly, in *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984), the Fourth Circuit determined that the numerosity requirement was met for a proposed class between forty-six and sixty members.

In this case, the size and constituency of the mandatory evacuation subclass is defined by the boundary of the mandatory evacuation ordered by the Town of Apex. Chief Haraway identified the boundaries of the evacuation zone as shown on the attached Exhibit 20.[15] The affidavits of Sharon Peterson and Lisa Sago, of the Wake County Planning Department, indicate an estimated population within the mandatory evacuation zone of approximately 10,231 people.[16]

The size and constituency of the voluntary evacuation subclass is defined by the plume model run by William Zegel, Ph.D., Plaintiffs' expert environmental scientist.[17] Dr. Zegel employed the AERMOD computer program, officially recognized by the EPA as the program of choice for modeling pollutant dispersion. Among other things, the air model took into account actual weather conditions in Apex at the time of the fire, and the major chemicals which were involved in the fire. The model then dispersed the plume from the fire out to a point where the limit of maximum chemical concentrations equaled the minimum detection threshold for human senses. This threshold was chosen to establish an objective standard for voluntary evacuation,

---

[15] Exhibit 20, Deposition of Mark Haraway, Vol. I, p. 71 and Deposition Exhibit 3, thereto.
[16] Exhibits 21 and 22, Affidavits of Sharon Peterson and Lisa Sago of the Wake County Planning and GIS Departments.
[17] Exhibit 23, Affidavit of William Zegel Ph.D. and appendices attached thereto.

(*i.e.*, if you could smell the noxious odor it was reasonable to leave). That limit is represented as an isopleth on Figure 3 attached to Dr. Zegel's affidavit. The geographic boundaries of the voluntary evacuation subclass are thus readily ascertainable as those who were located outside of the mandatory zone and within the odor threshold limit isopleths. Dr. Zegel estimates that the population within the voluntary evacuation zone was at least 3,000 people.

EQ admits that "some number of residents of Apex temporarily evacuated as a result of the fire, and some number chose to evacuate, though not subject to any evacuation order."[18] As discussed above, those numbers are sufficiently large to meet the numerosity requirement.

### B. COMMONALITY

The question of commonality asks whether there are legal and factual issues common to the class that, when decided, will be binding on the entire class. As to this requirement, Professor Newberg writes:

> Rule 23(a)(2) does not require that all questions of law or fact raised in the litigation be common. The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative; that is, there need be only a single issue common to all members of the class. Therefore, this requirement is easily met in most cases. When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.

Newberg, *supra*, § 3:10. Courts have held that "commonality" exists under manifold circumstances. Generally, there are common questions if the claims of the class arise from the same wrongful acts or underlying set of acts or circumstances. *Holsey*, 743 F.2d at 216-17.

Plaintiffs have asserted several causes of action against the various defendants, all of which raise legal and factual issues that are common to the entire class: (1) the respective negligence of the defendants, (2) whether EQ defendants are guilty of trespass, (3) whether the

---

[18] R. Doc. No. 110, EQIS Answer to Second Supplemental and Amended Master Class Action Complaint.

EQ defendants are guilty of nuisance, (4) whether defendants' negligence, trespass and/or nuisance was a proximate cause of the evacuation of the Plaintiff class, and (5) liability for and quantification of punitive damages.[19]

In a Rule 23(b)(3) class action, such as this case, the commonality requirement is "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over" other questions. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997); *Lienhart v. Dryvit Systems, Inc.*, *supra*, at note 4. Therefore, further attention to the commonality issue will be reserved for the discussion of predominance issues, below.

### C. TYPICALITY

> The typicality prerequisite assures that the class representative shares the issues common to other class members. Thus, to some extent, it overlaps with the Rule 23(a)(2) requirement that there be questions of law or fact common to the class, except that each test proceeds from a different perspective. The typicality criterion focuses on whether there exists a relationship between the plaintiff's claim and the claims alleged on behalf of the class.

Newberg, *supra*, § 3:13. Typicality is also closely tied to adequacy of representation in that, if the claims of the class representatives are aligned with that of the class, the vigorous prosecution of their claims will necessarily inure to the benefit of the class. Professor Newberg writes:

> The Supreme Court in *General Telephone v. E.E.O.C.* observed: "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims." The rationale for this provision is that a plaintiff with typical claims will pursue his or her own self-interest in the litigation, and in so doing, will advance the interests of the class members, which are aligned with those of the representative.

Newberg, *supra*, § 3:13 (quoting *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318 (1980). At the same time, however, "Rule 23 does not require precise, mirror-image identity

---

[19] R. Doc. No. 105, Plaintiffs' Second Supplemental and Amended Master Class Action Complaint.

respecting the injuries caused by a single practice or policy . . . ." <u>Int'l Woodworkers of Am.,</u> <u>AFL-CIO, CLC v. Chesapeake Bay Plywood Corp.</u>, 659 F.2d 1259, 1270 (4th Cir. 1981). The Ninth Circuit put it more succinctly when it wrote: "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)).

The affidavits and depositions of the named plaintiffs, coupled with the allegations of the complaint, clearly indicate that they pass the typicality test enunciated by both the Fourth and Ninth Circuits. They were all evacuated from their homes and businesses because of the fire and drifting plume, having claims identical to the thousands of other persons and businesses who suffered the same harms. The action is based on defendants' conduct, involving the same legal theories as apply to the whole class. All other class members suffered the same fate as the named class representatives. "A claim is typical if it arises from the same course of conduct that gives rise to the claims of the class members and if the claims are based on the same legal theories." *Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 637 (D. S.C. 1992), *aff'd* 6 F.3d 177 (4th Cir. 1993) (quoting Newberg, *supra*, § 3:13).

Possible variations in proof do not destroy typicality. *See, e.g., In re: Southeast Hotel Properties, Ltd. P'ships Litigation*, 151 F.R.D. 597 (W.D. N.C. 1993). Class representatives' claims need not be identical to those of all class members, and there may be disparities in damages between the class representatives and individual members of the class. *See, e.g.*, *McGlothlin v. Connors*, 142 F.R.D. 626 (W.D. Va. 1992). Nor do defenses against class representatives make their claims atypical. *Rodger v. Electronic Data Systems Corp.*, 160 F.R.D.

532 (E.D. N.C. 1995). "In determining whether the claims of the class representatives are typical of the class, the Court looks to the nature of the claims asserted (*i.e.*, the legal theory) rather than any specific factual differences amongst class members." *In re: Polyester Staple Antitrust Litigation*, 207 WL 2111 380 (W.D.N.C. July 9, 2007) (citing *Brown v. Cameron Brown Co.*, 92 F.R.D. 32, 38 (E.D. Va. 1981), *Woodard v. Online Info. Servs.*, 191 F.R.D. 502, 505 (E.D.N.C. 2000), and *Holsey v. Armour & Co.*, 743 F.2d 199, 216-217 (4th Cir. 1984)).

A case very similar to this one is that of *Olden v. LaFarge Corp.*, 203 F.R.D. 254 (E.D. Mich. 2001), in which homeowners sued a concrete manufacturer for toxic air emissions from defendant's plant. They claimed damages for loss of use and enjoyment of their homes, mental anguish, and personal injury. LaFarge claimed that the typicality requirement was not met because of the great disparity in plaintiffs' damages. The court rejected LaFarge's claim on the ground that their plant was the source of all of plaintiffs' claimed damages, and that foreseeability and similarity of damages was common to the class.

Just as in *Olden*, this case involves a single source of toxic pollutants from a fire that resulted in a uniform and widespread evacuation of the Town of Apex. The issues of liability are the same, proximate causation is the same, and the damages, albeit in different amounts, are essentially the same. There are no issues peculiar to individual class members which differ from those of the class as a whole.

### D. ADEQUACY OF REPRESENTATION

There are two, and only two, criteria necessary to satisfy the adequacy requirement: (1) the class representatives must not have interests antagonistic to the interests of the class; and (2) the class representatives' counsel must be qualified, experienced, and generally able to conduct the litigation. *See Newberg*, *supra*, § 3:21.

In *Gunnells*, the Fourth Circuit said: "For a conflict of interest to prevent plaintiffs from meeting the requirements of Rule 23(a), the conflict 'must be fundamental. It must go to the heart of the litigation'". *Gunnells*, 348 F.3d at 430-431 (quoting *Newberg* § 18:14). Mere speculative conflicts are not sufficient to defeat the adequacy requirement. *Chisholm v. U.S. Post. Serv.*, 665 F.2d 482 (4th Cir. 1981).

In this case, no such fundamental conflict exists. The named plaintiffs "share the same common objectives and the same factual and legal positions" as the class. They have the same interest in establishing the liability of all defendants for both compensatory and punitive damages. The named plaintiffs have sworn that they have no conflicts with the class, and that they expect no additional remuneration beyond their own damages.[20]

The second prong of the adequacy test, goes to the vigor with which the class representatives will prosecute this lawsuit. Here the Court's focus is "primarily on class counsel, not on the plaintiff, to determine if there will be vigorous prosecution of the class action. Plaintiffs are generally laypeople and they are not expected to prosecute their own action or that of the class." *Newberg*, *supra*, § 3:24 (citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) and *Dolgow v. Anderson*, 43 F.R.D. 472 (E.D. N.Y. 1968)("Competency of counsel is assurance of vigorous prosecution.").

The members of the court-appointed interim Plaintiffs Management Committee have all submitted affidavits in support of this motion, attesting to their qualifications.[21] It is clear from those affidavits that counsel have the financial resources, and the requisite skill and experience in class actions and complex mass tort cases to assure vigorous prosecution of this case. The

---

[20] See affidavits of proposed class representatives, Exhibit 19.
[21] See affidavits of the Plaintiffs Management Committee, Exhibits 24 through 29.

Court's experience with the performance of Plaintiffs' counsel to date should justify that conclusion.

Defendants, in the depositions of the named plaintiffs, attempted to show that the named plaintiffs are not vigorously prosecuting this lawsuit, by asking questions about their understanding of the legal theories and particular facts of the case, and the various pleadings filed. The Fourth Circuit in <u>Gunnells</u> found such an attack abhorrant, saying:

> The lack of knowledge contention is particularly meritless. It is hornbook law, as the district court recognized, that "[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." J.A. 1256 (quoting 32B Am.Jur.2d *Federal Courts* § 1888 (1996) (footnotes omitted)); *see also Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 222 F.3d 52, 61 (2d Cir. 2000) ("The Supreme Court in *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 370-74 (1966), expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance.").

*Gunnells*, 348 F.3d at 430; *see also In re: Catfish Antitrust Litigation*, 826 F.Supp.1019, 1037-38 (N.D. Miss. 1993); *Peters v. AT&T Corp.*, 179 F.R.D. 564 (N.D. Ill. 1998).

The named plaintiffs are well aware of their roles as class representatives, they understand their obligations as such, and they will sincerely protect the interests of the class as a whole, not just themselves. It is also clear from the affidavits of counsel, and their conduct of this litigation to date, that counsel proposed to represent the class are highly experienced in class action, mass torts, and other complex litigation, who will vigorously prosecute this action in close consultation with the named class representatives.

## II. **RULE 23(B)(3) CRITERIA**

### A. *PREDOMINANCE*

At its core, the predominance inquiry focuses on the relationship between common and individual issues. "When common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis." *Polyester Staple Litigation*, 207 WL 2111 at *380.

As stated in the section on commonality above, in a Rule 23(b)(3) class certification, the issue of the existence of common questions is subsumed by the requirement that questions common to the class predominate over other questions. As the District Court stated in *In re: Polyester Staple Antitrust Litigation*:

> Although the analyses under Rule 23(a) and (b)(3) are similar, satisfaction of the predominance requirement articulated within Rule 23(b)(3) is "more stringent" than satisfaction of Rule 23(a). *Thorn,* 445 F.3d at 319 (quoting *Lienhart v. Dryvit Sys., Inc.* 255 F.3d 138, 146 n. 4 (4th Cir. 2001)). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623.

*Polyester Staple Litigation*, 207 WL 2111 at *380. The *Polyester Staple* Court went on to say:

> The purpose of Rule 23(b)(3) is to address cases "in which a class action would achieve economies of time, effort, and expense and promote … uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615 (citing Adv. Comm. Notes, 28 U.S.C. App., p. 697)). Because Rule 23(b)(3)'s focus is on the practical question of manageability, the trial court must "be granted a wide range of discretion." *Windham,* 565 F.2d at 65.

7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1778 (3d ed. 2005).

In the context of mass tort litigation, such as the instant case, the Fourth Circuit in *Gunnells* said:

However, as the Supreme Court has noted, the predominance and superiority requirements in Rule 23(b)(3) do not foreclose the possibility of mass tort class actions, but merely ensure that class certification in such cases "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231 (quoting Adv. Comm. Notes, 28 U.S.C.App. at 697). For these very reasons, we have expressly "embraced the view that the mass tort action for damages may be appropriate for class action, either partially or in whole." *Central Wesleyan Coll. v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir.1992) (citation, internal quotation marks, ellipses, and alterations omitted).

*Gunnells*, 348 F.3d at 424.

One of the primary purposes of a Rule 23(b)(3) certification is to provide "a single proceeding in which to determine the merits of the plaintiffs' claims, and therefore protects the defendant from inconsistent adjudications." 5 Moore's Federal Practice § 23.02, (1999). The Fourth Circuit also discussed this very issue in <u>Gunnells</u>:

This protection from inconsistent adjudications derives from the fact that the class action is binding on all class members. *See* Fed.R.Civ.P. 23(c)(2)(B). By contrast, proceeding with individual claims makes the defendant vulnerable to the asymmetry of collateral estoppel: If TPCM [the defendant] lost on a claim to an individual plaintiff, subsequent plaintiffs could use offensive collateral estoppel to prevent TPCM from litigating the issue. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (concluding that the use of offensive collateral estoppel should not be precluded in federal courts). A victory by TPCM in an action by an individual plaintiff, however, would have no binding effect on future plaintiffs because the plaintiffs would not have been party to the original suit. *See Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) ("[T]he concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue.") (citing *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Class certification thus promotes consistency of results, giving defendants the benefit of finality and repose.

*Gunnells*, 348 F.3d at 427. Just as in *Gunnells*, class certification will protect the Defendants from possible inconsistent adjudications that would inevitably result from thousands of individual lawsuits.

Class actions are favored as an effective means of adjudicating numerous similar claims involving large numbers of people. *See, e.g., Kahan v. Rosenstiel,* 424 F.2d 161 (3d Cir. 1970), *cert denied,* 398 U.S. 950 (1970). In appropriate cases, such as the instant case, class actions provide benefits to both Plaintiffs **and** Defendants and serve as a practical tool for resolving multiple claims on a consistent basis at the least cost and with the least disruption to an overloaded judicial system.

Because of the extraordinarily high costs that individual plaintiffs can be expected to incur in a case of this difficulty, many claims are not viable absent the class mechanism provided in Rule 23. Where a single harmful act, such as a chemical fire, results in damages to a great many people, the class mechanism is the appropriate procedural device for vindicating claims which, taken individually, are too small to justify legal action, but which are of significant size if taken as a group. *See Escott v. Barchris Contr. Co.,* 340 F.2d 731 (2d Cir. 1965), *cert denied,* 382 U.S. 816 (1965).

This lawsuit arises from a single catastrophic event, a massive fire that resulted in a two day evacuation of thousands of residents of Apex, North Carolina. As stated previously, there are legal and factual issues common to the entire class: (1) the respective negligence of the defendants; (2) whether EQ defendants are guilty of trespass, (3) whether the EQ defendants are guilty of nuisance, (4) whether defendants' negligence, trespass and/or nuisance was a proximate cause of the evacuation of the Plaintiff class; and (5) liability for and quantification of punitive damages.[22]

The Court may bifurcate the case into a first trial on the common issues, and the damages of the class representatives. If Defendants win on the common liability issues, the case is over, since the entire class is bound thereby. If Plaintiffs win on one or more of the common issues,

---

[22] R. Doc. No. 105, Plaintiffs' Second Supplemental and Amended Master Class Action Complaint.

the only individual issues left to be decided in this case would be the actual quantum of damages suffered by each Plaintiff and class member. Defendants, as they do in opposing all mass tort class certifications, will surely argue that individualized proof of damages for thousands of class members will overshadow the common issues. The Fourth Circuit made short shrift of this argument in *Gunnells*:

> Third, to the extent that [Defendant] TPCM's causation argument is that individual inquiry is necessary to establish whether the collapse of the Plan caused Plaintiffs any damages, this is precisely the same argument made by almost all defendants in mass tort cases: determining damages will require an individualized inquiry. Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will *not* defeat class certification. *See Central Wesleyan,* 6 F.3d at 189; *Hill v. W. Elec. Co., Inc.,* 672 F.2d 381, 387 (4th Cir.1982) ("Bifurcation of ... class action proceedings for hearings on ... damages is now commonplace."); *Chisolm v. TranSouth Fin. Corp.,* 184 F.R.D. 556, 566 (E.D.Va.1999) (collecting cases). As one court explained, "Quantitatively, almost by definition there will always be more individual damages issues than common liability issues.... Qualitatively, however, ... liability issues" may "far exceed in complexity the more mundane individual damages issues." *In re Honda Motor Co.,* 979 F.Supp. 365, 367 (D.Md.1997); *see also In re Amer. Med. Sys., Inc.,* 75 F.3d 1069, 1080 (6th Cir.1996) (stating that commonality test is "qualitative rather than quantitative" (citation omitted)). So it is here. The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate.
>
> Moreover, the damage calculations in this case do not appear to be particularly complex, unlike the calculations in those cases in which courts have found that numerous complicated individual damage inquiries predominated over common issues. *Cf. Windham v. Am. Brands, Inc.,* 565 F.2d 59, 66-67, 72 (4th Cir.1977) (affirming denial of class certification because of overwhelming predominance of thousands of individualized damage questions). In fact, Plaintiffs' claims for punitive damages do not require *any* individualized inquiry at all because this damage calculation would be based solely on *TPCM'* s conduct.

*Gunnells*, 348 F.3d at 429.

The second paragraph in the above quote is particularly relevant to this case. Plaintiffs are not seeking damages for personal injuries, with their attendant individualized issues of preexisting conditions and alternate causation. The testimony of the Apex Fire Chief, the expert

opinion of Dr. Zegel, and the mandatory evacuation order collectively leave no doubt as to what caused members of the class to leave home in the middle of the night. The assessment of the quantum of their damages is fairly straightforward, and the jury charged with considering common issues may even award class-wide damages for certain elements of those damages, such as evacuation, inconvenience, and punitive damages. Although Defendants have pled contributory negligence and failure to mitigate damages in their answers,[23] these appear to be boilerplate defenses with no factual support at all. Are they claiming that Plaintiffs had something to do with starting the fire? Are they claiming that members of the class should have stayed in cheaper motels to mitigate their damages? Plaintiffs challenge Defendants to articulate a ***rational basis*** for those defenses in their opposition to this motion, or to drop those defenses altogether.

Equally apt is *Gunnells'* observation that plaintiffs' claims for punitive damages, as they are being asserted in this case, require no individualized inquiry at all, since that damage calculation is based solely on Defendants' misconduct.

There is a marked contrast between the simple damage issues in this case and those cases in which courts in this Circuit have found that individual issues predominate. *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 158 (4th Cir. 2001), involved products liability claims arising out of defective home siding. The Fourth Circuit held that "…under North Carolina law, the failure of a product user to follow express and adequate instructions or warnings absolutely precludes liability in a products liability action", raising individual contributory negligence issues that would bar recovery. *Id.* at 148. *Lukenas v. Bryce's Mountain Resort, Inc.,* 538 F.2d 594 (4th Cir. 1976), involved claims by land purchasers for fraudulent land sales based upon reliance on

---

[23] R. Doc 110, EQIS Answer and Affirmative Defenses to Plaintiffs' Second Supplemental and Amended Master Class Action Complaint [105] (Fifth Defense – Failure to Mitigate Damages, p. 23; Sixth Defense – Contributory Negligence, p. 23).

no fewer than six allegedly fraudulent "Statements of Record" and "Property Reports" filed by the defendant with HUD. Since the purported class members purchased their land at various times, some before any of the statements or reports were filed, the Fourth Circuit held that material variations in the representations to each plaintiff rendered the case unsuitable for class certification.[24] *Broussard v. Mieneke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), involved claims by a purported class of franchisees against a franchisor for fraudulent misrepresentation of the franchise agreements. The Fourth Circuit denied class certification based upon the fact that there were conflicts of interest among different groups of franchisees, and the fact that "plaintiffs built their breach of fiduciary duty, fraud, and negligent misrepresentation claims on the shifting evidentiary sands of individualized representations to franchisees." *See id*. Each of these distinguished cases involved discreet factual inquiries that went to the heart of an indispensable element of each and every individual plaintiff's claims.

None of those individual issues exist here. This case involves negligent acts of the Defendants resulting in a single catastrophic event, which caused uniform types of damages to the putative class. There are no individual issues of reliance, contributory negligence, or statute of limitations, as distinguished from the above-cited cases. The common issues, therefore, predominate over the rather simple issue of calculating the quantum of each class member's actual damages, which may be done, in part, on a class-wide basis. After trial on these common issues, the Court can fashion a case management plan appointing one or more special masters to quantify the actual damages suffered by each class member.

---

[24] The case at bar does not require proof of an element like reliance, which would be difficult to show in any manor except for in an individualized way.

## B.  SUPERIORITY

Rule 23(b)(3) identifies a non-exhaustive list of four factors for the Court to consider in

determining superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

### 1.  Class Members' interest in individual control

"Among the factors generally inferred to support individual litigation in such a case are a

high degree of emotional involvement, extremely large damage claims, and a desire to tailor trial

tactics to individual needs."  Newberg, *supra*, § 4:29.

The actual damages suffered by the Plaintiffs and the class are rather small in relation to

the magnitude and expense of proving the common liability issues.  In its answer to Plaintiffs'

Interrogatories,[25] EQ listed 594 individuals whose claims EQ says it has "resolved".[26]  All but

fourteen of the payments made by EQ are under $1,000.  The median amount paid was $157.08.

These are hardly amounts that a person would consider hiring a lawyer to make a claim for in an

individual lawsuit, (if indeed a lawyer could be found to take such a case).

At a status conference before Magistrate Judge Gates in this case,[27] counsel for one of the

defendants, Allworth, Inc., made a telling statement when arguing for bifurcation of class

certification discovery from merits discovery.  He said that concurrent merits discovery would

---

[25] Exhibit 30, EQIS Answer to Plaintiffs' Interrogatory No. 23; and Exhibit 31, EQIS Supplemental Answer to Plaintiffs' Interrogatory No. 23.

[26] EQ admits that it did not obtain releases from any of the 594 people, and they will remain class members for any other uncompensated damages they have suffered. See Exhibit 32, 30(b)(6) Deposition of  EQIS, Scott Maris, Vol. 2, p. 272, line 23 through p. 273, line 3.

[27] Status conference held on 31 Oct. 2007 before Magistrate Judge James Gates.

cause needless expense to the parties because, if a class is not certified, the claims are so small that no individual plaintiff would pursue the case. Counsel for Allworth gave a prime argument for class certification, by essentially admitting that class action procedure is the only way the relatively small claims resulting from this catastrophe may be vindicated.

The named plaintiffs have no emotional involvement in this litigation that is uniquely personal. All the class plaintiffs seek to obtain just compensation for themselves and the class, while they assure the defendants' accountability to the community of Apex. The unified nature of these claims indicate that there is no tactical advantage to be gained in prosecuting one class member's claim over another.

### 2. Existence of other litigation

This case is a consolidated action arising from six separate lawsuits filed in this Court and in Wake County Superior Court for the State of North Carolina. The state court cases were removed to this Court and all of the cases were consolidated. There is no other pending litigation. While the existence of other lawsuits may suggest an interest in individual litigation, that is not the case here. All of the litigation is presently before this Court in a consolidated action.

### 3. Desirability of concentrating litigation in one forum

This factor is only relevant when other litigation is commenced in other fora. Unlike a national class action in which suits may be filed in several states, this case involves a discrete incident in the state of North Carolina, involving only North Carolina class members, and applying only North Carolina law. This Court, along with North Carolina state court, is the only forum in which this case can be brought.

### 4. Manageability

"The Rule lists management difficulties as a matter to be considered when comparing the class action device to other methods of adjudicating the controversy. It is only when such difficulties make a class action less fair and efficient than some other method, such as individual interventions or consolidation of individual lawsuits, that a class action is improper." Newberg, *supra*, § 4:32. Manageability, therefore, must be examined in comparison with the alternative methods of adjudication. As the Court said in *Pruitt v. Allied Chemical Corporation*:

> The fact that the adjudication of a class action or of a series of class actions would be burdensome for the Court and jury does not preclude (b)(3) class certification, however, unless the problems of manageability in a class action are found to be greater than, or the same as, those found in other available methods of adjudicating the proposed class' claims. It is not enough simply to conclude that a class action or class actions would be difficult to control or conduct, else the Court's decision concerning class certification would be an easy one indeed. Instead, Rule 23(b)(3), in conjunction with subsections (c)(4) and (d), provides the Court flexibility to tailor class treatment of predominantly common interests where no better method is apparent.

85 F.R.D. 100, 115 (D.C. Va. 1980). It is difficult to imagine that judicial efficiency, and economies of time, effort and expense could be better achieved in the management of thousands of individual lawsuits.

Once a class is certified, a single bifurcated trial may be conducted on all of the common issues, Newberg, *supra*, § 9:53, as authorized by Rule 23(c)(4)(A) and discussed in more detail below. Judgment on the common issues will be binding on the entire class, and if favorable to the Defendants, will end the litigation. The actual damages of the class representatives may also be tried as pilot cases in the common issues trial, which in turn may be used as a benchmark in subsequent determinations of class members' damages. Newberg, *supra*, § 9:54.

After the common issues trial, the Court may adopt a trial plan, employing innovative techniques to manage the resolution of the damage claims of the class:

1. The court may replace formal discovery and strict application of the rules of evidence with less formal, but more efficient, devices, such as court-ordered proof of claim forms in lieu of any other discovery on the class members;

2. Pursuant to Rule 53(a)(1)(B) F.R.C.P., the Court may appoint one or more special masters to administer the claims of the class members, take proofs of claim, evaluate the claims, and make recommendations to the Court.   Newberg, *supra,* § 9:64.

A similar procedure was followed in a Louisiana state class action, after a common issues verdict for plaintiffs, and the court was faced with the resolution of almost 10,000 claims of class members.  *See Adams v. CSX Railroads*, 904 So.2d 12, (La. App. 4th Cir. 2004), *cert denied,* 922 So.2d 1171 (La. 2006) (copies attached hereto as Exhibit 33.)  The Court approved a streamlined procedure where a court-appointed expert would review the thousands of proof of claim forms, review the prior trial transcripts of awards made to forty trial plaintiffs, and make recommendations of awards to the Court.[28]

## III.   <u>ISSUE CERTIFICATION UNDER RULE 23(c)(4)(A)</u>

Closely tied to the issue of manageability in a Rule 23(b)(3) class action is Rule 23(c)(4)(A)'s provision that "an action may be brought and maintained as a class action with respect to particular issues."   This provision allows the bifurcation of common issues into a single trial, which is binding on the entire class.  The Fourth Circuit in *Gunnells* made a thorough analysis of Rule 23(c)(4)(A)'s relationship to the predominance and superiority concepts articulated in Rule 23(b)(3).  *See generally, Gunnells, cited infra.*  The Court said:

Additionally, precedent from our own court flatly rejects the dissent's sequential interpretation of Rule 23.   In *In re A.H. Robins,* 880 F.2d at 740, we counseled

---

[28] *See* Plaintiff Management Committee's Submission of Sample Expert Nominee and Proposed Duties, copy attached hereto as Exhibit 33.

that "courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case." We expressly recognized that *"if [an] action includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims* from other claims in the action *and certify them* under the provisions of subsection (c)(4)," provided that "each subclass must independently meet all the requirements of (a) and at least one of the categories specified in (b)." *Id.* at 728 (emphasis added). Thus, contrary to the dissent's protests in this case, we do not espouse a new rule. Rather, we follow the rule articulated in *A.H. Robins*-that subsection 23(c)(4) should be used to separate "one or more" claims that are appropriate for class treatment, provided that within that claim or claims (rather than within the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met.

*Gunnells*, 348 F.3d at 438-446, headnote 12. The Fourth Circuit also approved the liberal use of

issue certification in *Central Wesleyan College*, stating:

Along with the discretion accorded district courts, we note that this circuit has embraced the view that "the mass tort action for damages may .. be appropriate for class action either partially o[r] in whole." A.H. Robbins, 880 F.2d at 740. This court also has admonished district courts to "take full advantage of the provision in [Rule 23(c)(4)] permitting class treatment of separate issues" in order "to promote the use of the class device and to reduce the range of disputed issues" in complex litigation. *Id.*

*Central Wesleyan,* 6 F.3d at 185. The directive of the Fourth Circuit is clear: use of Rule

23(c)(4)(A) issues certification is an appropriate method to achieve economies of time, effort and

expense, and to satisfy the predominance and superiority requirements of a Rule 23(b)(3) class

action. When coupled with *Gunnells* discussion of offensive collateral estoppel,[29] bifurcation of

a common issues trial is clearly the most expeditious way to handle this litigation.

In determining whether to certify issues under Rule 23(c)(4)(A), the *Manual for Complex*

*Litigation* suggests that the Court determine whether there is a separate common issue or issues

that can be certified that "will materially advance a disposition of the litgation as a whole." *See*

Manual for Complex Litigation § 22.75 (4th Ed.); *see also Robinson v. Metro-North Commuter*

*R.R. Co.,* 267 F.3d 147, 167 n. 12 (2nd Cir. 2001). In mass tort litigation, Rule 23(c)(4)(A) issue

---

[29] See this memorandum *supra* at Sec. II.A.

classes have been used to establish liability elements such as negligence and causation. Judges

have also certified issues classes on punitive damages and class wide affirmative defenses such

as state of the art.  Manual for Complex Litigation § 22.751 (4th Ed.).  *See also Mejdrech v. Met-*

*Coil Sys. Corp.*, 319 F.3d 910, 912 (7th Cir. 2003) (identifying as common issues leakage of

contaminant by defendant and the geographical limits of the leakage); *In re Hanford Nuclear*

*Reservation Litig.,* 292 F.3d 1124 (9th Cir. 2002) (identifying general causation as potential issue

for class treatment, approving certification of Price-Anderson Act common liability issues as

issues class, and approving bifurcated trial with common issues trial followed by individual trials

of causation and damages issues); *Jenkins v. Raymark Indus.,* 782 F.2d 468, 473 (5th Cir. 1986)

(affirming certification of asbestos personal injury claimant class to resolve common liability

issues and the "state of the art" defense).

### A.  DEFINITION OF THE CLASS

Although not specifically mentioned in Rule 23, the Court must consider how to define

the proposed class.  By defining the boundaries of a class, Plaintiffs are not trying to prove, nor

must they prove, that everyone within those boundaries was damaged.  Plaintiffs need only to

establish a definable group who will be bound by any judgment of the court.  As stated in the

Manual for Complex Litigation:

> Defining the class is of critical importance because it identifies the persons (1)
> entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule
> 23(c)(2) to the "best notice practicable" in a Rule 23(b)(3) action.  The definition
> must be precise, objective, and presently ascertainable.

*Id.*, § 21.222

In this case, Plaintiffs have proposed two subclasses: (1) those who were affected by a

mandatory evacuation order, and (2) those who voluntarily evacuated.  As discussed in more

detail in the Numerosity argument, above, the membership in these two subclasses may be ascertained through objective criteria.

The proposed mandatory evacuation subclass consists of all persons or entities who or which were physically present, resided, operated businesses, owned property, or otherwise had a possessory interest in real property, on October 5-7, 2006 who had been evacuated, forced to leave, or prevented from entering their property by order of governmental authorities, as a result of the chemical release, fire, and its aftermath, at the EQ Industrial Services, Inc., hazardous waste facility in Apex, North Carolina beginning on October 5, 2006. All persons and entities located within Fire Chief Haraway's accurate description of the mandatory evacuation zone, together with the 109 nursing home residents he ordered evacuated, are easily identifiable.

The proposed voluntary evacuation subclass consists of all persons or entities who or which were physically present, resided, operated businesses, owned property, or otherwise had a possessory interest in real property, on October 5-7, 2006, outside of the mandatory evacuation zone, but within the area delimited by the maximum extent of the odor threshold of the fumes from the EQ fire, who voluntarily evacuated their property as a result of the chemical release, fire, and its aftermath, at the EQ Industrial Services, Inc., hazardous waste facility in Apex, North Carolina beginning on October 5, 2006. The outer boundary of this subclass is equally identifiable by the isopleths identified on the maps in Dr. Zegel's affidavit. By using the EPA's odor threshold to set those boundaries, an objective criterion is established to place a reasonable limitation on a prospective class member's justification for leaving home on October 5, 2006. Conversely, someone living in Cary or Chapel Hill, North Carolina on the night of October 5, who may have seen the news reports of the fire, but went outside and didn't smell the noxious odors, had no justification to evacuate, and should not be included as a member of this class.

## <u>CONCLUSION</u>

A class action is a procedural device used to accomplish significant judicial economies of time, effort and expense. Plaintiffs bring this suit as a class action because the unified adjudication of liability, causation and punitive damages will serve judicial efficiency, will reduce both Plaintiffs' and Defendants' costs, and will give all victims their day in court, instead of only the few who may have the substantial means to finance the litigation. When compared to the alternative of thousands of individual lawsuits, class certification will achieve those goals. Efficient management of the case can be accomplished by having a common issues trial, followed by a well thought out plan for assessing the damages suffered by each class member.

The usual impediments to class certification of a mass tort case are not present here. This case involves a single, short-term event affecting a discrete geographical area. There was no long-term exposure, such as the Courts have had to wrestle with in the myriad of asbestos cases in many states. In fact, no claims for personal injuries are made in this case, and the damages suffered by the class are similar. Besides the common liability issues, some of the damages may also be susceptible to adjudication on a class-wide basis.

A class should be certified with two subclasses, as set forth in Plaintiffs motion filed herewith. In addition, all common issues should be certified for trial pursuant to Rule 23(c)(4)(A).


Respectfully submitted,

**ATTORNEYS FOR PLAINTIFFS**

By: /s/ Robert E. Zaytoun_____

Robert E. Zaytoun (Class Counsel)

NC Bar No. 6942

ZAYTOUN & MILLER, PLLC

P.O. Box 307

Raleigh, NC  27602-0307

Telephone:  (919) 832-6690

Telecopier:  (919) 831-4793

rzaytoun@zaytoun-miller.com

*Liaison Counsel for Plaintiffs*


By: /s/ Henry T. Dart_____

Henry T. Dart (Class Counsel)

HENRY DART, ATTORNEYS AT LAW, P.C.

La. Bar # 4557

510 N. Jefferson Street

Covington, Louisiana 70433

PHONE: (985) 809-8093

FAX: (985) 809-8094


By: /s/ M. David Karnas_____

M. David Karnas, Esq. (Class Counsel)

AZ Bar #013728 (pro hac)

BELLOVIN & KARNAS, P.C.

131 East Broadway Boulevard

Tucson, Arizona 85701

Telephone 520-571-9700

Telecopier: 520-571-8556

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date served the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** on the Court's electronic docketing system. Prior to filing electronically, a search was made of the United States District Court for the Eastern District of North Carolina, Western Division Mailing Information for Case No. **5:06-CV-400-BR** which revealed that counsel of record are authorized to receive filing electronically from the Court. Therefore, the undersigned upon information and belief certifies that all counsel of record as noted below, will receive a copy of these papers through the Court's electronic notice system:

This, the 2nd day of January, 2008.

### ADDRESSED TO:

Frederick W. Rom, Esq.
Womble Carlye Sandridge & Rice, PLLC
P.O. Box 13069
Research Triangle Park, NC 27709
(919) 484-2300
*Liaison Counsel for Defendants.*

Steven B. Epstein, Esq.
Hunton & Williams, LLP
One Bank of America Plaza
421 Fayetteville Street, Ste. 1400
Raleigh, NC 27601
*Counsel for Defendant Allworth, Inc., and Philip Services Corp.*

Richard T. Boyette
Cranfill, Sumner & Hartzog, LLP
225 Hillsborough Street, Suite 300
Raleigh, North Carolina 27603
Phone:(919) 863-8729
Email: rtb@cshlaw.com

Stephen R. Stegich, Esq.
Michael J. Holland, Esq.
7 Times Square
New York, New York 10036
Tel: (212) 490-9100
Fax: (212) 370-4453

*Counsel for Defendant ST Mobile Aerospace Engineering, Inc.*

ZAYTOUN & MILLER, PLLC

/s/Robert E. Zaytoun
Robert E. Zaytoun
*Liaison Counsel for Plaintiffs*

# TABLE OF EXHIBITS – PLAINTIFFS' MEMORANDUM IN SUPPORT

## OF CLASS CERTIFICATION

| Exhibit Description | Memorandum Exhibit No. |
|---|---|

30(b)(6) Deposition of EQIS, by Scott Maris

Deposition Ex. 7..................................................................................................... 1

Deposition Ex. 10................................................................................................... 2

30(b)(6) Deposition of EQIS, Vol. 1, p. 101, lines 4-11; p. 104, line 20

through p. 105, line 1; and p. 109, line 9 through p. 110, line 19......................... 3

Appendix B - EPA Hazardous Waste Codes ............................................................ 4

15A N.C.A.C. 13A.0109 (1999), Standards For Owners And Operators Of

Hazardous Waste Treatment, Storage, And Disposal Facilities

[incorporating by reference CFR § 264.56 (Ex. 6) and § 264.73 (Ex. 7)]. ........... 5

40 C.F.R. 264.56 .................................................................................................... 6

40 C.F.R. 264.73 .................................................................................................... 7

Fire Chief Haraway Deposition,

Vol. 1, p. 95, lines 8-11; p. 145, line 10 through p. 146, line 5 ............................. 8

Vol. 1, p. 145, line 10 through p. 146, line 5 ........................................................ 9

Vol. 1, p. 70, line 11 through p. 71, line 13 .......................................................... 10

Vol. 1, p. 100, line 23 through p. 101, line 11....................................................... 11

Vol. 1, p. 116, line 20 through p. 117, line 22 ....................................................... 12

Fire Chief Haraway Deposition Ex. 3 ....................................................................... 13

Fire Chief Haraway Deposition,

Vol. 1, p. 101, line 17 through p. 102, line 10 ....................................................... 14

Vol. 1, p. 152, line 16 through p. 153, line 24 ....................................................... 15

Vol. 1, p. 96, line 8 through p. 97, line 21c ........................................................... 16

1

Fire Chief Haraway Deposition,

Vol. 1, p. 78, lines 7-12,  p. 96, lines 16-18, p. 99, lines 10-17 ............................ 17

Vol. 1, p. 99, line 18 through p. 100, line 5 ......................................................... 18

Affidavits of Proposed Class Representatives ............................................................ 19

Fire Chief Haraway Deposition, Vol. 1, p. 73, Depo. Ex. 3 ....................................... 20

Affidavit of Sharon Peterson, Wake County Planning Department ......................... 21

Affidavit of Lisa Sago, Wake County GIS Department .............................................. 22

Affidavit of  William Zegel Ph.D., with attachments ................................................ 23

Affidavits of Proposed Class Counsel

Robert Zaytoun, Plaintiffs' Liaison Counsel ......................................................... 24

Henry Dart, Plaintiffs' Management Committee .................................................... 25

M. David Karnas, Plaintiffs' Management Committee ......................................... 26

Roger Orlando, Plaintiffs' Management Committee ............................................. 27

J. Michael Malone, Plaintiffs' Management Committee ....................................... 28

Donald Dunn  ......................................................................................................... 29

EQIS Answer to Plaintiffs' Interrogatory No. 23 ...................................................... 30

EQIS Supplemental Answer to Plaintiffs' Interrogatory No. 23 ............................... 31

30(b)(6) Deposition of  EQIS, by Scott Maris, Vol. 2, p. 272, line 23 through
p. 273, line 3 .......................................................................................................... 32

*Adams v. CSX Railroads*, 904 So.2d 12, (La. App. 4th Cir. 2004),

*cert denied,* 922 So.2d 1171 (La. 2006) .................................................................. 33

Management Committee's Submission of Sample Expert Nominee

and Proposed Duties ............................................................................................. 34