**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| BEAULIEU, et al., | ) | No. 5 :06-CV-400-BR |
| | ) | |
| Plaintiffs, | ) | This Document Relates to ALL CASES |
| | ) | |
| v. | ) | |
| | ) | |
| EQ INDUSTRIAL SERVICES, INC., *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Defendants EQ Industrial Services, Inc. ("EQIS") and EQ Holding Company ("together, "EQ"), Allworth, Inc. ("Allworth"), and ST Mobile Aerospace Engineering, Inc. ("ST-MAE"), pursuant to the Court's Order dated May 8, 2008 (DE 187), hereby submit their consolidated Memorandum in Opposition to Plaintiffs' Motion for Class Certification.

## PREAMBLE

This case presents a classic example of class action lawyers in search of a certifiable class. In their original Complaints (most filed within 24 hours of the fire starting) and Amended Complaints, and again in this Motion for Class Certification, Plaintiffs have redefined and reshaped their proposed subclasses in a transparent effort to avoid the myriad of problems inherent in seeking certification of a class following a large-scale accident. Along the way, Plaintiffs' counsel dropped causes of action, class representatives and certain types of purported damages. Despite these efforts, Plaintiffs' own evidence, as well as written declarations signed by more than seventy (70) members of the putative subclasses, demonstrate that the subclasses proposed by Plaintiffs do not meet well-established standards for class certification.

Plaintiffs have failed to satisfy their burden on numerous grounds including: (1) proposed subclasses lack the requisite specificity; (2) proposed representative plaintiffs and their claims do not satisfy the typicality and adequacy requirements of Rule 23(a), (3) common issues do not predominate over individual issues as Rule 23(b) requires; and (4) class action treatment is not superior to other methods of handling the claims of the putative class, as Rule 23(b) requires. Plaintiffs' Motion is, therefore, without merit and should be denied.

## I. <u>Factual Statement</u>

### A. <u>Fire and Response</u>

The subject litigation arises out of a fire that started the evening of October 5, 2006, at the EQIS facility located at 1005 Investment Boulevard, Apex, North Carolina. At approximately 9:38 p.m. on Thursday, October 5, 2006, a motorist at the intersection of Investment Boulevard and Schiefflein Road in Apex reported a large cloud that smelled like chlorine. Haraway Dep. Vol. I (Ex. 2) at 61-62 and 65. The Apex Fire Department responded promptly to the scene, and after an initially unsuccessful effect to locate the source of the cloud, Apex firefighters observed a small fire, the size of two pallets, in an area referred to as "Bay 4" in the EQIS warehouse. *Id.* at 54-56 and 125-126.

The fire rapidly accelerated. Firefighters observed "fireballs" going through the metal roof of the warehouse and heard multiple explosions. Given the darkness at this time of night, explosions and the risk of injury to firefighters, Chief Haraway decided not to fight the fire until it could be assessed in daylight. Haraway Dep. Vol. II. (Ex. 3) at 42-44. Without knowing the specific chemical compounds that may have been in the cloud, and "assuming the worst," the Chief Haraway decided to advise residents within a seven block area to stay inside their homes

or to “shelter in place.” Haraway Dep. Vol. I at 78-79, 81-82, 86-87; Haraway Dep., Vol. II at 63.[1]

As the fire continued and spread smoke into the surrounding community, Chief Haraway became concerned about possible health risks associated with the smoke, (which is sometimes referred to as “the plume”*to). Based upon existing and forecasted weather conditions, particularly expected wind direction, Chief Haraway issued an evacuation “order” for a relatively confined area located to the northwest of the EQIS facility.[2] During the night of October 5 and continuing into the early morning hours of October 6, Chief Haraway expanded the evacuation area several times, based on repeated changes in wind direction forecasts and reports from emergency responders in the field. Haraway Dep. Vol. II at 58-63. By about 4:00 a.m. on October 6, the evacuation zone reached its final form, covering the triangular area generally bounded by Route 55 to the west, Route 1 to the east and Route 64 at the north, as depicted in Haraway Exhibit 3 (Ex. 4). *See also* Haraway Dep. Vol. I at 61-62.[3]

Plaintiffs refer to this area as the “mandatory evacuation zone.” As Chief Haraway noted, however, the evacuation was neither forced nor compelled. Apex residents within this evacuation area were allowed to stay if they chose. Haraway Dep. Vol. II at 81-83. Although Plaintiffs refer to the area outside the evacuation zone as the “voluntary evacuation zone,” no

---

[1] The area covered by the “shelter in place” directive was along James Street and Holleman Street up to Briarcliff Street to include Markham Street and the lower end of Shieffelin Road. Haraway Dep. Vol. I at 78-79, 81-82; *see also* Ex. 4 (map) (area marked by Chief Haraway as “SIP” for shelter-in-place). Based on review of an Apex street map, Chief Haraway may have meant Olive Street rather than Holleman Street.

[2] The initial evacuation zone was a 22-block area immediately northwest of the EQ facility, bordered by Center Street, Salem Street and Route 55. Haraway Dep. Vol. I at 73-74, 89-90.

[3] Officials notified residents of the recommended evacuation through Wake County’s reverse 911 system (where residents receive a telephone call with a recorded message), “route alerting” (a process that involves police officers canvassing neighborhoods and either going door-to-door or issuing alerts over loudspeakers) and television reports. Haraway Dep. Vol. I at 78:1-79:17; Lewis Dep. (Ex. 5) at 44-45, 52-54 and 202-205; Radford Dep. (Ex. 6) at 114 and 118-119.

such zone was designated by any authorities. Haraway Dep. Vol. II at 125:22-126:7, 137:6-138:2. The so-called "mandatory evacuation zone" and "voluntary evacuation zone" are simply terms created by Plaintiffs for purposes of this litigation.

It is important to note that authorities determined the evacuation zone by "assuming the worst case scenario." Haraway Dep. Vol. I at 86-87; Haraway Dep. Vol. II at 63; Lewis Dep. (Ex. 5) at 44-45; 52-54 and 202-205; Radford Dep. (Ex. 6) at 114:10-14, 118:15-119:14. Authorities assumed that whatever chemicals may have been in the fire, smoke or plume were harmful, and that residents should evacuate if there was any likelihood that the plume would move to their area. Radford Dep. at 114, 118-119; *see also* Haraway Dep. Vol. I at 95; Haraway Dep. Vol. II at 56-57.

The authorities established approximately 40 security check points on the outside perimeter of the evacuation zone. Haraway Dep. Vol. I at 109-111; Haraway Dep. Vol. II at 52-55. These check points were staffed by police from various local departments to control access to the area and make observations if the plume was approaching the perimeter. *Id.; see also* 139-140 and 141-143.

Chief Haraway believes that the evacuation area was sufficiently large to protect all Apex residents who were potentially at risk, because the plume did not get beyond the perimeter of evacuation zone, with one minor exception (to the west of Route 55, into a non-residential area). Haraway Dep. Vol. I at 95; Haraway Dep. Vol. II at 64-65, and 137-138.[4] Based on what he knew at the time, and what he has learned since the fire, Chief Haraway does not believe the

[4] Chief Haraway was initially concerned that the wind would shift to the west, southwest and could cause the plume to reach a nursing home located outside the evacuation zone. Haraway Dep. Vol. I at 152-55. Because of concern about the time that would be needed to evacuate the nursing home, Chief Haraway issued an evacuation order for the nursing home, but did not order evacuation of other nearby residences or businesses. *Id.*

evacuation zone should have been any larger. *Id.; see also* Deposition of Captain Bridges ("Bridges Dep.") (Ex. 7) at 100:11-22.

The Apex Fire Department allowed the fire to burn until late afternoon on Friday October 6. At that time, an industrial fire-fighting team from United States Environmental Services ("USES"), retained by EQIS, was permitted by Chief Haraway to engage the fire. Maris Dep. at 257:12-16; Haraway Dep. Vol. I at 105:24-106:10; Haraway Dep. Vol. II at 77:18-79:8. The fire was extinguished before 1:00 a.m. on Saturday October 7. Haraway Dep. Vol. II at 76:24-77:3.

Based upon comprehensive environmental testing by NCDENR and the Center for Toxicology and Environmental Health ("CTEH"), an environmental testing and consulting firm retained by EQIS, officials determined that the air quality in and around Apex was acceptable, and lifted the evacuation order on the morning of Saturday, October 7, at about 9:00 a.m. Haraway Dep. Vol. I at 113-116; Haraway Dep. Vol. II at 67-69.

**B. Number of Evacuees**

To date Plaintiffs have not documented the actual number of the Apex residents who evacuated. The various iterations of Plaintiffs' complaints have alleged that more than 17,000 people evacuated, s*ee* SAC, ¶20, an unlikely number given that the entire population of the "mandatory zone" is approximately 10,200. *See* Ex. 21 to Plaintiffs' Mem. Plaintiffs blithely claim, without factual support, that it would have been "reasonable" for at least 3,000 additional residents in the "voluntary zone" to evacuate. Plaintiffs' Mem. at 6-7.

Defendants believe Plaintiffs have significantly overstated the number of potential class members. As set forth in greater detail below, EQIS voluntarily established a program to reimburse out of pocket expenses and losses to anyone affected by the incident. *See* Maris Aff. (Ex. 9) at ¶¶ 4-7. As of March 31, 2008, EQIS and its insurer had paid 797 claims covering

reimbursement for 1,968 individuals, and 17 claims for businesses. In addition, Defendants have obtained declarations from numerous individuals residing in the so-called "mandatory zone" or "voluntary zone" who did not evacuate. *See* Ex. 10-16, 10-17, 10-22, 10-23, 10-31, 10-32 (declarants in "mandatory zone") and 11-1 through 11-12, 11-14 through 11-32 (declarants in "voluntary zone"). Therefore, the number of evacuees who have not otherwise been compensated is considerably smaller than claimed by Plaintiffs.

**C. Individual Experiences of Putative Class Members**

Discovery has revealed that the named Plaintiffs as a group had very different experiences as a result of the incident: what they observed, whether they evacuated, how long they evacuated, the circumstances of their evacuation – and how this would impact any claimed "inconvenience", whether they suffered any wage loss, whether they (or any family member) were allegedly physically harmed, and whether they have already received payments from EQIS for alleged losses arising out of the incident. These differences are further compounded by the experiences of other putative class members, as stated in their signed declarations. Many residents in both the "mandatory class" and the "voluntary class" did not observe any plume or smell by or on their property at any time. Many did not evacuate. Many have been compensated by EQIS. Others who have not been compensated, do not believe they have suffered any compensable harm. These differences are not simply academic -- they go to the very essence of Plaintiffs' claims and whether these claims meet the requirements for class certification.

While space constraints do not allow a complete litany of the different experiences of the named plaintiffs and other members of the putative class, certain examples are instructive:

### 1. **Visual Observations**

Some putative class members lived in locations where they made observations of the fire or smoke. Those living close to the EQIS facility reported witnessing the fire as it occurred. Lisa Carley, whose home was separated from EQIS only by an open field, testified she saw a "huge fireball in the sky" and "a black cloud completely over" her house. L. Carley Dep., Ex. 12 at 46-47 and 55. Others whose homes are within the "mandatory evacuation zone," but not as close to the facility, reported seeing smoke or clouds. *See e.g.*, A. Acosta Dep. at 77-85; S. Beaulieu Dep. (Ex. 13) at 35-36. Yet others living in the "mandatory" zone saw nothing at all. *See, e.g.*, Declaration of Christopher J. Ayers.[5] (Exhibit 10).

### 2. **Olfactory Observations**

Some putative class members smelled odors which they associated with the fire, while many others did not. For those smelling an odor, not all smelled the same type of odor: Ms. Acosta detected an "electrical smell." Dep. of A. Acosta (Ex. 14) at 83:5-10. Mr. Acosta smelled a chlorine smell. Dep. of G. Acosta (Ex. 15) at 57:7-9. Mr. Wilder smelled a bleach/"plasticky smell" Wilder Deposition ("Wilder Dep.") (Ex. 16) at 82:21-83:21. Ms. Beaulieu smelled a "sulfur" smell. Dep. of S. Beaulieu Dep. (Ex. 13) at 36:1-36:9. Other putative "mandatory" class members did not smell anything at their property. *See, e.g.*, Betsy Borden Dep. at 58; *see* Cooke Declarations ¶4 (Ex. 10-13, 10-14)[6]. Similarly, at least 15 members of the putative "voluntary" class did not smell any odor. *See, e.g*. Wilcut Declaration (Ex. 11-32), ¶ 4.[7]

---

[5] For a complete list of declarants from the "mandatory zone" who saw nothing at all, *see* Ex. 10-39.

[6] For a complete list of declarants from the "mandatory zone" who did not smell anything at their property, *see* Ex. 10-39.

[7] For a complete list of declarants from the "voluntary" class who did not smell anything, *see* Ex. 11-33.

### 3. Impact on Property

While some class members claim that the smoke plume or cloud touched their property, such as Ms. Beaulieu and Ms. Carley, other named plaintiffs in the mandatory zone never saw smoke on their property, including Ms. Borden, Mr. Carley and Mr. Wilder.[8] Numerous other putative members of both the "mandatory" class and the "voluntary" class did not observe any smoke, particulates or toxins on their properties. *See e.g.* Decl. D. Bryant (Ex. 10-11), ¶ 6.[9]

### 4. Evacuation

Residents within both the "mandatory" and "voluntary" zones had very different evacuation experiences.

#### a. Mandatory Class.

Some putative members chose not to evacuate, including Mr. Ferguson, Mr. and Mrs. Nielson, Mr. and Mrs. Gray, Mr. and Mrs. Juris. *See* Exs. 10-16, 10-31, 10-32, 10-17, 10-18, 10-22. Two proposed representatives of the "mandatory" evacuation were outside the evacuation zone when the order issued – Michael Borden and Clifford "Randy" Wilder. Dep. of M. Borden (Ex. 17) at 57-58, 70-71; Dep. of C. Wilder (Ex. 19) at 39-41.

Several individuals evacuated prior to receiving notice of an evacuation order - Mr. and Mrs. Acosta and Ms. Carley. Dep. of A. Acosta (Ex. 14) 80-85; Dep. of G. Acosta (Ex.15) at 59-63; Dep. of L. Carley (Ex. 12 ) at 49-52 and 64-66. Some "mandatory" class members evacuated to friends or family and incurred no housing expenses - Ms. Beaulieu, Mr. and Mrs. Hatzidakas and Mrs. Borden. S. Beaulieu Dep. (Ex. 13) at 39-40; Hatzidakis Dep. (Ex. 20) at 40-42; 188-194; B. Borden Dep. (Ex. 17) at 66-68; M. Borden Dep. (Ex. 18) at 57-58 and 70-71; *see also* ¶3 of

[8] Dep. of S. Beaulieu (Ex. 13) at 35:24-36:15; L. Carley (Ex. 12) at 49:24-50:3; B. Borden (Ex. 17) at 78:7-19; T. Carley (Ex. 28) at 74:17-74:23; C.R. Wilder (Ex. 19) at 86:10-15.

[9] For a complete list of declarants from the "mandatory" and "voluntary" classes who did not see any smoke, particulates or toxics on their properties. *See* Ex. 10-39 and 11-33.

Exs. 10-1 through 10-4, 10-9, 10-10, 10-13, 10-14, 10-15, 10-20, 10-21, 10-24, 10-26, 10-29, 10-30, 10-35 and 10-36. Other "mandatory" class members evacuated to hotels, and have already sought and received full reimbursement from EQIS for such expenses. *See* Exs. 10-5 through 10-8, 10-11, 10-12, 10-27, 10-28, 10-33, 10-34 and 10-37.

Some putative "mandatory" class members returned to their residences on different days. Mr. and Mrs. Borden returned home the evening of Friday, October 6, while the "mandatory" evacuation was still in effect. Dep. of B. Borden (Ex. 17) at 68, 74-77; Dep. of M. Borden (Ex. 18) at 113-114. Some such as Mr. and Mrs. Acosta did not return until the following day, Sunday, October 8, despite the fact that the evacuation had ended a day earlier. Dep. of G. Acosta (Ex. 15) at 85-87; Dep. of A. Acosta (Ex. 14) at 100-101.

**b. <u>Voluntary Class</u>**

The same differences exist in the so-called "voluntary evacuation subclass." According to Plaintiffs, a person is a member of the voluntary evacuation subclass if "[he or she] could smell the noxious odor" and decided to evacuate as a result. Plaintiffs' Mem. at 7. Yet, Nancy Hackney -- the sole named representative of this proposed subclass -- does not even fall within its definition. Moreover, her experience is undoubtedly different from many putative "voluntary" class members.

First, Mrs. Hackney decided to evacuate her home on the night of the fire because she mistakenly thought she was required to do so, not because she smelled "noxious odors." Hackney Dep. at 40-41. Second Mrs. Hackney spent the initial twelve hours of her "evacuation" at the hospital with her husband, who was admitted after experiencing breathing difficulty. She then stayed in a hotel with her son until Sunday, October 8. *Id.* at 25-39. Mrs. Hackney testified

that she did not return to her home until October 8 because she "had not heard [Apex officials] were letting people back in" their homes. *Id*. at 39.

**5. Wage Loss.**

Plaintiffs argue that ***all*** class members incurred "uniform types of damages, including "lost wages." Plaintiffs' Mem. at 3, 18. Importantly, however, Lisa Carley and Nancy Hackney are the only named class representatives seeking lost wages. N. Hackney Dep. at 51; Plaintiff Lisa Carley's Supplemental Response to Defendant Allworth, Inc.'s First Set of Interrogatories and Request for Production, Interrogatory No. 4. (Ex 22) Some named Plaintiffs were not employed at the time of the fire and suffered no wage loss, such as Ms. Beaulieu, while others were able to attend work, such as Mrs. Borden. Dep. of S. Beaulieu at 19; Dep. of B. Borden at 68. Still other residents experienced a wage loss, but sought and obtained compensation for EQIS. Dep. of N. Hackney (Ex. 21) at 38-39, 49-50.

**6. Personal Injury.**

Some putative class members believe they may have personal injury claims arising out of the incident. Levie Hackney, spouse of Nancy Hackney and a putative "voluntary" class member, went outside to evacuate when he smelled "something funny," did not feel well and returned to his house. He passed out and ultimately was taken by ambulance to Western Wake Hospital where he remained for several days for treatment for respiratory distress. Dep. of L. Hackney (Ex. 25) at 25-26; 38. Mr. Hackney testified that he wants to be compensated for any injury that he sustained from this incident. L. Hackney Dep. (Ex. 25) at 56. Mrs. Hackney, although a proposed class representative who should know otherwise, testified that she thought this pending lawsuit included her husband's personal injury claim. N. Hackney Dep. (Ex. 21), at 49, 70, 74.

In addition to the Hackneys, Plaintiff Michael Borden testified his wife Betsy has ongoing respiratory problems which he attributes to the fire Michael Borden Dep. (Ex 18) at 222 and 237. Further, the Acostas testified that, upon returning home after the evacuation, they experienced eye irritation and allergy symptoms for several days, as well as an itchy sensation when sitting on their upholstered furniture -- problems they attribute to chlorine exposure. A. Acosta Dep. (Ex 14) at 103-106, 109-26, 231-34; G. Acosta Dep. (Ex 15) at 81-93. Although Mrs. Acosta expressed concern that she and her husband suffered a personal injury, she was not included in the decision to drop the personal injury claims from this lawsuit. A. Acosta Dep. (Ex 14) at 220-27.

**7. <u>Inconvenience Damages</u>.**

According to Plaintiffs, all putative class members experienced "inconvenience" for which they are entitled to compensation. SAC. ¶¶ 42-52, 58-133. However, Plaintiffs' own testimony, as well as the declarations of putative class members, demonstrate that "inconvenience" is not an "across-the-board" issue that can be proven through the testimony of the named Plaintiffs.

While various named Plaintiffs testified at great length about their alleged inconvenience, numerous putative class members did not share such concerns. Numerous class members stated in their declarations that they viewed the fire and the evacuation as a "minor inconvenience similar to other inconveniences [they] recognize are unavoidable" in a "crowded and busy community" such as Apex. *See* Ex. 10-1 and 10-2; *see also* 10-3, 10-4, 10-13, 10-14, 10-15, 10-19, 10-20, 10-21, 10-29, 10-3. These individualized reactions of the putative class members are not surprising. As acknowledged by named Plaintiff Randy Wilder, each person reacted to the fire and was affected by it in his or her own way. As he stated, "We all deal with things

differently." R. Wilder Dep. (Ex. 19) at 189. Indeed Plaintiff Tim Carley was quoted in a report on the WRAL website on October 7, 2006 as saying "We just treated it like we were camping. And the only person stressed out was our dog."[10]

**D. Environmental Testing**.

The environmental testing and consulting firm, CTEH conducted extensive environmental testing in Apex starting at approximately 6:15 a.m. on Friday, October 6, 2006 and continuing through October 27, 2006. More than 1.3 million readings were taken, and none of the readings revealed a sustained level of chemicals or combustion products outside the immediate vicinity of the EQIS property. See Nony Affidavit (Ex. 8), ¶ 9, 13.

NCDENR also performed extensive testing in Apex including air monitoring, exterior "wipe samples", offsite interior "wipe samples", mercury vapor testing, soil samples and water samples. NCDENR concluded that the absence of offsite contamination indicated there were no long-term health effects associated with the fire. As stated in a NCDENR press release on November 17, 2006 (Exhibit 27):

> What we were looking for was any indication that homes or businesses might have been contaminated with heavy metals or other chemicals from the fire that would present a health risk to Apex citizens . . . . We didn't find that. We found the kind of thing you would find at low levels in any urban area.

## II. Procedural Posture

### A. Plaintiffs' Claims

Four groups of plaintiffs rushed to the courthouse to file their lawsuits on October 6, 2006, before the fire at the EQ facility was extinguished, and well before the extensive

[10] *See* WRAL webpage article, October 7, 2006, Ex. 26 at p. 2.

environmental testing was completed.[11] With the exception of the *Bullock* matter, each of these lawsuits was filed as a proposed class action.

The original Complaints asserted a broad range of legal theories, including negligence, strict liability, trespass, private nuisance, public nuisance, personal injury claims *(Shapiro)*, establishment of a medical monitoring program *(Beaulieu* and *Shapiro)*, injunctive relief *(Borden)*, loss in value of property *(Borden)*, and punitive damages (all). The Complaints sought various proposed subclasses including: (1) a property evacuation subclass; (2) a property devaluation class; (3) a property damage subclass; (4) a business/economic loss subclass; (5) a medical monitoring subclass; and (6) a personal injury subclass. *Id*.

After the Court consolidated the five cases for pretrial proceedings, DE 31 (June 20, 2007), Plaintiffs filed a Master Supplemental and Amended Class Action Complaint on July 2, 2007 ("MAC"). DE 32. In the MAC, Plaintiffs dropped their personal injury claims, request for injunctive relief and medical monitoring claims. Plaintiffs conceded that they dropped the personal injury claims to avoid problems with class certification.[12] The MAC proposed five subclasses (1) a "mandatory evacuation subclass;" (2) a "voluntary evacuation subclass;" (3) a "loss of use subclass" for those who lost the use of their home; (4) an "economic loss subclass" for those who lost wages and profits as a result of the fire; and (5) a "real property damage subclass" for those who suffered property damage, including expenses for cleaning and repair

---

[11] *See* Case 5:06-cv-00400-BR (Beaulieu) (filed Oct. 6, 2006); Case No. 5:06-cv-00406-BR (Shapiro) (filed Oct. 6, 2006); Case No. 5:06-CV-471-BR (Bullock) (filed in Wake County on Oct. 6, 2006 and removed on Nov. 10, 2006, and dismissed with prejudice on Jan. 30, 2008, DE 162); Case No.: 5:06-CV-472-BR (Borden) (filed in Wake County on Oct. 6, 2006 and removed on Nov. 13, 2006); Case No. 5:06-cv-00408-BR (Carley) was filed Oct. 10, 2006.

[12] *See* Memorandum in Support of Plaintiffs' Rule 26(f) Report (DE 85) at 6 ("[C]lass claims for personal injuries present individual issues, such as pre-existing conditions and specific causation issues, which may predominate over the common ones." *See also* Plaintiffs' Mem. at 6 ("Plaintiffs are not seeking damages for personal injuries, with their attendant individualized issues of preexisting conditions and alternate causation.").

and/or whose property suffered an environmental impact. *Id*. at ¶ 42 (a-e). The MAC sought monetary damages for expenses of evacuating or sheltering, inconvenience, loss of use of home, lost wages, lost profits, real property damage (including cleaning and repair costs), expenses to assess the environmental impact of the fire, attorneys fees, costs, and interest. *Id*. It also added new defendants Allworth, Inc., Philip Services Corporation, and ST Mobile Aerospace Engineering, Inc. *Id*. at ¶¶ 13-15.

Plaintiffs' filed the SAC on October 15, 2007, DE 105. It changed both the class definition and the relief sought. Plaintiffs narrowed their proposed class definition to include (1) a "mandatory evacuation subclass" consisting of all persons and businesses who had been evacuated/forced to leave their property; (2) a "voluntary evacuation subclass" consisting of all persons and businesses who voluntarily evacuated their property; and (3) a "shelter in place subclass" consisting of all persons and businesses who voluntarily sheltered in place. *Id*. at ¶ 42 (a-c). The SAC abandoned the proposed "property damage" class. Plaintiffs amended their damage claims to include mental anguish and incidental and consequential damages, and to drop real property damage and expenses to assess environmental impact. *Id*. Plaintiffs' SAC also dropped four Plaintiffs who had been named in the MAC[13] and added four new Plaintiffs.[14] *Id*. at ¶ 7. The SAC is the Complaint now before the Court.[15]

---

[13] (Jennifer Shapiro, Patsy Martinez, BB&J Services d/b/a Em R Wings, and Donna Thompson).

[14] (Randy Wilder, Anne Acosta, George Acosta and Hatzidakis, LLC d/b/a Xios Restaurant).

[15] Although not relevant to the Motion for Class Certification, Plaintiffs moved for leave to file a Third Supplemental and Master Class Action Complaint on December 3, 2007 ("TAC"). DE 123. The Court has not ruled on this Motion. In that proposed pleading, Plaintiffs again seek to change the class definition. The TAC re-defined the "mandatory evacuation subclass" to include those individuals or businesses whose person or property had been "touched or physically invaded by smoke, particulates, and airborne toxins from the fire and as a result were forced to leave their property or were prevented from accessing their property." *Id*., ¶ 39(a) (emphasis added). Plaintiffs also changed the "voluntary evacuation subclass" to include only those persons or businesses who "had their persons and property touched or physically invaded by smoke and airborne toxins from the fire and as a result voluntarily evacuated their property." *Id*., ¶ 39(b) (emphasis added). Plaintiffs' TAC also dropped several named

On April 28, 2008, The Honorable W. Earl Britt entered an Order (1) dismissing PSC; (2) dismissing the strict liability, *res ipsa loquitur*, trespass and nuisance claims against Allworth and MAE and (3) determining the Plaintiffs cannot recover damages for mental anguish. DE 181

**B. Motion for Class Certification**

In the Motion for Class Certification, Plaintiffs again re-define the proposed classes. Plaintiffs' current class definition is as follows:

> (1) A "**mandatory evacuation subclass**," including all persons or entities who were physically present, resided, operated businesses, owned property, or otherwise had a possessory interest in real property, on October 5-7, 2006, within the geographic boundaries depicted on Plaintiffs' Ex. 1 who had been evacuated, forced to leave, or prevented from entering their property by order of governmental authorities as a result of the chemical release, fire, and its aftermath.
>
> (2) A "**voluntary evacuation subclass**" consisting of all persons or entities who were physically present, resided, operated businesses, owned property, or otherwise had a possessory interest in real property, on October 5-7, 2006, outside of the boundaries depicted on Plaintiffs' Ex. 1, but within the area delimited by the maximum extent of the **odor threshold** of the fumes from the EQ fire, who voluntarily evacuated their property as a result of the chemical release, fire, and its aftermath.

Plaintiffs' Mem. at 1-2 (*emphasis added*). As a review of the referenced exhibit reveals, the geographic scope of the proposed "mandatory evacuation" subclass is co-extensive with the area of the evacuation announced by Apex officials. The geographic scope of Plaintiffs' "voluntary evacuation" subclass, however, is outside of the evacuation area set by Apex officials, and by definition comprised of areas that Apex emergency officials believed were not at risk and did not need to be evacuated. Haraway Dep., Vol. II (Ex. 3) at 137-138. As stated in Plaintiffs' Memorandum: "[T]he size and constituency of the voluntary evacuation subclass is defined by

---

Plaintiffs, including Levie Hackney, Jr., Dennis Mahaffey, Irene Mahaffey, Kyriakos Hatzidakis and Timothy Carley. DE 123.

the plume model run by William Zegel Ph.D." Plaintiffs' Mem. at 6; *See also* Plaintiffs' Mem. at 25. The basic methodology employed by Dr. Zegel is described as follows:

> Dr. Zegel employed the AERMOD computer program… The model…dispersed the plume from the fire out to a point where the limit of maximum chemical concentrations equaled the minimum threshold for human senses. This threshold was chosen to establish an objective standard for voluntary evacuation, (i.e., if you could smell the noxious odor it was reasonable to leave).

Plaintiffs' Mem. at 6-7. Despite Plaintiffs' efforts to make Dr. Zegel's opinions appear scientific and reasonable, his analysis is rife with serious flaws, rendering it useless as a basis to define a "voluntary" subclass.

**1. <u>Dr. Zegel's Analysis</u>**

Using computer modeling, Dr. Zegel sought to determine and depict the extent and concentration of the plume for certain categories of chemicals/materials. Plaintiffs' Mem. at 6. The area of the plume as determined by Dr. Zegel, is depicted in what he referred to as Figure 3 (revised), Ex. 31 hereto, which is entitled "Dispersion of Polycyclic Aromatic Hydrocarbons released over the first 24 hours of the EQNC Fire Incident." Zegel Dep. (Ex. 30) at 350; Ex. 31. In order to generate this model, Dr. Zegel had to add information (inputs) into the computer program, such as weather conditions (wind direction and speed), of the amount of material being released, temperature of the materials released, etc. Zegel Dep. at 128-131, 254-256.

According to Dr. Zegel, Exhibit 31 depicts the plume for chemicals known as PAHs (Polycyclic Aromatic Hydrocarbons) which are recognized combustion by-products of petroleum fuel.[16] Zegel Aff. at p. 10, ¶6; Ex. 30 at 368. However, in determining the odor threshold limits for the PAHs, Dr. Zegel utilized a different chemical, acrolein (which is not a PAH). Zegel Dep.

[16] Dr. Zegel acknowledged that his computer model revealed that there were areas within both the "voluntary" and "mandatory" zones where the plume had not reached the minimum human odor threshold. Zegel Dep. at 262 and 364-366.

at 350, 368-371.  Although not in his report, Dr. Zegel testified that the PAH plume, based upon the odor threshold for acrolein, was comparable to the plume spread and odor threshold for other chemicals -- chlorine and hydrochloric acid.  Zegel Dep. at 368-371

Exhibit 31 merely shows the highest average PAH plume concentration for each location within the plume for a one-hour time period for the 24 hours modeled.  Therefore, Exhibit 31 does not depict the same hour for each location in the plume, just the highest one-hour average concentration for each location within the plume.  The different colors of the plume on Ex. 31 depict different concentration levels, with most of the plume just barely above the minimum odor threshold (as alleged by Dr. Zegel).  Zegel Dep. at 359-364.

Even though Plaintiffs contend that everyone within the plume in the "voluntary zone" could be treated the same because each could smell the plume, Dr. Zegel acknowledged in his deposition that whether a person could actually smell the plume was dependent on numerous individual factors including: whether the person has "adequate nose capacity," (Zegel Dep. at 391-392); whether he is indoors or outdoors (*id*. at 392); whether awake or asleep (*id*. at 392-393); and, if the person is indoors, whether the house was tightly sealed from outdoor air.  *Id*. at 413-414.  Dr. Zegel further testified that whether someone would actually smell the plume was based on individual circumstances:

> Q.:    . . . so you would need to know when the highest average was and how long it lasted in order to determine whether the sensory perception level of the person has been reached or exceeded?
>
> A.:    We would have to know the condition of each of the individuals in question, as to where they were, what their condition was at various times in order to know whether they might have been able to sense it or not.

Zegel Dep. at 415.

### 2. <u>Flaws in Dr. Zegel's Analysis</u>

In the interest of brevity, Defendants will focus only on some of the more egregious deficiencies in Dr. Zegel's analysis.

First, Dr. Zegel's basic methodology is flawed. Smell is not a recognized parameter for setting evacuation boundaries and therefore is not a valid scientific method for determining the area of an evacuation. *See* Nony Affidavit (Ex. 8), ¶ 32. Further, the sense of smell is highly variable from one individual to another. Smell varies by age, gender and smoking status. *Id*. at ¶ 25. Even if individuals had the same ability to smell an odor, their individual experience or actions can impact whether they can actually smell the odor (i.e., activities engaged in during exposure, time indoors or outdoors, etc.). *Id.* at ¶27 and 28.

Second, Dr. Zegel utilized incorrect data in his analysis. Although Dr. Zegel asserted that the odor threshold for acrolein is 70 micrograms per cubic meter, *see* Zegel Aff., p. 10, ¶6, the actual accepted threshold is 370 micrograms per cubic meter. Drivas Affidavit, ¶ 29; Nony Aff., ¶ 37. If the correct standard had been used in his modeling, there would be no plume exceeding the human smell threshold. Drivas Aff., ¶ 29. Even if the incorrect standard of 70 micrograms/parameter was used in the program, the plume area exceeding the human odor threshold would be much smaller than Dr. Zegel depicted in Ex. 31 and would cover only a small portion of the "mandatory" zone, as shown in Figure 6 in Drivas' Affidavit. *Id*. at ¶30.

In addition, Dr. Zegel used an "area source" designation with his computer model. As noted in Dr. Drivas' Affidavit, this setting prevents the model from taking into account the significant plume rise resulting from fire heat. Drivas Aff. at ¶32. By correcting this improper input, the plume model is dramatically reduced, as depicted in Figure 7 in the Drivas Affidavit,

such that the plume does not get outside the "mandatory" zone and only covers a small portion of that zone. *Id.* ¶33, 34.

Third, Dr. Zegel failed to conduct a "reality check" for his computer model. Zegel Dep. at 358-359. His conclusion that a plume extended miles to the north and southwest beyond the actual evacuation zone (*see* Ex. 31) does not match up with testimony of the responding authorities that the plume did not get beyond the "mandatory" zone.[17] *See* Sec. I-A, *supra.*

Fourth, the plume model generated by Dr. Zegel (Ex. 31) is the result of substantial, unexplained manipulation of the computer model. After his deposition, Dr. Zegel provided Defendants with the actual data he input to the computer program used to create Figure 3 (revised). Using those same inputs, Defendants' expert ran the same program but generated a plume model that is dramatically different than Dr. Zegel's. *See* Figure 5 in Drivas Affidavit (Ex. 29), ¶ 27. Dr. Drivas's computer model (based on Dr. Zegel's inputs) **does not show any plume** reaching the eastern half of the "mandatory" evacuation zone. Further, although Exhibit 31 shows the plume going 3 miles to the southeast of the EQIS facility, Dr. Zegel had only provided data up to 1.8 miles. Therefore, there was no supporting data for last 1.2 miles of the plume, and therefore no basis for a 3-mile plume on Exhibit 31.

Based upon the many flaws in Dr. Zegel's analysis,[18] defense experts have concluded that his analysis has "no validity in representing maximum plume concentrations or specific areas affected by the EQ fire," Drivas Aff., ¶38, and his models "are broadly inconsistent with the

[17] The computer model also is contradicted by the statements made by many declarants that they never saw or smelled any plume or odors on their properties. *See, e.g.,* Exs. 10-39 and 11-33.

[18] Defendants reserve the right to move to exclude the proposed expert opinions of Dr. Zegel for the Class Certification Motion.

reality of the EQIS incident and should not be relied upon to assess the impacts of the EQIS incident on the residents of Apex." Nony Aff., ¶46.

## III. Argument

### **PLAINTIFFS HAVE NOT MET THEIR BURDEN FOR CLASS CERTIFICATION UNDER FED. R. CIV. P. 23**

### A. **Rule 23 Requirements and Burden**

The class action device is an exception to the general rule that a party in federal court may vindicate only his own interests. *Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d 311, 318 (4th Cir. 2006). Federal courts may adjudicate the rights of putative class members only upon certification of that class under Rule 23 of the Federal Rules of Civil Procedure, which involves a two-part inquiry. *Partington v. Am. Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 340 (4th Cir. 2006). A party seeking certification must first demonstrate that he has met the four prerequisites provided in Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation. *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). If all four prerequisites of Rule 23(a) are met, the moving party also carries the burden to show that the class action is maintainable under the requirements of Rule 23(b) – predominance and superiority. *Id.* at 146.

In determining the propriety of class certification, the court "must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." *Thorn*, 445 F.3d at 319. *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976) As the Fourth Circuit has noted, "[s]uch findings can be necessary even if the issues tend to overlap into the merits of the underlying case." *Thorn*, 445 F.3d at 319; *see also Falcon*, 457 U.S. at 160-61 ("district courts must conduct a rigorous analysis to ensure compliance with Rule 23, paying careful attention to the requirements of that Rule"); *See also Rodger v. Electronic Data Sys. Corp.*, 160 F.R.D. 532, 535 (E.D.N.C. 1995) (the Rule 23

requirements "are mandatory and the failure to establish just one bars class certification"). Thus, "the relevant question in considering a certification motion is not whether the defendant has shown certification is improper, but whether the plaintiff has shown certification is proper." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 326 n.18 (4th Cir. 2006).

### B. PLAINTIFFS' DEFINITIONS OF PROPOSED SUBCLASSES ARE NOT SUFFICIENTLY PRECISE TO PERMIT CERTIFICATION

The definition of the class or subclass "is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action. The definition must be ***precise***, ***objective***, and ***presently ascertainable***." *Manual for Complex Litigation (Fourth)* § 21.222 at 270 (emphasis added). Rule 23(b)(3) requires a class or subclass definition which "will permit identification of individual class members," to allow for proper notice so that those wishing to opt out may do so without being bound to a final judgment. *Id.* It is imperative that the plaintiffs' description of the class or subclass be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1760 (2d ed. 1986 & Supp. 2007). "Courts have declined to certify a class where the proposed definition would not enable identification of class members short of individual fact-finding." *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 662 (S.D. Ala. 2005).

Plaintiffs' proposed definitions do not sufficiently permit the identification of members of their proposed subclasses. As is evident from the declarations submitted by Defendants, numerous individuals who resided in the "mandatory evacuation zone" ***did not evacuate***. (*See* Nielsen Decls. ¶ 3; Ferguson Decl; ¶ 3; Gray Decls. ¶ 3, Exs. 10-31, 10-32, 10-16, 10-17, 10-18). Thus, it is not possible to determine membership in the "mandatory evacuation" subclass simply by

determining whether putative class members lived within the area depicted by Exhibit 1 to the SAC. This problem is even more acute with respect to the "voluntary evacuation" subclass. Defendants have submitted 31 declarations of Apex residents who reside within Dr. Zegel's "voluntary evacuation zone" who did not evacuate as the result of the fire. (*See, e.g.*, Andrews Decl. ¶ 3, Magee Decls. ¶ 3; Moncol Decls. ¶ 3; Teachout Decls. ¶ 3). These problems are compounded by the nature of Dr. Zegel's definition of the voluntary class – one based on the ability to smell odors, which is subjective at best and dependent upon multiple individual factors. If a class notice were sent to all residents of Dr. Zegel's "voluntary evacuation zone," a majority or significant plurality would not even be members of the voluntary evacuation subclass. Consequently, it is not ***presently ascertainable*** which Apex residents are members of either the proposed mandatory or voluntary evacuation subclasses.

If class notice were to be sent to all residents in the area depicted by Exhibit 1, and all residents depicted by Dr. Zegel's "voluntary evacuation zone," residents who are not members of these subclasses would be advised of rights not applicable to them and how to respond for a class to which they do not belong. Moreover, and more significantly, at the conclusion of this case, it will not be possible for Plaintiffs, Defendants, or the Court to determine which Apex residents are bound by the judgment in this case -- as the failure of Apex residents to opt out would not bind them to a judgment if in fact they were never members of the class in the first place. Hence, one of the inherent goals of a class action -- determining with finality the identity of all persons bound by a class action judgment -- would not be achieved.

Furthermore, the very notion of who "evacuated" or was "forced to leave" as a result of the EQ fire is at best ***imprecise***. Businesses, who are included in both proposed subclasses, are legal fictions who cannot "evacuate" or be "forced to leave" property. What Plaintiffs mean by

"forced to leave" is ambiguous and amorphous. Even the concept of "evacuation" is prone to many possible meanings which would be subject to individualized judicial determinations. For instance, Defendants have submitted four declarations of Apex residents who had prior arrangements to travel out of town October 6, 2006 and did so, just as they had planned. (Juris Decls. ¶ 3; Dismukes Decls. ¶ 3.) Under Plaintiffs' subclass definitions, would these residents be considered to have "evacuated" and therefore be part of the class? Would residents within the "voluntary evacuation zone," who decided to leave their homes when they saw news of the fire, but came back hours -- or minutes -- after ensuring it was safe to do so, be considered part of the class? The list of permutations is endless. For this reason, determination of which Apex residents may be considered part of each subclass will require individualized, and in many instances, ***subjective*** analysis.[19]

In this regard, this case is very similar to the recently decided case of *Cuming v. South Carolina Lottery Commission*, 2008 WL 906705 (D.S.C. March 31, 2008). In that case, Plaintiffs sought to certify a class defined as "all individuals who purchased South Carolina Education Lottery instant scratch-off tickets offering a chance to win top prizes that at the time of sale were no longer available." *Id.* at *2. The district court concluded the this definition was not "sufficiently definite," *id.* at *3, and that the class could not be certified:

> To become a member of the class, prospective members would have to show that they purchased … instant scratch-off tickets that offered the chance to win top prizes that were no longer available at the time of sale. In order to determine which of these individuals has standing to sue, the court would have to conduct potentially thousands of individualized inquiries to determine whether the ticket had been purchased after the top prize had been awarded. This is exactly the type of "extensive factual inquiry" that courts have held to be too administratively burdensome to warrant class certification.

[19] This is also confirmed by Dr. Zegel's testimony that in order to know who actually smelled the supposed plume, one would need to know where they were, what they were doing etc. Zegel Dep. 391-393; 413-415.

*Id.* at *3. As is demonstrated above, determination of membership in the mandatory and voluntary evacuation subclasses here would require similar individualized factual inquiries resulting in similar administrative burdens. For this reason alone, Plaintiffs' proposed subclasses should not be certified.

Finally, Plaintiffs' proposed subclasses include many residents that evacuated who believe they suffered no compensable harm. Defendants have submitted declarations of numerous residents who stayed with family or friends, or who stayed at hotels but were then fully compensated by EQ, or who have sworn that they suffered no compensable harm even though they evacuated their homes. (*See, e.g.*, Ayers Decls. ¶ 6; Cooke Decls. ¶ 6; Jessup Decls. ¶ 6; Hynus Decl. ¶ 6; Barnes Decls. ¶ 7; Brantley Decls. ¶ 7; Marshall Decls. ¶ 7). The same Article III standing concerns raised in *Conigliaro v. Norwegian Cruise Line Ltd.*, Case No. 05-21584-CIV, (S.D. Fla. Sept. 1, 2006) therefore exist here. As the district judge there observed:

> Importantly, as evidenced by the affidavits of the non-suing passengers, some passengers explicitly reject the contention that they suffered any injury aboard the ***Norwegian Dawn***. Accordingly, a class definition that encompassed all passengers would contain members lacking an injury-in-fact, and consequently, Article III standing. This problem cannot be rectified by relying on individual passengers to 'opt out' of the class if they did not suffer an injury. It was Plaintiffs' burden to propose a class definition that was precise, objective, and presently ascertainable, and not amorphous or overbroad. For the many reasons stated above, Plaintiffs have failed to meet that burden.

*Slip op.* at 11-12 (citations omitted).

In summary, Plaintiffs have failed to define subclasses that readily permit identification of class members without requiring the parties and Court to engage in extensive individualized factual inquiries. Their proposed definitions also necessarily include individuals who suffered no compensable harm and therefore would lack Article III standing to pursue this case. *See*

*Taylor v. XM Satellite Radio, Inc.*, 533 F.Supp.2d 1151, 1154 (N.D. Ala. 2007) (dismissing putative class action for failing to present a case or controversy under Article III, where satellite radio provider voluntarily offered to credit satellite radio users' accounts for two days of service, after satellite signal was interrupted for one day; "the court can afford no more relief than that already offered" by defendant). Certification of Plaintiffs' proposed subclasses would therefore entail significant administrative burdens to segregate those who should be able to participate in this action from those who should not, at the risk of binding individuals and businesses to a judgment even though they are not and never were members of the proposed class. For these reasons, certification should be denied.

**C. PLAINTIFFS CANNOT ESTABLISH TYPICALITY, ADEQUACY OF REPRESENTATION, PREDOMINANCE OR SUPERIORITY**

**1. Plaintiffs Have Failed to Establish Typicality.**

The typicality requirement of Rule 23(a) assures that "the claims of the class representatives are similar to those of the class, so that the representatives will adequately represent the class." *Bradford v. Union Pacific R.R. Co.*, 2007 WL 2893650 (W.D. Ark. Sept. 28, 2007) (Ex. 33). "[O]nly those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id*. at 340.

Courts in similar circumstances have denied class certification based in part on concerns about differences between putative class representatives and other members of the class they seek to represent. *See, e.g.*, *Bradford*, 2007 WL 2893650; *Turnage v. Norfolk Southern Corp.*, 2005 WL 2387728 (E.D. Tenn. Sept. 28, 2005) (Ex. 34). *Bradford*, for example, arose from the 19-hour evacuation of residents and businesses after two freight trains collided, releasing

compressed flammable gas that exploded and caused a series of fires and a large, black smoke plume. *Id*. at *1. Plaintiffs sought to certify several subclasses, including an "evacuation subclass" and a "business/economic loss subclass." *Id*. at *12, 14. The court refused to certify the proposed subclasses, based in part on the fact that representative plaintiffs' claims were not typical of the class they sought to represent. One proposed representative of the evacuation subclass, for example, left her home only 30 minutes earlier than her normal practice in response to the evacuation. Another elected not to return home when the evacuation order was lifted. *Id.* at *15. The court held that these experienced were not typical. *Id*. at *15. Similarly, the proposed representative of the business/economic loss subclass had planned only limited hours of operation on the day of the evacuation - not typical of "those businesses with regular Saturday business hours." *Id*. at *13.[20]

*Turnage* also involved a train derailment and resulting smoke plume, which prompted officials to evacuate residents within 1.3 miles of the derailment site and to suggest that residents within three miles of the site evacuate as well. 2005 WL 2387728, at *1. Plaintiffs sought to represent a class consisting of "all persons who evacuated their real property and/or 'sheltered in place,' and/or were prevented from returning to their homes and who suffered economic losses and inconvenience, as a result of, and within a three mile radius from, the derailment and toxic spill." *Id*. at *6. The court found that plaintiffs failed to establish typicality, since no proposed class representative "sheltered in place" or was located in the "suggested evacuation zone." *Id*. at *8.

[20] As described in more detail below, the *Bradford* court also found that these differences undermined the adequacy of the proposed representatives, and raised individual issues that predominated. *Id*. at *14-16.

As in *Bradford* and *Turnage*, several proposed representative plaintiffs here had experiences atypical of the class they seek to represent – as a result, they cannot represent the class.

**a. The sole remaining representative of the "voluntary evacuation" is atypical of the class she seeks to represent.**

Plaintiffs initially named only two proposed class representatives of the so-called "voluntary evacuation zone" – Nancy Hackney and Levie Hackney, Jr. *See* SAC at ¶ 42(b). Plaintiffs have dropped Mr. Hackney as a representative in that they have not sought to have him approved as a class representative in this Motion. This would leave Mrs. Hackney as the sole representative of the "voluntary evacuation" subclass. (DE 124). Mrs. Hackney's sworn testimony makes clear, however, that her experience was atypical of the class she seeks to represent. First, although the Hackneys live outside the "mandatory evacuation zone," Mr. and Mrs. Hackney were under the mistaken impression that they had been ordered to evacuate their neighborhood (based on their understanding of TV news reports). Dep. of Nancy Hackney (Ex. 21) at 20-21, 40-42; Dep. of Levie Hackney (Ex. 25) at 23-24. Thus, the Hackneys' evacuation was not "voluntary," and based upon perception of an odor as Plaintiffs seek to define the "voluntary" class. In addition, the Hackneys' plan to evacuate to a family member's house changed when Mr. Hackney collapsed and was transported by ambulance to a nearby hospital, where he remained for several days. Dep. of N. Hackney (Ex. 21) at 22:-24 and 28-33; Dep. of L. Hackney (Ex. 25) at 22-33 and 46-51:3. As a result, Mrs. Hackney's inconvenience and nuisance damages may hinge almost entirely on whether her husband's condition can somehow be attributed to the Apex fire.

Although the evacuation was lifted on the morning of Saturday, October 7, Mrs. Hackney did not return home until about 1:00 p.m. on Sunday, October 8. Dep. of N. Hackney (Ex. 21) at

42-43, 37-39 (explaining that she stayed at a hotel the night of October 7 because she "hadn't heard that they [emergency officials] were letting people back in [to Apex]"). Therefore as in *Bradford*, her experience may not be typical of the class she seeks to represent.

Moreover, Mrs. Hackney seeks to represent a class of individuals who suffered evacuation expenses and wage losses arising out of this incident, but she already presented an expense claim to EQIS, who has paid her the requested amount. Hackney Dep. (Ex. 21) at 38-39, 49-50

Finally, Mrs. Hackney and her husband are contemplating bringing some sort of personal injury claim for Mr. Hackney. *See* Dep. of L. Hackney (Ex. 25) at 51-56:22. ("Do you want to be compensated for any injury that you sustained? A: Yes"). In fact, as of the date of her deposition, Mrs. Hackney was under the impression that this lawsuit includes her husband's personal injury claim. Dep. of N. Hackney (Ex. 21) at 49, 70-74.

Each of the foregoing factors renders Mrs. Hackney's experience atypical of the subclass she seeks to represent. Defendants have obtained declarations from 31 residents of the "voluntary evacuation zone," for example, each of whom was able to understand the geographic scope of the recommended evacuation and make a decision whether to evacuate based in part on that understanding. *See* Ex. 11-1 through 11-32. Defendants are unaware of any other member of the "voluntary evacuation" subclass that "evacuated" by following a family member to a hospital, or that spent the duration of the evacuation visiting a family member at a hospital outside of Apex. Finally, to the extent other members of the proposed subclass evacuated at all,

there is every indication that they returned home promptly after the "mandatory" evacuation was lifted.[21]

As explained in *Bradford*, Mrs. Hackney is not an appropriate class representative, since her claims are not typical of the class she seeks to represent.[22] Since Plaintiffs have not proposed any viable representative on behalf of a "voluntary evacuation" subclass, the court should deny certification of this subclass.

**b. Several proposed representatives of the "mandatory evacuation" subclass had experiences atypical of the class they seek to represent.**

Similarly, several proposed representatives of the "mandatory evacuation" subclass had experiences very different than other members of the class they seek to represent. In fact, in light of the many and varied ways in which Apex residents and business reacted to the fire and evacuation, it may not be possible to determine what would constitute a "typical" class member's claims.

Plaintiff Michael Borden's experience was particularly idiosyncratic. He was in Raleigh the night of October 5, attending the North Carolina State football game. Since the roads into Apex were closed, he stayed with a friend. *See* Dep. of M. Borden (Ex. 18), 66- 71, 92-94. In addition, Mr. Borden and his wife, Betsy Borden, actually returned home on Friday evening, October 6, while the "mandatory" evacuation was still in effect. *See* Dep. of B. Borden (Ex. 17), 66-68, 74-77; Dep. of M. Borden (Ex. 18), 76-77. As noted above, the court in *Turnage* found that plaintiffs failed to establish typicality, since no proposed class representative "sheltered in

---

[21] *See, e.g.*, Decl. of A. Brantley (ex. 10-10), ¶3 (stating returned home on Saturday, October 7). *See also* Exs. 10-27, 10-28, 10-37, 10-12, 10-5, 10-6, 10-11.

[22] Presumably, Plaintiffs have abandoned the business portion of the "voluntary evacuation" subclass, since they have presented no viable representative of such a group. Clearly, Mrs. Hackney's claims are not typical of such businesses, if they exist.

place" or was located in the "suggested evacuation zone." *Turnage*, 2005 WL 2387728 at *8. The same logic applies to Mr. and Mrs. Borden here – neither has claims typical of the class they seek to represent.

Similarly, other proposed representatives either evacuated before any official recommendation, failed to return home promptly when the evacuation order was lifted, or both. *See* Dep. of Haraway (Ex. 2) at 113-115 (re-entry to Apex began after 9:00 a.m. on October 7, 2006). For example, proposed representatives Anne and George Acosta and Lisa Carley evacuated on their own initiative, before emergency officials issued a recommendation. *See* Dep. of A. Acosta (Ex.14), 80-85; Dep. of L. Carley (Ex. 12) 49-52, 64-66;[23] *cf*. Ex. 10-1, 10-2, 10-3, 10-4, 10-11, 10-13, 10-14, 10-15, 10-16, 10-17, 10-18. (evacuated after learning of evacuation order). Similarly, Mr. and Mrs. Acosta spent one extra night at a hotel, after the evacuation had ended, thus undermining their claims for inconvenience and nuisance. *See* Dep. of A. Acosta (Ex. 14), 100-102; Dep. of G. Acosta (Ex. 15) at 84-87; 184-185. As explained above, these individual differences mean that the claims brought by Anne and George Acosta and Lisa Carley are different from, and therefore atypical of, the class they seek to represent. Therefore, they are not appropriate class representatives. *See Bradford*, 2007 WL 2893650, at * 15 (holding proposed representative atypical where he elects not to return home promptly after evacuation order is lifted); *see also Broussard*, 155 F.3d 331, 340 ("only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class").

---

[23] Defendants' understanding is that representative plaintiff Timothy Carley has asked to withdraw, perhaps based on his testimony about personal and business bankruptcies and a conviction for tax evasion. Dep. of T. Carley (Ex. 28) at 45:5-46:22, 52:4-14. Lisa Carley's involvement in the same business calls into question her fitness to represent the financial interests of a class, in addition to the other concerns raised herein.

Several proposed representatives of the "mandatory evacuation" subclass may also have claims for personal injury and/or property damage, again atypical of the class they seek to represent. Plaintiff Michael Borden, for example, attributes his wife's respiratory problems to the EQ fire. *See* Dep. of M. Borden (Ex. 18) 223:7-237:12; 222:5-223:6. Similarly, Anne and George Acosta experienced eye irritation and allergy symptoms for several days upon returning home following the evacuation, along with an "itchy sensation" when sitting on upholstered furniture in their home – problems they attribute to chlorine exposure. Dep. of A. Acosta (Ex. 14), 103-106, 109-116, 231-234; Dep. of G. Acosta (Ex. 15) 87-93.[24] The Acostas may also have property damage claims, based on their unique observation of an "acid smell" inside their house, as well as a "slight film on everything," after the evacuation. Dep. of G. Acosta (Ex. 15) 87-93. Similarly, Denise Hatzidakis testified that smoke and chemicals from the fire damaged her juniper bushes. Dep. of D. Hatzidakis (Ex. 20) at 26-28.[25] Such claims are not typical of the claims of the majority of the putative class members, most of whom have no claims for personal injury or property damage. *See, e.g.*, Exs. 10 and 11 (declarations of 73 individuals within the mandatory evacuation zone who do not have personal injuries or property damage); *see also* EQIS's Second Supplemental Interrogatory Responses (Ex. 35) (showing that EQIS has reimbursed approximately 1968 individuals and businesses for the cost of hotels, mileage, meals, incidentals, lost income and lost profits).

---

[24] Although Mrs. Acosta expressed concern that she and her husband suffered a personal injury, she was not part of the decision to drop personal injury claims on behalf of the class. Dep. of A. Acosta (Ex. 14) at 220:6-227:3.

[25] Plaintiffs' original complaints and Master Amended Complaint asserted a number of claims that have now been abandoned, including personal injury and property damage claims, and defined classes to include a property devaluation class (Borden), a property damage class (MAC), a medical monitoring class (Beaulieu and Shapiro) and a personal injury class (Shapiro). *See* Section II-A, *infra*.

These potential personal injury and property damage claims show that Betsy and Michael Borden, Anne and George Acosta and Denise Hatzidakis have claims that are atypical of the class they seek to represent, rendering them unsuitable as class representatives.

**2. Several Plaintiffs Are Not Adequate Class Representatives**

Adequacy demands that the class representatives must be part of the class and possess the same interest and suffer the same injury as the class members. *Broussard*, 155 F.3d at 338 (quoting *E. Texas Motor*, 431 U.S. at 403). Adequacy is based on "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests" of the class and "whether plaintiffs have interests antagonistic to those of the rest of the class." *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1254 (11th Cir. 2003) (reversing class certification).

"Basic consideration of fairness requires that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representative[] at all stages of the litigation where absent members will be bound by the court's judgment." *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1374 (11th Cir. 1984). The need for a stringent examination of the adequacy of the class representative is especially great when, as in this case, the attorney's fees will "far exceed[]" the class representative's own recovery. *Shroder*, 729 F.2d at 1375. Contrary to Plaintiffs' contention, scrutiny of proposed class representatives is a necessary part of this examination. Rule 23(a)(4), Advisory Comm. Notes, 2003 Amendments (discussion of new subsection Rule 23(g)); Plaintiffs' Mem. at 10.[26] Where the named plaintiffs

[26] Cases cited by Plaintiffs do nothing to undermine this proposition. Plaintiffs' Mem. at 12 (citing *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417 (4th Cir. 2003)). Although Plaintiffs claim that it is "abhorrant" [sic] to ask class representatives to explain their understanding of facts and legal theories upon which their claims are based, or pleadings filed on their behalf, *Gunnells* said that class representatives "need not have *extensive* knowledge of the facts of a case," implying that at least some level of awareness is required. *Gunnells*, 348 F.3d at 417 (emphasis added). Also, the Supreme Court decision cited in *Gunnells* related to verification of a complaint, not adequacy of the proposed representative. *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001) (*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370-74 (1966)).

"have abdicated their role in the case beyond that of furnishing their names as plaintiffs," the attorneys, in essence, are the class representative. *Helfand v. Cenco,* 80 F.R.D. 1, 7-8 (N.D. Ill. 1977)

**3. Plaintiffs have no adequate representative for the "voluntary evacuation" subclass.**

As explained in detail above, Nancy Hackney, Plaintiffs' sole proposed representative of the "voluntary evacuation" subclass, had a very different experience during the fire than other members of the putative class she seeks to represent. In short, she believed she was within the "mandatory evacuation zone," when in fact she was not; she accompanied her husband as he was taken by ambulance to a nearby hospital, where she remained for a significant portion of the evacuation; she did not return home until 24 hours after evacuation was lifted. *See supra* at Section III. C. 1. a. As a result, Mrs. Hackney's claims are atypical of other members of the class she seeks to represent, which also makes her an inadequate representative for the proposed subclass. *Bradford,* 2007 WL 2893650 (explaining that adequacy "overlaps with the typicality requirement" and finding proposed representative with atypical claims made it "impossible for them to adequately represent the interests of the class in this matter"); *see also Broussard,* 155 F.3d at 338.

Mrs. Hackney also submitted a claim to EQ and received $320.92 for her food and lodging expenses during the evacuation and for wage loss arising during the incident. *See* EQ Industrial Services, Inc.'s Responses to Plaintiffs' First Set of Interrogatories (Ex. 38) at Response No. 23, at 23. *See also* Dep. of N. Hackney at (Ex. 21) 38-39, 49-50 (acknowledging reimbursement). Thus, she is an inadequate representative for members of the class who seek reimbursement.

Finally, Mrs. Hackney has participated minimally in this litigation, raising serious questions about her ability to adequately represent the proposed class. In the 13 months between the fire and her deposition, Mrs. Hackney met with class counsel three times – once shortly after the fire, the second time the day before her deposition, and the third time at her deposition. Ex. 21 at 67-68. Other than appearing for her deposition, Mrs. Hackney has done nothing to fulfill her duties as a class representative:

> Q: Okay. What have you done as a class representative to present the interests of the people who voluntarily evacuated?
> A: Give you my deposition today.
> Q: Is there anything else that you've done as a class representative that you know?
> A: Not far as I know.

*Id*. at 69-70. Mrs. Hackney had never heard of Defendants Allworth, PSC or ST-MAE until one day before her deposition in November 2007, although they were added as parties to this lawsuit about six months earlier, in July 2007. *Id*. at 80-81, 92-94, *see also* Docket Entry 32. She had no knowledge of whether Plaintiffs had retained investigators or experts in connection with the litigation. N. Hackney Dep. at 75-76. She had not even seen her written responses to EQ's document requests and interrogatories which had been served weeks earlier, until the day of her deposition. *Id*. at 98-99. Mrs. Hackney also had limited understanding about the claims being made on her behalf – she believed that her husband's personal injury claims remain a part of this lawsuit, when, in fact, they are not. *Id*. at 71-72.

In short, Mrs. Hackney lacks "a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation," as is required to meet the adequacy requirement. *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001) (explaining that proposed representatives must "possess a sufficient level of knowledge and understanding to be

capable of 'controlling' or 'prosecuting' the litigation."; *see also Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) (similar).[27]

**4. Many proposed representatives of the "mandatory evacuation" subclass are not adequate representatives.**

Many of the proposed representative plaintiffs residing in the "mandatory evacuation zone" are equally inadequate. As a group, they have been exceptionally willing to cede control of the litigation to counsel:

- Most named plaintiffs generally did not bother to review pleadings or discovery responses filed or prepared on their behalf. *See* Dep. of S. Beaulieu at (Ex. 13) at 60; Dep. of B. Borden (Ex. 17) at 135-137; 180; 184-186; 212-213; Dep. of L. Carley (Ex. 12) at 200-204; 246-247; 219-220; 187-189 (similar – "I leave it up to my attorneys to keep me informed"); Dep. of C. Wilder (Ex. 19) at 15 and 66; Dep. of A. Acosta (Ex. 14) at 224-225; 240-242; Dep. of G. Acosta (Ex. 15) at 19-20; 129-130; 151-152; 154-155 (similar); Dep. of T. Wilder (Ex. 16) at 66-67, 68, 119-121; 127-128.[28]

- Several were unaware that they had been named as representative plaintiffs until after the fact. *See, e.g.*, Dep. of S. Beaulieu (Ex. 13) at 61, 81 did not know she had been named as a class representative until more than a year after the complaint was filed). Dep. of T. Wilder (Ex. 16) at 91.

- Although many proposed representatives expressed concern that the fire resulted in contamination of their property, few if any read the test results published by NCDENR, let alone any other relevant information. *See, e.g.*, Dep. of S. Beaulieu (Ex. 13) at 53-57; Dep. of B. Borden (Ex. 17) at 201; Dep. of C. Wilder (Ex. 19) at 85; 107-111; Dep. of T. Wilder (Ex. 16) at 66-67; 683; 119-121, 127:12-128:14; Dep. of A. Acosta (Ex. 14) at 65:13-72:3.

- Representative plaintiffs also described little or no role in making decisions on behalf of the class, including whether to drop claims or elements of damage – as a rule, they expressed some confusion as to which claims and damages are still being pursued on their behalf. *See, e.g.*, Dep. of Beaulieu (Ex. 13) at 84:5-84:11; 85:14-85:15; 85:21-86:4 ("I'm not sure whether I know I have decision-making authority or not"); 89:22-90:24;

---

[27] It is equally clear that Mrs. Hackney is not an adequate representative for any businesses located within the "voluntary evacuation" zone.

[28] The drawbacks to this approach are fairly obvious, and significant. Mr. Acosta, for example, testified that he was unaware that the complaint filed on his behalf misstated the date on which he and his wife returned home after evacuating. Dep. of G. Acosta (Ex. 15) at 184:1-184:20. He believed that he was representing residents of Apex who evacuated through the morning of October 8 – a different class than that proposed by his attorneys. *Id.* at 181:7-182:12.

110:21-111:7 (testifying that she did not participate in the strategic decision to drop personal injury claims from this lawsuit, and stating her belief that claims for property diminution were still being pursued); Dep. of B. Borden (Ex. 17) at 178:5-179:10; 205:12-205:24; Dep. of L. Carley. (Ex. 12) at 148:4-148:17; 135:1-135:5 (played no role in deciding what damages to seek in the lawsuit, and had no understanding of the damages being claimed); 135:21-22 ("I just know that we want it [the lawsuit] to go forward and that's why I hired by attorney."); Dep. of T. Carley (Ex. 28) at 42:24-45:4 ("not exactly sure" whether he had made any decisions on behalf of the class, other than to file the lawsuit);[29] Dep. of T. Wilder (Ex. 16) at 201:6-201:20 (similar); Dep. of A. Acosta (Ex. 14) at 221:15-222:24 (not consulted when personal injury claims were dropped, although she and her husband may have such a claim).

- Several representative plaintiffs either were not aware of all of the parties involved in this litigation, or learned of them only shortly before their depositions. *See, e.g*, Dep. of B. Borden (Ex. 17) at 222:12-222:22; 224:4-225:3; Dep. of L. Carley (Ex. 12) at 237:19-240:17; 244:4-245:1.

- Nor were representative plaintiffs necessarily aware of important events in the litigation, including mediation and dispositive motions. *See, e.g.,* Dep. of T. Wilder (Ex. 16) at 200:13-201:1.

Weaving a constant theme throughout this litany of disengagement, representative plaintiffs repeatedly affirmed their complete deference to Plaintiffs' counsel. Mrs. Carley may have put it best, explaining that it is not her role to make decisions on behalf of the class: "I have my lawyer to do that." Dep. of L. Carley (Ex. 12) at 117:20-120:1. A potential class, however, is entitled to "more than blind reliance upon even competent counsel by uninterested and inexperienced [class] representatives." *In re Goldchip Funding Co.,* 61 F.R.D. 592, 594 (M.D. Penn. 1974). Plaintiffs' lack of vigor and evident willingness to allow the attorneys to control the litigation renders them inadequate. *Berger v. Compaq Computer Corp.,* 257 F.3d 475 (5th Cir. 2001).

As demonstrated above, Plaintiffs' participation in this litigation has been minimal, with most of the named Plaintiffs having little more than a surface-level understanding of the claims

[29] Since Mr. Carley's deposition, Plaintiffs have sought to withdraw him as a representative plaintiff.

and damages being sought. Significant decisions affecting the parties' rights (including the decision to drop personal injury and property damage claims) have been made without any apparent input from Plaintiffs, who are content to allow class counsel to run the litigation. This falls far short of the "forthrightness and vigor" that a class representative must possess *See London*, 340 F.3d at 1254.

**D. Plaintiffs Seek to Split Claims, Which Defeats Adequacy**

A serious question of adequacy of representation arises when class representatives seek to split claims, such that the class pursues only a subset of the claims that are available to putative class members, leaving personal injury and property damage claims for resolution by another court. Under principles of *res judicata*, "if the later litigation arises from the same cause of action as the first, then the judgment bars litigation not only of every matter actually adjudicated in the earlier case, but also of every claim that might have been presented." *In re Varat Enter., Inc.*, 81 F.3d 1310, 1314-15 (4th Cir. 1996). When the requirements for claim preclusion are met, "the judgment in the first case acts as an absolute bar to the subsequent action with regard to every claim which was actually made or and those which might have been presented." *Id*. at 1317; *see also Rodgers Builders, Inc. v. McQueen*, 76 N.C. App. 16, 23, 331 S.E.2d 726, 730 (1985) ("a party will not be permitted, except in special circumstances, to reopen the subject of the arbitration or litigation with respect to matters which might have been brought forward in the previous proceeding.").

Here, several proposed representatives for the "mandatory evacuation" subclass apparently believe that they have personal injury claims stemming from the fire. Plaintiff Michael Borden attributes his wife's respiratory problems to the EQ fire. *See* Dep. of M. Borden (Ex. 18), 222-237; 222:5-223:6. The Acostas testified that they experienced eye irritation and

allergy symptoms for several days upon returning home following the evacuation; they also had an itchy sensation when sitting on upholstered furniture in their home – problems they attribute to chlorine exposure. Dep. of A. Acosta (Ex. 14), p.103:11-106:21; 109:18-116:20; 231:20-234:8; Dep. of G. Acosta (Ex. 15), 87:16-93:3. The Acostas and Denise Hatzidakis also may have property damage claims. Dep. of G. Acosta (Ex. 15), 87:16-93:3 (he observed an "acid smell" inside the house, as well as a "slight film on everything"); Dep. of D. Hatzidakis (Ex. 20), at 26-28 (smoke and chemicals from the fire allegedly damaged her juniper bushes). Significantly, however, before filing the Second Amended Complaint, Plaintiffs made the strategic decision to forgo all personal injury and property damage claims. This was done to increase the chances of certifying a class.[30] Several of the proposed representatives were not even consulted before counsel dropped these and other claims. *See* Dep. of A. Acosta at 220:6-227:3; Dep. of S. Beaulieu at 89:22-90:24; Dep. of B. Borden at 178:5-179:10.

Plaintiffs' strategic decision to split their claims, however, may bar the class members' personal injury and property damage claims in a subsequent lawsuit. This serious conflict of interest defeats the adequacy of representation requirement. Analyzing this identical issue, the court in *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 203 (W.D. Tex. 2004) explained that "Courts have repeatedly held the failure to seek full recovery by splitting out personal injury and property damage claims creates a significant conflict of interest destroying adequacy of representation." In their fourth attempt to certify a class, plaintiffs' claims had been "split and re-split solely to obtain class certification. Specifically, Plaintiffs' disavow[ed] and waive[d] all personal injury claims." *Id.* at 203. Analyzing adequacy of representation, the court was

---

[30] *See* Plaintiffs' Mem. at 6 ("Plaintiffs are not seeking damages for personal injuries, with their attendant individualized issues of preexisting conditions and alternate causation."); *see also* Memorandum in Support of Plaintiffs' Rule 26(f) Report (DE 85) at 6 ("[C]lass claims for personal injuries present individual issues, such as pre-existing conditions and specific causation issues, which may predominate over the common ones").

troubled by the splitting of such claims, and held that *res judicata* "would forever bar the personal injury claims of those who allege that they are injured by treated wood, subjecting them, instead, to the limited damages allowed under the present cause of action." *Id*. at 203. Because unnamed class members would be "conclusively bound by the judgment in any class action brought on their behalf," the court held that plaintiffs were not adequate class representatives. *Id*. at 203-04; *see also Clark v. Experian Information Solutions, Inc.*, 2001 WL 1946329, *4 (D.S.C. Mar. 19, 2001) (Ex. 38) ("the implications of *res judicata* cannot be ignored. Plaintiffs' efforts to limit their relief to only statutory damages in this case, may, in fact, jeopardize the remaining class members' rights to seek alternative grounds of relief in a subsequent case"); s*ee also Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595, 606-07 & n.16 (S.D.N.Y. 1982) (plaintiffs' deliberate tailoring of the class claims "was purchased at the price of presenting putative class members with significant risks of being told later that they had impermissible split a single cause of action, and this implicates adequacy).[31] Applying these principles here, Plaintiffs' strategy to seek certification of certain claims, and leave for another day the unasserted personal injury and property damage claims of the Bordens and Ms. Hatzidakis, and of an unknown number of absent class members, defeats their arguments on adequacy of representation.

[31] *Gunnells*, 348 F.3d at 431, is not to the contrary. The *Gunnells* decision, in dicta, states that a class action is an exception to the rule against claim splitting. 348 F.3d at 431. However, this statement was made without analysis or discussion, in response to the dissenting opinion, and without reference to authorities which have closely analyzed claim preclusion in a class action context. *Id*. The court cited Moore's Federal Practice, which in turn cites the Restatement (Second) of Judgments § 26(1)(c). However, section § 26(1)(c) does not address class actions at all, and instead addresses claim splitting where the first court lacked subject matter jurisdiction over a portion of a claim. Further, plaintiffs' substantive claims in *Gunnells* were premised on South Carolina law, *id*. at 436, while North Carolina law governs here.

### E. Plaintiffs Have Failed to Prove that Common Issues Predominate.

Plaintiffs seek certification under Rule 23(b)(3), which allows class certification only if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . . " Fed. R. Civ. P. 23(b)(3).[32] The predominance requirement is a more exacting standard than commonality – rather than merely demonstrating that some issues of law or fact are common to the class, putative representative plaintiffs must demonstrate that common issues overwhelm individual issues:

> It is important to note that while a class may satisfy the commonality requirement of Rule 23(a), the class may fail to satisfy the "far more demanding" predominance requirement of Rule 23(b)(3).
>
> . . .
>
> This rule "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." To determine if a common question predominates over individual questions the Court looks to the nature of the evidence necessary to make out a prima facie case.
>
> . . .
>
> If the members of the proposed class need to present evidence that varies from member to member to make a prima facie showing of a given question, then it is an individual question.

*Bradford*, 2007 WL 2893650, *6-8 (Ex. 33) (citing, *inter alia*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1979) in refusing to certify individual and business classes after an evacuation). Plaintiffs here cannot pass this test, since their claims and damages require resolution of highly individual questions of fact and law, as described in detail below. Plaintiffs' Motion for Class Certification must therefore be denied.

### F. <u>Plaintiffs' Claims Require Individualized Proof</u>.

Plaintiffs would have this Court adopt the simplistic view that because all members of the putative classes were residents of Apex, and there was an evacuation, common issues

[32] As discussed in detail below, Rule 23(b)(3) also requires that putative representative plaintiffs demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

predominate. Other courts have refused to certify a class in similar situations, however, concluding that putative class claims hinged on individualized issues of proof, including proof as to causation and damages, and therefore failed to meet Rule 23(b)(3)'s predominance requirement. *See, e.g., Bradford*, 2007 WL 2893650 at *14-16 (refusing to certify subclasses of residents and business owners after an evacuation); *Snow v. Atofina Chemicals, Inc.*, 2004 WL 3768120, (E.D.Mich. 2004) (Ex. 42) (similar).

The court in *Atofina*, for example, refused to certify a class under circumstances similar to those presented here. *Atofina*, 2004 WL 3768120. Following an explosion at defendant's chemical plant, plaintiffs sought to certify a class consisting of "[a]ll persons who lived within and were evacuated from the official evacuation zone which was instituted following the chemical explosion/fire . . . ." *Id*. at *1.[33] Plaintiffs asserted claims for negligence and nuisance, and sought damages for out-of-pocket economic losses and mental anguish. *Id*. The court denied class certification, recognizing that individual issues of causation and damages predominated over common issues of defendant's liability. *Id*. at *7.[34] Applying the same logic here, individual issues predominate any analysis of Plaintiff's claims – including trespass and nuisance - as well as the damages they seek – including "inconvenience" and "lost profits."

In addition to the foregoing evacuation cases, a line of cases involving cruise lines establish that individualized proof will often predominate despite some common experience. *See, e.g., Conigliaro v. Norwegian Cruise Line Limited*, No. 05-21584-CIV (S.D. Fla. Aug. 31, 2006) (denying class certification) (Ex. 43); *Neenan v. Carnival Corp.*, 199 F.R.D. 372 (S.D. Fla.

---

[33] Plaintiffs in *Atofina* initially sought to certify multiple subclasses, including subclasses for evacuation, economic harm, medical monitoring, and personal injury. *Atofina*, 2004 WL 3768120 at *1. However, as here, those plaintiffs eventually abandoned most of the subclasses and focused on a proposed class of evacuees. *Id*.

[34] The *Atofina* court also rejected plaintiffs' argument that certification would be superior to traditional tools of case management, such as joinder or consolidation. *Id.* at *7.

2001) (similar); *Elliot v. Carnival Cruise Lines*, No. 02-23253-CIV, 2003 WL 25677700 (S.D. Fla. Oct. 17, 2003) (Ex. 44) (Ex. 42) (similar).

In *Conigliaro*, for example, a cruise ship sailed into a violent storm, "causing objects to fall, fly, and break, and causing extreme fear and panic in the passengers." *Id*. at 3. Plaintiffs argued that passengers "were all similarly impacted by the severe weather conditions encountered," since they "suffered physical injuries, emotional injuries, and had their cruise ruined." *Id*. at 3-4 (emphasis added). The court saw things differently, noting that class treatment is inappropriate "when the class is defined simply as consisting of all persons who may have been injured by some generically described wrongful conduct allegedly engaged in by a defendant." *Id*. at 4-5 (internal quotation and citation omitted).[35] The court explained that "[l]iability here is not predicated on Defendant's decision to sail into the storm. Contrary to Plaintiffs' assertion, it is not possible to assess Defendants' liability in a class-wide proceeding under a theory of 'general causation,' and defer individual issues of damages for subsequent adjudication." *Id*. at 8-9, 18-19 (emphasis added).

The same logic applies here, where Plaintiffs essentially argue that all members of the putative class are "in the same boat" with respect to the Apex fire. The mere fact that a single event affected many people does not dispense with the need to analyze the effect of the event. As described in detail above, members of the putative class had very different experiences, ranging from ignoring the fire to collapsing while attempting to evacuate and being taken by ambulance to a nearby hospital.

[35] The *Conigliaro* court also held that the fact that some putative class members did not experience any harm from the defendant's allegedly wrongful conduct raised Article III standing issues, which precluded a class from being certified. *Id*. at 12. The same is true here, since many Apex residents within Plaintiffs' proposed subclasses did not evacuate and considered the event at most "a minor inconvenience." *See* Ex. 10-11.

The cases cited by Plaintiffs do nothing to undermine this conclusion. *See, e.g., Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (cited in Pls' Mem. at 14-16); *see also Thorn,* 445 F.3d at 318 n.8 ("To the extent the vision of liberality and flexibility set forth by the court in *Gunnells* conflicts with the Supreme Court's admonitions that we should pay 'careful attention' to Rule 23 by giving it a 'rigorous analysis,' we are, of course, bound to follow the Supreme Court."). *Gunnells* arose from the collapse of an insurance plan, not a fire, explosion or evacuation. *Id*. at 422. The court found that the overriding issue was not whether plaintiffs had been damaged, but whether defendant's actions proximately caused the plan's collapse. *Id*. at 429. There was no dispute that had the plan not collapsed, plaintiffs' claims would have been paid. *Gunnells,* 348 F.3d at 429. Here, on the other hand, individual issues of causation abound, along with the need to assess damages claimed by each member of the putative class.

Particularly when weighing issues such as "trespass," "nuisance," "inconvenience" or "lost profits," individual claims cannot be resolved without considering individual circumstances. As Randy Wilder stated: "We all deal with things differently." R. Wilder Dep. (Ex. 19) at 189. The ways in which members of the putative class "dealt with things" were many and varied, ranging from those who described the event as "a minor inconvenience" to Anne Acosta, who testified that she thought Apex was under terrorist attack. A. Acosta Dep. (Ex. 14) at 86-89. It would seem an impossible task to determine causation and damages across this spectrum using generalized proof, and Plaintiffs have provided no road map that would allow this Court to do so. *Conigliaro* and any number of similar decisions teach that in such circumstances, class certification must be denied.[36]

[36] *See, e.g., Neenan v. Carnival Corp.,* 199 F.R.D. 372 (S.D. Fla. 2001). In *Neenan*, cruise ship passengers alleged that after their ship caught fire, they were "held inside a smoke-filled, unventilated 'muster station,'" and that the ship's sanitary system and engines became inoperable. *Id*. Plaintiffs argued that "all of the more than 1000

### G. Individual Issues Predominate Any Analysis of Plaintiffs' Claims for Trespass.

Under North Carolina law a claim of trespass requires a showing of unauthorized entry onto plaintiff's land or property by the defendant "or an object under his control." *Woodring v. Swieter*, 180 N.C. App. 362, 376, 637 S.E.2d 269, 280 (2006). Trespass is an intentional tort, so entry alone is not sufficient - plaintiff must establish that defendant *intended* to go upon plaintiff's land. *Rudd v. Electrolux Corp.*, 982 F. Supp. 355, 370 (M.D.N.C. 1997). "[T]he unintentional and non-negligent entry onto the land of another does not constitute a 'trespass' unless the actor is engaged in an ultrahazardous activity." *Id.*[37] In addition, "an action for trespass to real property requires plaintiff [to] show that defendant's unauthorized entry onto plaintiff's property caused damage to plaintiff's property." *Ellington v. Hester*, 127 N.C. App. 172, 175, 487 S.E.2d 843, 845 (1997). Putting aside for now the obvious problems with Plaintiffs' position that defendants *intended* any trespass here, and whether smoke, chemicals or residue from the fire were *under defendants' control*, each class member's trespass claim will require evidence of smoke, chemicals or residue that actually invaded their property, and the degree to which the unauthorized entry caused damage if any to the property. These are not insignificant issues, or issues that can be established by general evidence applicable to all class members. Seemingly oblivious to these required elements of a trespass claim under North Carolina law, Plaintiffs offer the bare assertion that "whether [the] EQ defendants are guilty of trespass" is a common issue. *See* Plaintiffs' Mem. at 8. Plaintiff's own evidence, purportedly offered in support of class certification, calls this conclusion into question, however. Plaintiffs'

---

passengers suffered the same horrible experience as did we." *Id*. at 375. The court denied class certification, noting that "individual issues of causation and injury in fact [would] consume the majority of the Court's time in this matter," thus causing individual issues to predominate. *Id*. at 376.

[37] As explained above, there is no allegation that defendants here engaged in "ultrahazardous activity" as defined under North Carolina law.

expert, Dr. William Zegel, concluded that different locations in Apex experienced very different concentrations of smoke, chemicals and particulate matter, and that in some areas in the "mandatory" zone and the "voluntary" zone the plume never reached very low thresholds at all.[38] *See* Zegel Dep. at 262, 364-366. This of course assumes Zegel's analysis is correct. As noted in detail *supra* in Section II. B. 1, Dr. Zegel's analysis contained certain basic flaws that grossly overstated the spread of the plume. Once these modeling errors were corrected, the plume essentially did not reach the "voluntary" zone, and in fact did not reach most of the "mandatory" zone.

In any event, the concentrations of smoke, chemicals and particulate matter reaching each class member's property must be determined in order to understand the extent of the alleged intrusion, and one class member's testimony sheds little light, if any, on the trespass claims of another. This is confirmed by statement of multiple declarants in both the "mandatory" zone and the "voluntary" zone that the plume did not enter their property.

As a result of this inherently individualized inquiry, courts have refused to certify trespass claims for class treatment in similar circumstances, finding that common issues did not predominate. *See, e.g., Bradford*, 2007 WL 2893650, *8 (Ex. 33) (refusing to certify a class in a train derailment case where common questions – *e.g.,* whether railroad was liable; whether PAHs are capable of causing harm - were overwhelmed by individual questions of causation, injury and damages) (citing *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir.2006)); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 310 (S.D. Ala. 2006) (denying class certification of nuisance, trespass and negligence claims, notwithstanding core common facts

---

38 As explained in detail above, defendants disagree with Dr. Zegel's methodology and many of his conclusions. Defendants agree, however, with the underlying concept that air plume models provide valuable insight into the direction and concentration of potential exposure as a result of the Apex fire.

relating to chemical contamination of property outside defendant's facility, since proof of classwide "background" facts would not establish defendant's liability to individual class members or the amount of damages to be awarded to each); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673, 678-79 (S.D. Ala. 2005) (refusing to certify a class including all property owners within a "zone of contamination" as shown by an air dispersion model, since trespass and nuisance claims require individual proof, including a physical invasion of property and interference with the property owner's enjoyment); *Church v. General Electric Co.***,** 138 F. Supp. 2d 169 (D. Mass. 2001) (finding class action was not appropriate for trespass and nuisance claims where "extent of contamination . . . will differ among the putative class members," and such differences "pertain not just to damages . . . but to the threshold question of whether the contamination constitutes a nuisance or trespass").

Evidence developed thus far bears out the concern that individualized proof will overwhelm the Court's analysis here. The testimony of one member of the putative class provides little or no insight into the experience of any other member of the putative class. For example, several putative representative plaintiffs testified that they did not smell any odor or see any smoke on their properties. *See, e.g.,* B. Borden Dep. (Ex. 17) at 78; T. Carley Dep. (Ex. 28) at 75; R. Wilder Dep. (Ex. 19) at 42-43. Similarly, other putative class members stated that their property was never "touched or physically invaded by smoke, particulates, or airborne toxins from the fire and that they did not lose the use and enjoyment of their homes." *See, e.g.*, Ex. 10-39 (listing 32 declarants) at ¶¶4-5and 11: (Exs. 10-3, 10-4, 10-20, 10-21, 10-35, 10-36, 10-29, 11-30, 10-13, 10-14, 10-24, 10-16, 11-7, 11-8, 11-29, 11-30, 11-10, 11-21, 11-22 and Ex. 11-33 (listing 27 declarants) at ¶¶4-6). These individuals would presumably have significant difficulty establishing a viable trespass claim. Other members of the putative class testified that they saw a

chemical cloud or smoke on their property, or that they smelled something. *See, e.g.,* Beaulieu Dep. (Ex. 13) at 36; G. Acosta Dep. (Ex. 15) at 57; R. Wilder Dep. at (Ex. 19) 42-43. Even within this group, however, individual experiences varied greatly. Putative representative Plaintiff Denise Hatzidakis, for example, stands alone in her belief that smoke or chemicals from the Apex fire damaged her juniper bushes. Hatzidakis Dep. (Ex. 20) at 26-28. No other putative representative plaintiff described any property damage, nor did any declarant observe such damage.[39]

Perhaps implicitly recognizing the individualized nature of trespass claims, Plaintiffs make no attempt to address the elements of trespass under North Carolina law, nor do they offer any insight into how such claims could be resolved on the basis of generalized evidence. Plaintiffs' Mem. at 13-18. Based on the highly individualized evidence required to state a claim for trespass under North Carolina law, common issues do not predominate here. As the court observed in *LaBauve*, "after adjudication of class-wide issues, plaintiffs would still need to introduce extensive individualized proof or argue substantial individualized legal points to establish most of the elements of their claims." *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005). The same logic applies here, and Plaintiffs' Motion for Class Certification should therefore be denied.

### H. <u>Individual Issues Predominate Any Analysis of Plaintiffs' Claims for Nuisance</u>.

Similarly, Plaintiffs blithely assert that "whether the EQ defendants are guilty of nuisance" is a common issue, but they fail to provide any meaningful basis for this conclusory assertion. Plaintiffs' Mem. at 8. Nor do Plaintiffs show that common issues predominate over

[39] Paul Nony, an expert toxicologist involved in the emergency response made a point of observing vegetation in and around the EQ facility, and observed no damage to surrounding vegetation. Ex. 8 at ¶34.

individual issues with respect to the alleged nuisance. A careful review of what Plaintiffs describe as common issues demonstrates that they do not predominate and their nuisance claims cannot be adjudicated on a class-wide basis.

Under North Carolina law, a claim of nuisance requires that plaintiff demonstrate that defendant's actions "unreasonably invaded or interfered with the plaintiff's use and enjoyment of his property." *Elliott v. Muelbach*, 173 N.C. App. 709, 712, 620 S.E.2d 266, 269 (2005); *see also Pendergrast v. Aiken*, 293 N.C. 201, 216-17, 236 S.E.2d 787, 796 (1977) (citing section 822 of the *Restatement (Second) of Torts*). Accordingly, Plaintiffs' nuisance claims require individualized evidence that chemicals, smoke and/or particulate matter invaded each putative class member's property and the degree to which the intrusion interfered with that class member's use and enjoyment of the property.

Based on these requirements, one member of the putative class cannot establish a cause of action for nuisance for another. As noted above, many of the named Plaintiffs testified that they did not smell any odors or see any smoke on their properties. Many other members of the putative class stated that their property was never "touched or physically invaded by smoke, particulates, or airborne toxins from the fire and that they did not lose the use and enjoyment of their homes." This testimony stands in stark contrast to those who stated that they saw smoke or smelled odors on their property. Even among the subgroup of putative class members who directly experienced smoke or smell during the fire, however, their experiences (and, presumably, the potential extent of any recovery for nuisance) varied greatly. As with Plaintiffs' trespass claims, individual issues predominate.

Courts in similar circumstances have refused to certify a class, recognizing that individual issues predominate in resolving claims sounding in nuisance. *See, e.g., Bradford*, *8

(Ex. 33) (refusing to certify class to pursue nuisance claims after evacuation); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 310 (S.D. Ala. 2006) (similar); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D.Ala. 2005) (similar); *Snow v. Atofina Chemicals, Inc*., 2004 WL 3768120, *7 (Ex. 42) (similar); *Church v. General Electric Co.***,** 138 F. Supp. 2d 169 (D. Mass. 2001) (similar).

As the court observed in *Atofina*, nuisance claims "require individual proofs, because of the varying lengths of evacuation, reasons for evacuation, circumstances of evacuation, levels of inconvenience, and extent of exposure." *Atofina*, 2004 WL 3768120, *7. Similarly, the court in *Bradford* explained that evacuation claims required each class member "to present evidence that they were home on the Saturday in question and that they actually evacuated. Since this evidence will vary from individual to individual, the end result will be a series of mini-trials that will dominate the proceeding." *Id*. at *15. *Bradford*, 2007 WL 2893650, at *15. Both courts ultimately refused to certify a class. The same analysis applies here, and the result should be the same – class certification should be denied.

**1. Damages Claimed By Plaintiffs Require Individualized Proof**.

Plaintiffs assert without support - and against the overwhelming weight of evidence developed in discovery in this matter - that all putative class members "suffered the same damages." Plaintiffs' Mem. at 6. Information provided by representative plaintiffs in discovery to date indicates the opposite - damages asserted by putative representative plaintiffs are highly individualized.

In addition to these "special damages," documented to a limited extent in Plaintiffs' discovery responses or through deposition testimony, Plaintiffs assert much more substantial "general damages." *See, e.g.*, Plaintiffs' Initial Disclosure Report (Ex. 46) (October 5, 2007) at

9-10 (claiming $5,000 per person for each day of the evacuation). Despite repeated requests by defendants during the course of more than a year of discovery, Plaintiffs have been unable or unwilling to state any legal or factual basis for such damages, or even to explain how such damages were calculated. Putting aside this fairly significant shortcoming, Plaintiffs have yet to offer a viable method for determining damages suffered by each member of the putative class without a detailed, individualized inquiry.

The Fourth Circuit has recognized that the need for individualized proof of damages undermines predominance. *See Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138 , 149 (4th Cir., 2001) (quoting *Windham v. American Brands, Inc.*, 565 F. 2d 59, 66 (4th Cir. 1977)).[40] Other courts addressing the issue have generally agreed. The Fifth Circuit, for example, held that individual issues predominate where, as here, "an individual's damages cannot be determined by reference to a mathematical or formulaic calculation." *Steering Committee v. Exxon Mobil Corp.,* 461 F.3d 598, 602 (5th Cir.2006) (citations omitted); *see also Perrin v. Expert Oil and Gas, LLC***,** 2008 WL 339684 (E.D. La. Feb. 6, 2008) (explaining that "the nature of the alleged damages implicates the subjective differences of each plaintiff's circumstances, rather than calling for a class-wide remedy"). Similarly, the Eleventh Circuit has explained that unless damages can easily be calculated by reference to "some formula, statistical analysis, or other easy or essentially mechanical methods," individual issues predominate - "where there are significant individualized questions regarding liability . . . individualized assessments of damages may warrant denial of Rule 23(b)(3) certification." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004).

40 "Damages always require individual proofs and the crucial element in a court's analysis will be whether the 'liability' issues are so closely linked to the 'damage' issue that severability is not practicable." *In re Polyester Staple Antitrust Litigation*, MDL No. 3:03CV1516, 2007 WL 2111380, *14 (W.D.N.C. July 19, 2007) (cited in Plaintiffs' Mem. at 13).

Plaintiffs' rhetoric to the contrary does nothing to change this conclusion. *See* Plaintiffs' Mem. at 16. In *Gunnells*, the primary case relied on Plaintiffs, the court certified a class in part because "the damages calculations . . . [did] not appear to be particularly complex, unlike the calculations in those cases in which courts have found that numerous complicated individual damage inquiries predominated over common issues." *Gunnells*, 348 F.3d at 429 (noting that court-appointed fiduciary had already calculated most of the plaintiffs' claims for unpaid medical bills).[41] Here, on the other hand, not only the amount of damages but the fact of damages is subject to highly individualized proof. The damage issues include proximate causation issues. Did the plume reach the specific putative class members property? If so, did it damage their property? If so in what way? Did Plaintiffs take reasonable steps to mitigate damages (close windows etc.). Did Plaintiff evacuate? Where? What costs? Have they been reimbursed? Have they suffered a wage loss? Has it been reimbursed? All of these issues require individualized inquiry and proof. Under such circumstances, class certification is inappropriate.

***(1) Individual Issues Predominate Under Any Analysis of Plaintiffs' Inconvenience Damages.***

Inconvenience is inherently individual, since it is based on "*personal* inconvenience, discomfort, annoyance, or sickness," rather than "generalized inconvenience, discomfort, annoyance or sickness." *See* Annotation, 25 A.L.R. 5th 568, 568 (1994) (emphasis added). Inconvenience is a measure of damages, rather than an independent cause of action. *See, e.g., Kaplan v. Profile Action League of Greensboro,* 111 N.C. App. 1, 21, 431 S.E.2d 828, 838

[41] As described in detail above, *Olden v. Lafarge Corp.*, 203 F.R.D. 254 (E.D. Mich. 2001), *aff'd*, 383 F.3d 495 (6th Cir. 2004), is also inapposite. *Olden* involved an active cement manufacturing plant that emitted, and continued to emit, cement dust that covered property in Alpena. The damage was objective and subject to scientifically valid estimation. *Olden*, 383 F.3d at 509-10. Here, in the absence of any objective evidence of contamination, and with clear evidence that many individual properties were not affected at all, Plaintiffs' damages are inherently more speculative and individualized.

(1983), *quoting* Prosser, Restatement (Second) of Torts, § 87, at 619. If inconvenience damages represent the sole source of compensable harm, the injury must be substantial for there to be recovery. A substantial invasion is one involving more than "slight inconvenience or petty annoyance." *Watts v. Pama Manufacturing Company*, 256 N.C. 611, 619, 124 S.E.2d 809, 815 (1962). In order to impose liability, Plaintiffs must present evidence to establish that each putative class member was inconvenienced, that such inconvenience was proximately caused by Defendants' conduct and that each putative class member suffered actual damages.

As noted above, courts analyzing similar claims have found them unsuitable for class treatment. *See, e.g.*, *Elliot v. Carnival Cruise Lines*, 2003 WL 25677700 (Ex. 44) (denying class certification). In *Elliot*, Plaintiff alleged that while he was a passenger on defendant's cruise ship, the ship experienced engine problems and was diverted from its planned itinerary. *Id*. at *1. Plaintiff alleged that this schedule change caused him to experience "inadequate and inferior accommodations and service, … delay, and inconvenience," and sought to represent a class of passengers onboard whom he claimed shared the same experience. *Id*. at *1. The court concluded that questions of law or fact common to the class did not predominate over questions affecting only individual members because of the wide variety of passenger experiences. *Id*. at *6 (noting, *e.g.*, that some members of the putative class remained on defendant's ship for the entire cruise, while others, including plaintiff, left the ship early; some passengers were subject to significant vibrations from the damaged engines, while others were not; some passengers, including plaintiff, accepted money from defendant, while others did not;).[42] In light of these differences in passenger experience (which echo the different experiences of the putative class

---

[42] As described in detail above, many members of the putative class have accepted reimbursement from EQ for expenses associated with evacuation.

here), the court reasoned that "individual issues relevant to each putative class member's claims . . . [would] consume the majority of the Court's time in this matter," since each passenger's recovery would "depend on individual testimony." *Id*. at *6.[43]

In this case, such a determination is a highly-individualized inquiry that requires plaintiff-specific proof, first to establish liability and then to determine damages, if any. As described in detail above, each member of the putative class had an individualized experience. Some witnessed the fire directly, others heard about it second-hand. Some members of the putative class evacuated, while others did not. (Even within the population that evacuated, their experiences differed – some evacuated before the "mandatory" evacuation order, some long after; some returned early, some promptly, some well after the order was lifted.) Some reported "stress" at not knowing whether they were exposed to toxic chemicals, while others seemed unconcerned. Some evacuated with infants or small children in tow, while others did not. Some had pets, while others did not. (Even among those with pets, some brought them along during the evacuation, some left them behind, with no apparent ill effect.) Some (perhaps not surprisingly, those represented by counsel here) likened the event to a major catastrophe, while others described it as a "minor inconvenience" (perhaps not the strongest foundation for a legally cognizable inconvenience claim).

As in *Conigliaro*, *Neenan*, and *Elliot*, each putative class member's experience here differed greatly, depending entirely on his or her individualized response to the fire. As a result, Plaintiffs' claims for inconvenience require a highly individualized, fact-specific inquiry for each class member, thereby defeating predominance.

---

43 The court in *Elliot* also found that class certification was not superior to other available methods of adjudication, because it "would bring in hundreds - possibly as many as 1,900 claimants whose presence would require a multitude of mini-trials." *Id*. at *6. The same is true here.

### c. Claims of the Voluntary Evacuation Subclass Require an Individualized Inquiry.

The very concept of a "voluntary" subclass underscores the individual nature of the subclass. As noted above, many Apex residents living in the "voluntary" zone did not smell any odor and did not evacuate. Yet Plaintiffs seek to clarify a subclass of individuals living in the "voluntary" zone who <u>chose</u> to evacuate allegedly because they could smell the plume

This means obvious proof questions. Did they smell the plume? What did they smell and when? What information was established to them about the fire and evacuation? Was it reasonable for them to choose to evacuate under the circumstances?

Plaintiffs' proof problems are not alleviated by Dr. Zegel's air modeling. His analysis denies common sense, good science and is refuted by the testimony of the responders and the statements by the declarants.

The issues raised for so-called "voluntary" class members require individual proof and testimony. The experience of the proposed class representative for the "voluntary" zone does not resolve such issues for other purchase class members. Common issues do not predominate.

### 4. Plaintiffs Have Not Shown that a Class Action is Superior to Other Available Methods of Adjudicating the Dispute.

Rule 23(b)(3) requires the court to find that "'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Gregory v. Finova Capital Corp.*, 442 F.3d 188, 190 (4th Cir. 2006) (quoting FED.R.CIV.P. 23(b)(3)). "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case . . . [which] necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998) (citing Wright, *supra*, § 1779). "As long as the class

action is not superior to one method, it makes no difference whatsoever that the class action is superior to other methods." *Gregory*, 442 F.3d at 190 n.3. "[R]ead as a whole [, Rule 23(b)(3)] reflects a broad policy of economy in the use of society's difference-settling machinery. One method of achieving such economy is to avoid creating lawsuits where none previously existed . . . . If a class of interested litigants is not already in existence the court should not go out of its way to create one without good reason." *Berley v. Dreyfus & Co.*, 43 F.R.D. 397, 398-99 (S.D.N.Y. 1967).

**a. EQIS' Claims Reimbursement Program Undermines Plaintiffs' Superiority Arguments**

On October 6, 2006 – before the fire had been extinguished – EQIS announced that it would reimburse anyone affected by the fire and evacuation for their out-of-pocket expenses. *See* Affidavit of Scott Maris (Ex. 9) at ¶¶ 4-7. Representatives of EQIS repeated this message, and gave out EQ's toll-free claims hotline telephone number, numerous times in press briefings in the days following the fire. *Id*. at ¶¶ 4. Information about the EQIS claims reimbursement program was also issued as a press release to local and national outlets, which included this information in broadcasts and news articles. *Id*. at ¶ 5. As stated in the press release, EQIS encouraged those "affected or displaced by the fire to contact [the] toll free line to report claims, including out of pocket expenses incurred during the evacuation, and to get information updates." *Id*.

Nearly 2000 individuals and businesses responded to EQIS's offer. *Id.* at ¶¶ 8-10. As of March 31, 2008, EQIS and its insurer have reimbursed approximately 1,968 individuals for out-of-pocket expenses associated with the fire and evacuation, including hotel bills, meals, travel

expenses, other incidentals and lost income. *Id*.[44] EQIS has also paid $107,355 to reimbursed 17 businesses affected by the fire. *Id*.; *see also* EQIS's Second Supplemental Responses to Plaintiffs' Interrogatories (Ex. 35). As of March 31, 2008, the following claims have been paid. EQIS's claims reimbursement program is ongoing and equally available to any member of the putative class, including named Plaintiffs.[45] Notably, proposed class representative Nancy Hackney submitted a claim and received a reimbursement check from EQ. *See* Dep. of N. Hackney (Ex. 21) at 49:17-50:14. Donna Thompson and Ronald Mercer, originally named as plaintiffs in the consolidated cases but later dropped, also submitted claims.

"The fact that many members of a proposed class have settled their disputes has been recognized as a significant factor in determining whether a class action is the superior method for adjudicating the controversy." *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1171 (S.D.N.Y. 1974); Wright, Miller, & Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1779 (Under Rule 23(b)(3), "[t]he court need not confine itself to other available 'judicial' methods of handling the controversy in deciding the superiority of the class action," and may consider informal resolutions of claims); 32B Am.Jur.2d Federal Courts § 1737 ("Additional considerations which may militate against a superiority finding include . . . the fact that many class members have already settled their disputes, or that there is an offer by the party opposing the class to settle with class members."); *see also Bradford,* 2007 WL 2893650 (Ex. 33) at *2 (rejecting superiority and refusing to certify an evacuation subclass following a fire and

---

[44] The table included in EQIS's Second Supplemental Responses to Plaintiffs' Interrogatories (Ex. 35) denotes the type of claim which EQ has reimbursed. The type of claim is denoted on the table as (F) Food; (L) Lodging; (T) Travel; (B) Business Loss; (M) Medical; (I) Income; and (O) Other.

[45] Exhibits 10 and 11 hereto include declarations from 13 Apex residents who submitted reimbursement claims and received payment from EQIS for their expenses. *See* Exs. 10-6, 10-7, 10-9, 10-10, 10-26, 10-28, 10-12, 10-5, 10-6, 10-11, 10-33, 10-34; *see also* 10-27, ¶¶5-6 ("I was pleased with the time in which we received the reimbursement").

evacuation where defendant had established a claims center and resolved 2000 evacuation-related claims prior to litigation); *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 214 F.R.D. 614, 622 (W.D. Wash. 2003) ("To this day, defendants maintain refund and product replacement programs for individuals still in possession of PPA-containing products. It makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress"); *see also Congiliaro v. Norwegian Cruise Lines*, (Ex. 43) Slip. Op. at 11-12 (Ex. 40) (noting that affidavits submitted by "non-suing passengers" supported denial of class certification). These decisions confirm the obvious: It cannot be more efficient to certify a class action so that class members can pursue litigation to recover money damages that EQ is already ready, willing and able to pay.

**a. Other Factors Militate Against Superiority of the Class**

Plaintiffs offer nothing of substance to undermine this conclusion – they cannot credibly argue against EQIS's willingness to informally resolve claims, or the simple fact that this undermines superiority. Instead, Plaintiffs may argue that EQIS's payments to 2000 claimants have not compensated members of the putative class for intangible damages such as "loss of use." This argument is wrongheaded, however - EQ has already paid for loss of use, and claimants are not permitted to receive a double recovery.[46]

"Loss of use" can be determined in several ways. First, it can be measured by expenses - the cost of lodging, meals, transportation and incidentals while the claimant could not use his or her house. *See Huff v. Thornton*, 287 N.C. 1, 9, 213 S.E.2d 198, 205 (1975) (establishing loss of use via evidence of availability of other comparable lodging, rental cost, time required for repair

[46] Each of the 13 declarants who have received reimbursement payments from EQIS (s*ee* n. 48 *supra*) have testified that they are not entitled to additional compensation. *See*, *e.g.*, D. Barnes, (Ex. 10-8) ¶7 ("I do not believe that I was harmed in any way by the events of October 5, 2006 and do not believe I am entitled to any additional compensation").

or rebuilding and cost of moving). Alternatively, "loss of use" can be measured on a *per diem* basis - mortgage, rent, taxes and utilities during the time that the house is unavailable. *Sprinkle v. N.C. Wildlife resources Comm'n*, 165 N.C. App. 721, 730, 600 S.E.2d 473, 479 (2004) (holding that loss of use of boat could be determined by "specific evidence of the costs of a similar boat's rental" or by evidence of monthly mortgage payments). Claimants cannot recover both measures of loss of use, however. Double counting these alternative measures of damage would allow a windfall. *Id*., 165 N.C. App. at 731, 600 S.E.2d at 479 (error to award loss of use damages that exceed the monthly mortgage payments, where this was the proper measure of loss of use). Plaintiffs' demand for "loss of use" damages is therefore no different than the out-of-pocket expenses that EQ is willing to pay, and has already paid to nearly 2,000 claimants.

Plaintiffs also may argue that EQ has not paid "inconvenience damages" to claimants. Although such damages are recoverable under North Carolina law, no North Carolina decision has quantified how to measure inconvenience.[47] As explained in detail above, inconvenience is a quintessentially individualized issue, necessarily requiring proof of how a given individual was affected. This individualized inquiry cannot be adjudicated on a class-wide basis.[48]

---

[47] As explained above, Plaintiffs assert substantial (albeit unsubstantiated) "general damages." *See, e.g.*, Plaintiffs' Initial Disclosure Report (Ex. 46) (October 5, 2007) at 9-10 (claiming $5,000 per person for each day of the evacuation). Substantial individual damages undermine superiority. *See, e.g.*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."); *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190-91 (9th Cir. 2001 (explaining that allegations that each class member's damages were in excess of $50,000 "undermined [plaintiff's] assertion that the claims ha[d] a relatively small value"); *In re General Motors Corp. Dex-Cool Products Liability Litig.*, No. Civ. MDL-03-1562, GPM, Civ. 05-10008-GPM, 2006 WL 2818773, at *6 (S.D. Ill. Sept. 27, 2006) (explaining that "[c]lass actions are, virtually by definition, devices for litigating a large number of very small claims in a single proceeding . . . . In fact, it is a prerequisite for the maintenance of a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure that the claims at issue be small").

[48] Plaintiffs' decision to split claims here also undermines superiority, especially in light of the doctrine of *res judicata*. As explained in detail above, Plaintiffs decided to forgo personal injury and property damage claims to increase the chances that a class will be certified. *See supra* at Section III-D. Even if Plaintiffs somehow manage to avoid being barred by *res judicata*, split claims will still need to be adjudicated in subsequent lawsuits, consuming additional judicial resources – hardly a superior approach.

According to Rule 23(b)(3) there are several factors the court may consider when deciding superiority including the class members' interest in individually controlling the prosecution or the defense of the action, Rule 23(b)(3)(A) and the likely difficulties in managing a class action Rule 23(b)(c)(1). In terms of the individual class members interest in controlling their claims, as noted above, almost 2,000 putative class members have taken control of their claim and availed themselves to the claims program. The number of putative class members going through the EQIS program grossly exceeds the number of named Plaintiffs and presumably other clients retained by Plaintiffs' counsel.

Concerning difficulties with managing a class action here it is obvious that there will be a need for individual trials on numerous issues: trespass, nuisance, proximate causation, damages, etc. The hoped for economies would never materialize.

Based on the foregoing, Plaintiffs cannot establish that a class action is superior to other available methods for the fair and efficient adjudication of this dispute. As a result, their Motion for Class Certification must be denied.

## III. INCLUSION OF BUSINESS ENTITIES IN PLAINTIFFS' PROPOSED "MANDATORY EVACUATION" SUBCLASS FURTHER UNDERMINES TYPICALITY, ADEQUACY AND PREDOMINANCE.

Inexplicably, Plaintiffs seek to certify a "mandatory evacuation" subclass that includes both individuals and businesses.[49] *See* Pl. Mem. at 3. Individual putative class members' claims, however, are wholly dissimilar from the claims of businesses within the putative class. Xios Restaurant and Alamo Concrete's claims arise from the fire's alleged impact on their profits,

---

[49] Initially, Plaintiffs proposed a "business/economic loss" subclass comprised exclusively of businesses that were allegedly injured by the evacuation. Subsequently, Plaintiffs collapsed the business/economic loss subclass into the proposed "mandatory evacuation" and "voluntary evacuation" subclasses. SAC, ¶ 42 (a)-(e). No representative plaintiff operates a business within the "voluntary evacuation" zone. Presumably, Plaintiffs have abandoned the business portion of the "voluntary evacuation" subclass, since they have presented no viable representative of such a group.

while individual class members' claims arise from the fire's alleged impact on them personally – trespass, nuisance, inconvenience. Indeed, an inherent conflict of interest exists between Alamo, Xios and other businesses in the putative class - who will seek to maximize damages based on lost profits - and individuals, who will seek to maximize damages based on evacuation expenses and intangible personal losses. Consequently, combining businesses and individuals into the same subclasses underscores why a class should not be certified.

**A. Plaintiffs' proposed business representatives for the "mandatory evacuation" subclass have claims atypical of the class they seek to represent.**

Plaintiffs' "broad brush" approach exacerbates the absence of typicality of the representative plaintiffs.[50] Individual representatives primarily seek compensation for expenses incurred from the loss of use of their residences, while business representatives seek "loss of profits." *See, e.g.,* Beaulieu Dep. (Ex. 13) at 39-40; B. Borden Dep. (Ex. 17) at 67-68; M. Borden Dep. (Ex. 18) at 69; SAC at ¶¶ 48, 50. Since individual plaintiffs' pursuit of their claims will not advance business claims, and vice versa, they lack typicality.

The claims of representative plaintiffs Denise Hatzidakis (owner of Xios Restaurant) and Anne and George Acosta (owners of Alamo Concrete Placement, LLC) are not even typical of each other, let alone the class they seek to represent. Xios operates a restaurant within the "mandatory evacuation" zone; thus, it alleges that it lost profits when it could not open for business. Xios Supp. Resp. No. 13 (Ex. 36). Alamo, on the other hand, operates a concrete business that performs its services at construction sites throughout the Triangle - none of which were within the "mandatory evacuation" zone. Thus, Alamo alleges it lost profits when it lost

[50] *Cf. Manual for Complex Litigation (Fourth)* § 21.23 at 272 (describing the need for separate subclasses to account for variation in injuries and relief sought within a putative class).

access to its office within the evacuation zone, as well as equipment and supplies stored there. Alamo Supp. Resp. No. 13 (Ex. 40).

The methods by which Xios and Alamo would measure alleged economic losses are also distinctly different. Restaurants like Xios generate revenue from a large number of customers and small transactions, while construction subcontractors like Alamo generates revenue from a limited number of customers and large transactions, thus creating different issues of proof in allocating and attributing lost profits to the time of the evacuation. Different cost drivers, expenses and accounting methods will also require Xios and Alamo to offer individualized, proof to measure lost profits.

Testimony by Mrs. Hatzidakis and the Acostas highlights the fact that proof of their claims will do nothing to establish such claims on behalf of other businesses within the "mandatory evacuation" zone. Mrs. Hatzidakis, for example, initially claimed that Xios was "shut down during October 6 and October 7" and "incurred loss of profits during this time." *See* SAC, ¶¶ 48, 50. During her Rule 30(b)(6) deposition on behalf of Xios, however, Mrs. Hatzidakis admitted that the restaurant reopened on Saturday, October 7. Thus, it was closed for three meal services - lunch and dinner on Friday, October 6, and lunch on Saturday, October 7. Dep. of Xios (Ex. 36) at 48:5-21. Notwithstanding the brevity of this interruption, Ms. Hatzidakis claims 69 days of "lost profits," despite the fact that Xios has operated at a loss throughout its existence. *Id.* at 269-271. Perhaps implicitly acknowledging the problems inherent in claiming lost profits on behalf of an unprofitable business, Ms. Hatzidakis actually describes her losses as "lost revenues" rather than lost profits. Dep. of Xios (Ex. 36) at 269-

272.[51] Plaintiffs' claims on behalf of the class, however, are for lost profits, not lost revenues, so Xios' "lost revenues" claims are inherently atypical of the class it seeks to represent.

Deeper analysis of Xios' finances does nothing to bolster Ms. Hatzidakis' claims, but it does highlight the need for individualized proof with respect to lost profit damages. Ms. Hatzidakis admitted that the restaurant experienced seasonal decreases in revenue during similar time frames in prior years. She also admitted that many factors affect the number of customers that dine at the restaurant. Finally, she acknowledged that Xios' revenues were higher shortly after the fire than they had been shortly before the fire (comparing, *e.g.*, daily revenue Wednesday before the fire to daily revenue Wednesday after the fire). *Id.* at 137-138, 300-304.[52] Accordingly, establishing causation would require a detailed, fact-specific analysis. As such, her claims are atypical of the class she seeks to represent.

Alamo Concrete's claim for lost profits is completely different, albeit equally speculative. There is no evidence that any of Alamo's jobsites were affected by the evacuation.[53] Thus, Alamo's claims will rise and fall based on whether they could have operated as usual, despite the evacuation. Facts at issue include whether or not any of the equipment stored at the Acostas' home in Apex was actually needed on October 6 or October 7, whether or not they were actually prevented from retrieving such equipment, and whether they could have mitigated damages, either by renting replacement equipment or otherwise. In addition, residential construction is seasonal, and the Apex fire occurred at a time of year when residential construction is winding

[51] Defendants dispute the contention that "lost revenues" are compensable under North Carolina law.

[52] As described in detail above, this fact makes Xios owner Denise Hatzidakis an inadequate representative of the class she seeks to represent, since her claims are atypical of the class.

[53] Despite Defendants' repeated, abortive attempt to gain some insight into the basis for Alamo's claim of lost profits, it is unclear whether Alamo would normally have done any work on Saturday, October 7. Dep. of Alamo Concrete (Ex. 39) at 31:6-18.

down. Even if Alamo is able to document jobs that could not be addressed on October 6 or October 7, the work may not have been "lost" – it may have been completed on a later date. The Acostas will also need to explain why, if Alamo would otherwise have performed services on Saturday, October 7, they were unable to retrieve their equipment and restart operations when the evacuation was lifted on Saturday morning. The Acostas' potential failure to mitigate damages highlights the individualized proof at issue with respect to claims for lost profits, and highlights the atypicality of Alamo's claims.

Even if Xios or Alamo somehow managed to clear the twin hurdles of proving causation and damages, their testimony would shed no light on any other business within the putative class. This Court would still need to conduct a mini-trial on causation and damages for each of the "hundreds of businesses in Apex" that Plaintiffs claim experienced lost profits as a result of the fire and evacuation. Plaintiffs' Mem. at 3. The North Carolina Court of Appeals has recognized as much, explaining that lost profits must be evaluated on a case-by-case basis:

> "North Carolina courts have long held that damages for lost profits will not be awarded based upon hypothetical or speculative forecasts of losses."
> . . .
> This Court has chosen to evaluate the quality of evidence of lost profits on an individual case-by-case basis in light of certain criteria to determine whether damages have been proven with "reasonable certainty."

*Castle McCulloch, Inc. v. Freedman*, 169 N.C. App. 497, 502, 610 S.E.2d 416, 420 (2005), aff'd, 360 N.C. 57, 620 S.E.2d 674 (2005) (quoting *Iron Steamer, Ltd. v. Trinity Rest., Inc*., 110 N.C.App. 843, 847, 431 S.E.2d 767, 770 (1993)).

Here, "lost profits" claimed by Xios and Alamo are idiosyncratic and speculative. It seems unlikely that either business will be able to demonstrate lost profits for themselves, let alone on behalf of the class they seek to represent. *Dalton v. Camp*, 138 N.C.App. 201, 214, 531 S.E.2d 258, 267 (2000) *rev'd on other grounds* 353 N.C. 647, 548 S.E.2d 704 (2001) (explaining

that claim for lost profits must be based on "the usual profits of a regularly established business prior to the tortious conduct").

Recognizing the need to evaluate lost profits on a case-by-case basis, other courts have refused to certify claims for lost profits based on evacuation. *See, e.g., Bradford* , 2007 WL 2893650 at *13 (refusing to certify a "business/economic loss subclass," noting that proposed representative's business "had limited hours of operation on Saturday" which was "not typical of [other] businesses [within the subclass] with regular business hours"); *Turnage* at *13 (explaining that a business which planned to be open only part of the day is atypical of businesses that would have been open all day but for the evacuation). The same logic applies here, leading to the inescapable conclusion that the claims of Xios and Alamo are not typical of the class they seek to represent.

**B. Plaintiffs have offered no adequate business representative for the "mandatory evacuation" subclass.**

Xios and Alamo are not adequate representatives of other businesses within the putative class, let alone the thousands of individuals whose claims would also be at issue. Xios, for example, has operated at a loss throughout its existence. *See* Xios Restaurant Dep. (Ex. 35) at 269-271. Xios is therefore unable to present its own claim for lost profits, let alone pursue such claims on behalf of a class. *See Dalton v. Camp*, 138 N.C.App. at 214; *Castle McCulloch*, 169 N.C. App. at 502.

Nor has Alamo provided anything beyond "hypothetical or speculative forecasts of losses." *Id*. Alamo has failed to produce any documentation of "lost profits" – the claim contained in the Complaint filed on Alamo's behalf - as opposed to lost revenues, nor has Alamo provided requested information on its business expenses associated with the evacuation. *Id.* at

24-25.[54] Attempts to obtain this information in the six months since Ms. Acosta's deposition have been unavailing, and Alamo has steadfastly refused to Plaintiffs cure these deficiencies despite repeated requests. Ms. Acosta's failure to read the pleadings, initial disclosures or discovery responses filed on her behalf, described in detail above, apply equally to her role on behalf of Alamo, as does her failure to make any attempt to understand the NCDENR findings about the fire or otherwise investigate the merits of her claims. *See* Dep. of A. Acosta (Ex. 14) at 224-225, 240-242, 65-72. Simply put, Ms. Acosta and her business Alamo are inadequate representatives for the class she seeks to represent, as she has provided little or no evidence of lost profits, and her efforts fall far short of the "forthrightness and vigor" the proposed class is entitled to. *See London*, 340 F.3d at 1254.

### C. Plaintiffs' Claims For "Lost Profits" Raise Individualized Questions That Predominate.

The predominance analysis laid out in detail above with respect to Plaintiffs' individual claims applies with equal, if not greater, force to Plaintiff's business claims. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342-43 (4th Cir. 1998) (explaining that "each putative class member's claim for lost profits damages was inherently individualized and thus not easily amenable to class treatment"). Although Plaintiffs offer the conclusory assertion that all businesses within the mandatory and voluntary evacuation zones experienced "lost profits" as a result of the fire and evacuation, they do not address how they plan to use generalized proof to demonstrate causation and damages – "lost profits" -- for all businesses within the putative class, as would be required in order to justify class treatment. *See* SAC, ¶ 42.

[54] EQIS served a detailed list of topics in advance of the deposition. However, Alamo representative Anne Acosta testified that she did not review EQ's Rule 30(b)(6) notice prior to her deposition. Dep. of Alamo (Ex. 39) at 12-15.

The above-described testimony on behalf of Xios and Alamo highlights the individualized nature of a claim for lost profits and the fact that generalized proof cannot establish such claims here. As a result, this Court would need to conduct a mini-trial for each of the "hundreds of businesses in Apex" that Plaintiffs claim experienced lost profits as a result of the fire and evacuation. *See* Plaintiffs' Mem. at 3.

Recognizing the need to evaluate lost profits on a case-by-case basis, other courts have refused to certify claims for lost profits in similar circumstances. *See, e.g., Bradford,* 2007 WL 2893650**.** In refusing to certify a business subclass, the court in *Bradford* noted that individualized proof would dominate resolution of the business claims:

> Each business will have to present individualized proof as to the facts and circumstances surrounding its claimed economic loss. Such proof will include whether a particular business is open on Saturdays, its normal hours of operation and the length of its closure on October 15th. The end result will be a series of individual mini-trials to determine if an economic loss has in fact taken place. These mini-trials will dominate the proceedings. As such the common questions of law or fact common to the class are not predominate in this subclass.

*Id*. at *15. The same logic applies here, and class certification must be denied.

**IV. THIS COURT SHOULD NOT CERTIFY "ISSUES" FOR CLASS TREATMENT**

Consistent with their ever-evolving proposed class definitions and narrowed claims, and in pursuit of their goal of finding *something* that may be certified as a class, Plaintiffs' Memorandum sets forth a "fall back" position in favor of issue certification under Rule 23(c)(4)(A). Mem. at 22-24. However, Plaintiffs cannot resort to issue certification as a way to bypass the predominance and superiority requirements of Rule 23(b). *Gunnells*, cited by Plaintiffs at 22-23, makes clear that court may not cherry pick one or more claims and deem them to be appropriate for certification unless all of the Rule 23(a) and Rule 23(b) requirements are satisfied. *See Gunnells*, 348 F.3d at 446 (issue certification requires that "within that

[severed] claim or claims (rather than within the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met."). As the Fifth Circuit has held, "[a] district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial." *Castano v. American Tobacco Co*., 84 F.3d 734, 745 n. 21 (5th Cir. 1996); *see also Chisolm v. TranSouth Financial Corp.*, 184 F.R.D. 556, 566 (E.D. Va. 1999) (issue certification appropriate only where there are "advantages and economies to be achieved by a single adjudication of common issues").

Issue certification as proposed by Plaintiffs simply cannot overcome the problems inherent in Plaintiffs' proposed subclasses and claims. Even if the Court certified the single issue of whether Defendants were negligent in causing the EQ fire, and even assuming that Defendants are found to be negligent, this would not resolve even a single class member's claim for damages. Instead, the Court still would face with an overwhelming number of individual issues to determine whether the negligence proximately caused any injury to each class member, and what damages that individual or business entity sustained. As discussed at length above in the "predominance" and "superiority" sections, each putative class member would need to offer their own evidence on, among other issues, where they were when the fire began, what they observed, whether smoke affected his person or property, what he did in response to the evacuation, and evidence quantifying any alleged damages for loss of use or inconvenience. In addition, much of the same evidence needed to establish negligence (what materials were in the EQNC facility, when they arrived, how they were handled, how and whether wind conditions

affected the fire) would need to be presented again in the individual trials on proximate causation and damages. Because proof of these individualized issues would necessarily overwhelm the single common issue of Defendants' negligence, neither the predominance nor the superiority requirements can be met. *Castano*, 84 F.3d 734 at 745 n. 21 ("Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended"); *Chisolm*, 184 F.R.D. at 566; *Snow v. Atofina Chem, Inc.*, 2006 WL 1008002 (Ex. 39) (rejecting issue certification for lack of predominance where each "will require individual proofs regarding: duration and level of exposure; the nature and extent of alleged injuries; causation, which will include an assessment of prior and current medical histories; and, damages).

## CONCLUSION

A careful review of the underlying facts and the nature of Plaintiffs' claims establishes that Plaintiffs have not carried their burden of meeting the requirements of Federal Rule Civil Procedure 23 for class certification. The Motion fails on multiple grounds and should be denied.

Dated this the 12th day of May, 2008.

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC

_/s/ Frederick W. Rom
Frederick W. Rom (N.C.S.B. No. 26675)
John J. Bowers (N.C.S.B. No. 23950)
Michael T. Wood (N.C.S.B. No. 32427)
P. O. Box 13069
Research Triangle Park, NC 27709
Telephone: (919) 484-2304
Fax: (919) 484-2091
Email: from@wcsr.com

*Attorneys for EQ Industrial Services, Inc. and EQ Holding Company*

/s/ Steven B. Epstein
Steven B. Epstein
Edward A. Wyatt
Hunton & Williams LLP
One Bank of America Plaza
421 Fayetteville Street, Suite 1400
Raleigh, NC 27601

*Attorneys for Philip Services Corporation and Allworth, Inc.*

/s/ Richard T. Boyette
Richard T. Boyette
Cranfill, Sumner & Hartzog, LLP
5420 Wade Park Blvd, Suite 300
Raleigh, NC 27607

*Attorneys for ST Mobile Aerospace Engineering, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 12th day of May, 2008 he filed the foregoing DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION on the Court's electronic docketing system and thereby made service upon the following counsel of record:

Robert E. Zaytoun (Liaison counsel for Plaintiffs)
W. Stacy Miller, II
Zaytoun and Miller, Attorneys at Law
414 West Jones Street
Raleigh, NC 27603

Steven B. Epstein
Edward A. Wyatt
Hunton and Williams LLP
One Bank of America Plaza
421 Fayetteville Street, Suite 1400
Raleigh, NC 27601

Richard T. Boyette
Cranfill, Sumner & Hartzog, LLP
5420 Wade Park Blvd, Suite 300
Raleigh, NC 27607

/s/ Frederick W. Rom