IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:06-CV-400-BR
ALL CASES

SUELLEN A. BEAULIEU, *et al.*,          )
                                        )
            Plaintiffs,                 )
                                        )          **MEMORANDUM AND**
        v.                              )          **RECOMMENDATION**
                                        )
EQ INDUSTRIAL SERVICES INC., *et al.*,  )
                                        )
            Defendants.                 )

## CONTENTS

INTRODUCTION ................................................................................................ 2

BACKGROUND ................................................................................................ 3

DISCUSSION ..................................................................................................... 6

I.   CERTIFICATION OF SETTLEMENT CLASS AND SUBCLASSES ................... 6

    A.   Requirements for Class Certification ............................................. 7

    B.   Definition of the Class and Subclasses ......................................... 10

    1. Requirements for Class and Subclass Definitions ........................... 10

    2. Proposed Definition of the Class and Subclasses .......................... 11

    3. Analysis of Definition of the Class ................................................. 13

    4. Analysis of Definition of the Recommended Evacuation Subclass .......... 13

    5. Analysis of Definition of the Secondary Evacuation Subclass ............ 15

    6. Analysis of Definition of the Business Loss Subclass ...................... 17

    C.   Rule 23(a) Requirements ................................................................ 19

    1. Numerosity ......................................................................................... 19

    2. Commonality ...................................................................................... 20

    3. Typicality ............................................................................................ 23

    4. Adequacy ............................................................................................ 26

        a. *Vigorous Prosecution* .............................................................. 26

        b. *Common Interest* ...................................................................... 29

    D.   Rule 23(b)(3) Requirements .......................................................... 35

    1. Predominance ..................................................................................... 35

    2. Superiority .......................................................................................... 38

II.    PRELIMINARY APPROVAL OF CLASS SETTLEMENT ...................................    41
       A.    Standards for Preliminary Approval ............................................    41
       B.    Fairness ......................................................................................    42
       C.    Adequacy ...................................................................................    44
III.   APPROVAL OF CONTENT AND METHOD OF CLASS NOTICE ....................    48
       A.    Standards for Approval ...............................................................    48
       B.    Content of the Proposed Notice ..................................................    49
       C.    Proposed Method of Notice ........................................................    56
IV.    OTHER MATTERS ...........................................................................................    58
       A.    Notice under the Class Action Fairness Act of 2005 .................    58
       B.    Appointment of Settlement Administrator .................................    58
       C.    Appointment of Guardian Ad Litem ..........................................    59
       D.    Stay Pending Proceedings on Settlement ...................................    59
CONCLUSION ...............................................................................................................    59
APPENDIX A—Contents of PSA ..................................................................................    65
APPENDIX B—Exhibits to PSA ...................................................................................    66
APPENDIX C—Exhibits to Plaintiffs' Memorandum ....................................................    67

## INTRODUCTION

This consolidated case comes before the court on the joint motion ("Jt. Mot.") by all the parties for preliminary approval of the settlement they have reached and certification of the proposed settlement class and subclasses (D.E. 373). The motion is accompanied by the parties' Preliminary Settlement Agreement ("PSA") (D.E. 373-2), dated 23 March 2009, and the exhibits thereto (D.E. 373-3 to -8; 374-2 to -4; and 375).[1] Plaintiffs have filed a supporting memorandum ("Pls.' Mem.") (D.E. 376) with exhibits (D.E. 376-2 to -19; and 377; *see also* 383).[2] The motion was referred to the undersigned Magistrate Judge for review and recommendation, pursuant to 28 U.S.C. §

---

[1] Tables showing the contents of the PSA and the exhibits to it are attached hereto as Appendices A and B, respectively.

[2] A table showing the exhibits to the supporting memorandum is attached hereto as Appendix C.

636(b)(1)(B), and is ripe for adjudication. For the reasons set forth below, it will be recommended that the motion be allowed in part and denied in part. The partial denial is based on recommended changes to the proposed class notice.

## BACKGROUND

This case arises from a fire which occurred at a facility ("EQ facility") located in Apex, North Carolina owned and operated by defendants EQ Industrial Services, Inc. ("EQ Industrial") and EQ Holding Company (collectively, "EQIS").[3] (Fourth Supplemental and Amended Master Class Action Complaint (D.E. 370) ("4th Compl.") ¶¶ 2, 10-12). In this facility, EQIS stored, handled, processed, and disposed of hazardous waste. (*Id.* ¶ 15). The fire began on 5 October 2006 and burned for three days destroying much of the EQ facility. (*Id.* ¶ 16). Plaintiffs allege that the fire released toxic, hazardous, and ultra-hazardous materials into the surrounding neighborhoods. (*Id.*). The fire also produced a purported chemical cloud, which was visible or odorous over the town of Apex and other parts of Wake County. (*Id.* ¶ 17). As a result of the fire and cloud, local authorities ordered mandatory evacuation of a defined area surrounding the EQ facility. (*Id.* ¶ 18). Some individuals in areas outside of the mandatory evacuation area also voluntarily evacuated. (*Id.*).

Plaintiffs allege that the rapid spread of the fire was due in part to unspent chemical oxygen generators ("COGs") in the EQ facility. (*Id.* ¶ 23.d.). COGs are used in commercial aircraft to supply emergency supplemental oxygen to passengers in the event of an emergency. (*Id.* ¶ 27). Defendant ST Mobile Aerospace Engineering, Inc. ("MAE") is an independent aviation maintenance

---

[3] The court cautions that in other filings in this case "EQIS" refers to EQ Industrial Services, Inc. alone  The collective definition given above is the one used in the joint motion, the supporting memorandum, and the PSA. The court is therefore using the collective definition in this Memorandum and Recommendation to facilitate reference to. these documents.

company with a service facility in Mobile, Alabama which performs aircraft inspections. (*Id.* ¶¶ 13, 27, 29). As part of such inspections, MAE removes COGs from aircraft when their useful life has expired. (*Id.* ¶ 29). These COGs must be disposed of as a hazardous material pursuant to federal regulations. (*Id.*). The COGs in question were sent by MAE to defendant Allworth, LLC (formerly known as "Allworth, Inc."), a solvent reclamation and hazardous waste collection facility in Alabama. (*Id.* ¶¶ 14, 31). The COGs were then transported to the EQ facility. (*Id.* ¶ 31).

By 10 October 2006, four days after the fire began, four cases[4] pled as class actions were filed in this court, or in state court and subsequently removed to this court, in connection with damages allegedly suffered by individuals and businesses from the fire. Jurisdiction in this court is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. (*Id.* ¶ 4). On 20 June 2007, the court consolidated each of these cases for all pre-trial proceedings and ordered that the parties file a consolidated, amended complaint. (D.E. 31). On 2 July 2007, plaintiffs filed their first master amended complaint (D.E. 32). On 15 October 2007, plaintiffs filed a second master amended complaint (D.E. 105) with leave of court (D.E. 96). On 2 January 2008, plaintiffs filed a motion for class certification. (D.E. 137).

---

[4] The four cases are: *Suellen A. Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-CV-400-BR; *Jennifer Shapiro v. EQ Indus. Servs., Inc.*, No. 5:06-CV-406-BR; *Timothy Carley v. EQ Indus. Servs., Inc.*, No. 5:06-CV-408-BR; and *Michael Borden v. EQ Indus. Servs., Inc.*, No. 5:06-CV-472-BR (removed 13 Nov. 2006). A fifth lawsuit filed in state court on 10 November 2007 was removed to this court and consolidated with these four cases (*see* D.E. 31). *Nathan Curtis Bullock, Jr. v. EQ Holding Co.*, No. 5:06-CV-471-BR. However, *Bullock*, not pled as a class action, was voluntarily dismissed by plaintiff on 30 January 2008 without prejudice. (*See* Stipulation of Dismissal (D.E. 162)). Notwithstanding the dismissal, the PSA includes *Bullock* as one of the cases encompassed by the instant case. (PSA § 3.10). The error appears immaterial, however, because the other provisions of the PSA would encompass the claims in *Bullock*, assuming, of course, that the plaintiff in *Bullock* falls within the settlement class. An additional case filed in state court on 19 June 2008 was removed to this court on 5 September 2008 where it remains pending. *Cooper Tools, Inc. v. EQ Indus. Servs., Inc.*, No. 5:08-CV-445-BR. It is being recommended herein that plaintiff's counsel in that case be sent the class notice; defendants' counsel is the same as in the instant case. Another case arising from the fire was apparently filed in state court in 2008, but later dismissed with prejudice. *Dreams Sports Center, LLC v. EQ Indus. Servs., Inc.*, 08 CVS 1347 (Wake Co. Sup. Ct.).

On 28 April 2008, pursuant to a motion (D.E. 113) by Allworth and defendant Philip Services Corporation ("PSC"), the court dismissed all claims against PSC, and the claims for strict liability, *res ipsa loquitur*, nuisance, and trespass against Allworth and MAE. (Dismissal Order (D.E. 181) at 11). The court further ruled that plaintiffs may not recover for mental anguish on their negligence and negligence per se claims. (*Id.*). On 22 October 2008, plaintiffs filed a third master complaint (D.E. 317) with leave of court (D.E. 283, 315), in part, to reflect the court's dismissal ruling.

In the meantime, on 2 September 2008, plaintiffs and EQIS notified the court that they had reached a settlement as to all claims against EQIS. (*See* 4 Sep. 2008 Order (D.E. 283)). The settlement was set out in the initial version of the PSA, which is the same as the current version of the PSA in most material respects. (*See* D.E. 303-2). On 7 October 2008, plaintiffs and EQIS filed a motion for preliminary approval of the settlement (D.E. 301) and a motion to certify the class for the purposes of the settlement (D.E. 299). Plaintiffs' initial motion for class certification, applicable at this point to only the claims against the non-settling defendants, MAE and Allworth, was also pending. The court heard argument on these motions on 28 October 2008, and the parties made post-hearing submissions (including revised versions of exhibits to the initial PSA (*see, e.g.*, D.E. 329).

On 12 February 2009, prior to a ruling on these motions, the parties advised the court (D.E. 346) that settlement had been reached between plaintiffs and MAE and Allworth, and plaintiffs withdrew their motion for class certification as to these defendants (D.E. 347). The court subsequently held two telephone status conferences with the parties. (*See* post[5] D.E. 347, 349). As a result of these conferences, the parties withdrew the other motions which had been pending (D.E.

---

[5] "Post" signifies that the entry referenced is unnumbered but follows the numbered docket entry indicated.

349), and filed the instant motion and supporting documents, and a fourth amended master complaint.

In this current version of the complaint, plaintiffs assert claims of negligence and negligence per se against all defendants and an additional claim of *res ipsa loquitur* against EQIS. (4th Compl. ¶¶ 54-98). Plaintiffs seek compensatory damages for the necessity to evacuate homes and businesses, loss of use of homes and businesses, lost earnings and wages, lost profits from businesses, inconvenience, and other alleged losses, and punitive damages. (*Id.* ¶¶ 35, 99-100).

Outside this litigation, EQ Industrial has operated a claims reimbursement program providing payments to persons and entities who claimed damages as a result of the fire. (Maris Aff. (D.E. 191-2) ¶ 5).[6] As of 31 March 2008, approximately 1,988 individuals, businesses, and municipalities have received payments through this program. (*Id.* at ¶ 10).

## DISCUSSION

## I. CERTIFICATION OF SETTLEMENT CLASS AND SUBCLASSES

In their motion, the parties seek conditional certification of this case as a class action for purposes of settlement in accordance with the PSA. (*See* Jt. Mot. at 1 ¶ 1; PSA § 5.4). Specifically, the PSA provides that in the event the settlement is not approved, the PSA is terminated, there is no

---

[6] In its consideration of the parties' motion, the court has not limited itself to evidence presented with the motion and memorandum, but has considered the complete and significant body of evidence that has been developed over the course of these proceedings. The courts have recognized the permissibility, if not the need, to examine the evidentiary record in determining certification issues. *See, e.g., General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question"); s*ee also Vernon Gries v. Standard Ready Mix Concrete, L.L.C.*, No. C07-4013-MWB, 2009 WL 427281, at *3 (N.D. Iowa 20 Feb. 2009) (collecting cases and holding that "to determine whether the requirements of Rule 23(a) have been satisfied, the court must examine the factual basis for the plaintiff's claims and may examine not only the pleadings but also the evidentiary record, including any affidavits and results of discovery."). In the settlement context, as here, such a comprehensive review of the record is consistent with the court's obligation to apply heightened scrutiny to the certification requirements designed to protect absent class members. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997).

class certification, and the status of the litigation will be as it was prior to the PSA without prejudice to the parties' positions regarding class certification and otherwise. (PSA § 5.5). The law permits conditional certification for settlement purposes only. *See Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S.D. Fla. 2006).

However, even where the parties agree to class certification as part of a settlement, the court must still review the case to ensure that it meets the requirements for certification under Fed. R. Civ. P. 23. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997). Indeed, "those [requirements] designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heightened, attention in the settlement context." *Id.* The one exception is that the court "need not inquire whether the case, if tried, would present intractable management problems," because settlement eliminates the need for a trial. *Id.* The court therefore turns now to the applicable requirements for certification of the instant case.

## A.      Requirements for Class Certification

A central purpose of class actions is to promote judicial economy and efficiency. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003). "[C]lass actions also 'afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions.'" *Id.* (quoting 5 James Wm. Moore, *et al.*, Moore's Federal Practice § 23.02 (3d ed. 1999)). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997). Although the commentary to Rule 23 states that "a 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action," the Fourth Circuit has

7

"embraced the view that the mass tort action for damages may be appropriate for class action, either partially or in whole" where such actions meet the predominance and superiority requirements of Rule 23(b)(3), which are discussed below. Rule 23 advisory committee's notes (1966 amend. subdiv. (b)(3)); *Gunnells*, 348 F.3d at 424 (citations omitted).

To be certified as a class action under Rule 23, an action must meet the requirements of both subsections (a) and (b) of Rule 23. *Haywood v. Barnes*, 109 F.R.D. 568, 575 (E.D.N.C. 1986). The burden of proving satisfaction of these requirements rests with the parties seeking class certification. *Garcia v. Veneman*, 211 F.R.D. 15, 18 (D.D.C. 2002) (citing *McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n.9 (D.C. Cir. 1984)). Rule 23(a) requires that a precisely defined class exist and that the proposed class representatives be members of the putative class. *Id.*;109 F.R.D. at 576; *see East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) ("a class representative must be a part of the class"). In addition, the four prerequisites expressly set out in Rule 23(a) must be satisfied. *Id.* They are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). These requirements are often referred to as numerosity, commonality, typicality, and adequacy, respectively.

If the prerequisites under Rule 23(a) are met, the action must then satisfy one of the three alternative sets of requirements under Rule 23(b). *Id.* (b). Here, plaintiffs allege a class action maintainable under Rule 23(b)(3). It requires: (1) that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and (2) that a

8

class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *Id.* (b)(3). These requirements may be referred to as predominance and superiority, respectively. Rule 23(b) goes on to provide a non-exclusive list of factors pertinent to predominance and superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.* (A)-(D). As indicated above, in the settlement context the court need not consider trial management issues because there is to be no trial. *Amchem*, 521 U.S. at 620.

Rule 23(c)(5) expressly authorizes the division of a class into subclasses. Fed. R. Civ. P. 23(c)(5). The subclasses "are each treated as a class under this rule" and therefore must meet the same certification requirements applicable to a class. *Id.*; *Johnson v. Am. Credit Co. of Ga.*, 581 F.2d 526, 532 (5th Cir. 1978) (citing former edition of 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1790 at 608-09 (3d ed. 2005)); *Farrar & Farrar Dairy, Inc. v. Miller-St. Naziarz, Inc.*, 254 F.R.D. 68, 76 (E.D.N.C. 2008) ("A subclass must independently satisfy all of the requirements of Rule 23.").

Rule 23 should be given "a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case 'best serve the ends of justice for the affected parties and . . . promote judicial efficiency.'" *In re A.H. Robins*, 880 F.2d 709, 740 (4th Cir. 1989), *abrogated on other grounds by Amchem*, 521 U.S. 591 (1997) (internal citations omitted). Courts have "'wide discretion in deciding whether or not to certify a proposed class,'" and a decision to certify a class action "'may be reversed only for abuse of discretion.'" *Central Wesleyan College*

9

*v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (citations omitted). With the foregoing principles in mind, the court will now address in turn each of the requirements for certification as they relate to the claims against defendants.

**B.     Definition of the Class and Subclasses**

**1.     Requirements for Class and Subclass Definitions**

The definition of the class and subclasses serves three important purposes: "it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best practicable notice' in a Rule 23(b)(3) action.'" *Manual for Complex Litigation* § 21.222 at 270 (4th ed. 2004). The definition must accordingly be "precise, objective, and presently ascertainable." *Id.*; *see also NOW v. Scheidler*, 172 F.R.D. 351, 357 (N.D. Ill. 1997) (to constitute an identifiable class, it must be possible to identify class members by reference to objective criteria).

Although a determination must always be made whether a particular person is a member of a class, the definition should not require the court to engage in extensive fact finding to determine an individual's membership in the class. *See Cuming v. South Carolina Lottery Com'n*, No. 3:05-CV-3608-MBS, 02008 WL 906705, at *1 (D.S.C. 31 Mar. 2008). In addition, the class or subclass should not be defined in terms that require resolution of the merits of the case. *Id. Newberg on Class Actions* states that in suits for damages the class or subclass should describe three principal things:

1.     a common transactional fact or status predicated on the cause of action, such as purchasers, stockholders, or franchisees;

2.     the time span appropriate to the cause of action;

3.     any appropriate geographical scope.

10

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 6:17 (4th ed. database updated December 2008) ("*Newberg*").

The definition of the class ultimately is to be determined by the court, not the parties. *See* Fed. R. Civ. P. 23(c)(1)(B) (class certification order "must define the class") and (C) (the order "may be altered or amended before final judgment"). Specifically, "[i]f the court finds that the proposed definition is not sufficiently definite, it may modify the definition instead of dismissing the proposed action." *Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999); *see also In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("[C]ourts are permitted to limit or modify class definitions to provide the necessary precision."); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly.").

## 2. Proposed Definitions of the Class and Subclasses

In the course of this litigation, varying definitions of the proposed class and subclasses have been presented in the successive versions of the complaint, prior motions for class certification, and the prior version of the PSA. The changes in the definitions reflect a sharpening of the issues based on discovery and other developments in the course of litigation and settlement negotiations. In their joint motion, the parties seek certification of the class and subclasses as defined in the PSA. (*See* Jt. Mot. ¶ 1; Pls.' Mem. at 1, 4-5; PSA § 3.9). The definitions in the PSA are materially the same as those in the joint motion and current version of the complaint. (*See* Jt. Mot. ¶ 1; PSA § 3.9). The precise formulation of the definition of the class in the joint motion incorporates elements that are

11

set out in several different provisions in the PSA and complaint, and the court will accordingly analyze the definition in the joint motion.[7]  (*See* Jt. Mot. at 2 ¶ 1; PSA § 3.9; 4th Compl. ¶ 38).

The parties propose the following definition of the class:

> All natural persons, whether minor or adult, and Businesses including those falling within one or more of the following sub-classes, including any person or entity claiming by, through or under a Class Member (as defined in the PSA), who seek compensation for damages or losses related to the Incident other than personal injuries but excluding those persons or Businesses who would otherwise be Class Members, but who or which are: (i) EQIS, Allworth, MAE, Released Entities, or any of their employees, agents, Insurers, contractors, and subcontractors, including employees of EQIS', Allworth's, and MAE's agents, contractors or subcontractors, (ii) the Court and Court personnel and their immediate families, (iii) the attorneys who have made appearances for any of the Parties; and (iv) Opt Outs from the class.

(Jt. Mot. at 2 ¶ 1; *see* PSA § 3.9; 4th Compl. ¶ 38).  The term "Incident" is defined in the PSA as "the October 5-7, 2006 fire at EQIS' facility in Apex, North Carolina, and the subsequent evacuation of the area surrounding the facility." (PSA § 3.29).

The parties also propose three subclasses, defined as follows:

> Subclass 1—Recommended Evacuation Subclass: All natural persons, including minors and adults, who, on October 5, 2006 resided within the geographic boundaries of the area of the Recommended Evacuation Zone (as defined and designated in Exhibit B-1 [to the PSA]) and who evacuated in response to the Incident.

> Subclass 2—Secondary Evacuation Subclass: All natural persons, including minors and adults, who, on October 5, 2006 resided outside the geographic boundaries of the Recommended Evacuation Zone, but within the geographical boundaries of the Secondary Evacuation Zone (as defined and designated in Exhibit B-2 [to the PSA]), and who evacuated in response to the Incident.

> Subclass 3—Business Loss Subclass: All Businesses that were physically located within or geographically contiguous to the Recommended Evacuation Zone (as defined and designated in Exhibit B-1 [to the PSA]) on October 5, 2006 that were forced to

---

[7] For example, the definition of the class in the joint motion includes the agreed exclusion of damages for personal injuries (Jt. Mot. at 2 ¶ 1), whereas the exclusion is not included in the definition in the PSA or the complaint but is addressed elsewhere in each (PSA §§ 3.9, 3.21; 4th Compl. ¶¶ 38, 40).

cease business operations in response to the Incident and sustained provable economic losses as a result of the Incident.

(PSA § 3.9 (section numbers omitted); *see* Jt. Mot. at 2 ¶ 1; 4th Compl. ¶ 39).

### 3. Analysis of Definition of the Class

The class definition sets out a common event, which incorporates by reference the geographic and temporal limitations set out in the subclass definitions. *See Newberg* § 6:17. Although the class is defined as "including," as opposed to comprising, the members of the subclasses, the class in fact appears to be made up of only persons in one or more of the subclasses. The court does not believe that defining the class in terms of the subclasses makes the class definition invalid. Rather, this fact merely renders the sufficiency of the class definition dependent upon the sufficiency of the subclass definitions. The court also finds no impropriety in the exclusion from the class of those associated with the parties. This exclusion presumably serves to avoid potential conflicts of interest.

### 4. Analysis of Definition of the Recommended Evacuation Subclass

Stated generally, the Recommended Evacuation Subclass is defined to comprise all individuals residing in the Recommended Evacuation Zone that evacuated because of the fire. As defined in Exhibit B-1 to the PSA (D.E. 374-1), "the Recommended Evacuation Zone" refers to the limits of the Recommended Evacuation Zone when it reached its greatest size. Local authorities increased the size of the evacuation zone a number of times based on changing wind and other conditions until it reached these outermost limits. (Haraway Dep. (D.E. 357-2) at 73-74, 100). The court believes the proposed definition of the Recommended Evacuation Subclass adequately identifies those who would be entitled to relief, bound by a final judgment, and entitled to class action notice.

To come within the subclass, an individual must have been a resident of the Recommended Evacuation Zone on 5 October 2006 and must also meet the relatively specific requirement of having evacuated in response to the Incident. The court does not believe it unreasonable to use the first day of the Incident as the date for determining subclass membership. Under the circumstances, it appears unlikely that a significant number of individuals would have, or could have, become residents in the Recommended Evacuation Zone (or the Secondary Evacuation Zone, for that matter) on the latter two days of the Incident.

Residence in the Recommended Evacuation Zone should be readily determinable from public records. Indeed, the PSA provides for the generation by the court-appointed Settlement Administrator of a "Mailing Matrix" from reliable sources that is to contain all known residential addresses within the Recommended and Secondary Evacuation Zones, and all businesses physically located within or geographically contiguous to the Recommended Evacuation Zone. (PSA §§ 3.31, 6.1.1). Individuals not in the Mailing Matrix who nevertheless resided in the Recommended Evacuation Zone on 5 October 2006 should be able to readily prove that fact with leases, utility bills, or similar records, assuming, of course, they otherwise learn of the settlement. The PSA permits such proof of residency by individuals not in the Mailing Matrix. (*See* Proof of Claims Processing Protocol ("Claims Protocol"), PSA, Ex. A (D.E. 373-3)).

As to evacuation, the court again does not believe that extensive individual fact finding is required to determine membership in the subclass. The fact that residents in the Recommended Evacuation Zone were told to evacuate makes it likely that many did. Indeed, the evidence of record suggests that the response to the evacuation order was widespread. (*See, e.g.*, T. Wilder Dep. (D.E. 358-6) at 183 (unaware of anyone living near her who did not evacuate). Perhaps in recognition of

14

these circumstances, no separate proof of evacuation is required of members of the Recommended Evacuation Subclass under the PSA claims process, although claimants do need to check a box indicating under penalty of perjury whether or not they evacuated in response to the Incident. (Claims Protocol § 4.3; Rec. Evac. Subclass Claim Form, pt. IV, PSA, Ex. D-1 (D.E. 373-5)).

In any event, the need for individualized fact finding regarding evacuation would not preclude the giving of adequate notice. Notice is to be sent to all persons within the Recommended Evacuation Zone before their evacuation status is known, thereby helping to ensure that all in the Recommended Evacuation Subclass are notified of the settlement. (*See* PSA § 6.1.1). Individualized fact finding regarding evacuation may thereafter proceed as part of the claims process. The court concludes that membership in this subclass can appropriately be determined pursuant to the provisions of the PSA and Claims Protocol discussed.

### 5. Analysis of Definition of the Secondary Evacuation Subclass

Stated generally, the Secondary Evacuation Subclass is defined to comprise all individuals residing outside the Recommended Evacuation Zone but within the area purportedly covered by the plume from the fire, as modeled by plaintiffs' expert, William Zegel, PhD., who evacuated their property in response to the Incident. The court believes the proposed definition of the Secondary Evacuation Subclass adequately identifies those who would be entitled to relief, bound by a final judgment, and entitled to class action notice.

As with the Recommended Evacuation Subclass, membership in the Secondary Evacuation Subclass is limited geographically and temporally. Residence in the Secondary Evacuation Zone would likewise be readily determinable.

15

In contrast to the Recommended Evacuation Subclass, however, separate proof of evacuation is required with respect to the Secondary Evacuation Subclass. (*See* Claims Protocol § 4.3). The fact that putative members of the Secondary Evacuation Subclass were not subject to the evacuation order increases the possibility that some did not evacuate and that individualized fact finding on the issue will be needed to determine membership in the subclass. The court does not believe, however, that any such required fact finding would be excessive.

Among other reasons, evacuation could readily be proved by a hotel receipt or by an affidavit if evacuation was to a non-commercial location (*e.g.*, the home of a relative or friend). In fact, the PSA permits precisely this type of proof to establish evacuation for claims purposes. (*See* Claims Protocol § 4.3). Significantly, no separate proof of the reason for evacuation is required, although claimants will be required to check a box indicating under penalty of perjury whether or not they evacuated as a result of the Incident. (*Id.*; Sec. Evac. Subclass Claim Form, pt. IV, PSA, Ex. D-2 (D.E. 373-6)). The absence of a requirement for separate proof of the reason for evacuation finds support in the obvious fact that people typically spend the night at their residences during the work week unless there exists some emergency or other unusual circumstance.

Nevertheless, as with the Recommended Evacuation Subclass, the need for individualized fact finding regarding evacuation would not preclude the giving of adequate notice, which is to be sent to all persons within the Secondary Evacuation Zone based solely on their location. (*See* PSA § 6.1.1). The individualized fact finding process applicable to members of the Secondary Evacuation Subclass is adequate to address any fact finding required to determine subclass membership.

The court further concludes that the use of the plume as modeled by Dr. Zegel to establish the geographic boundary for the Secondary Evacuation Zone is appropriate. *See LaBauve v. Olin Corp.*,

16

231 F.R.D. 632, 663 (S.D. Ala. 2005) (holding that there "can be no reasonable dispute" that a subclass of putative class members in a chemical plant contamination suit was adequately defined by "the singular criterion of property ownership within the isopleth charted by [plaintiffs' air modeling expert]"). Dr. Zegel employed the AERMOD computer program in developing his plume model, a program officially recognized by the EPA for use in modeling dispersion of pollutants. (*See* Zegel Aff., Ex. 2 (D.E. 140-32) at 10). Dr. Zegel has a background showing expertise in the area of modeling the movement of pollutants through the environment. (*Id.* at 1, 3). In addition, there is other evidence in the record tending to corroborate the model. (*See* Zegel Aff. (D.E. 140-31, 140-32, 140-33)). The court accordingly believes that Dr. Zegel's model is adequate for purposes of defining the geographic boundaries of the Secondary Evacuation Zone.

### 6. Analysis of Definition of the Business Loss Subclass

The Business Loss Subclass is defined to consist of all businesses physically located within or geographically contiguous to the Recommended Evacuation Zone on 5 October 2006 that were forced to cease business operations in response to the Incident and sustained provable economic losses as a result of the Incident. The court believes this definition of the Business Loss Subclass adequately identifies those who would be entitled to relief, bound by a final judgment, and entitled to class action notice.

The court does not believe that extensive fact finding is required to determine membership in this subclass. The subclass is delimited both geographically and temporally. Whether a business was located in the specified area on 5 October 2006 is readily determinable as with the other two subclasses. (*See* Claims Protocol § 5.2). Using 5 October 2006 as the date for determining subclass

17

membership given the unlikelihood that a business would have begun operations on the latter two days of the Incident.

In addition, the question of whether a particular business ceased operations in response to the Incident and sustained provable economic losses as a result of the Incident should not entail elaborate fact finding. Most businesses within the Recommended Evacuation Zone are obviously likely to have had the access of their employees and customers blocked because of the evacuation order. Similarly, businesses bordering the Recommended Evacuation Zone are likely to have had their employees' and customers' access impeded due to the evacuation order. The effect of the evacuation order would therefore help narrow the proof of evacuation and its cause. The degree of fact finding would also tend to be limited by the relatively brief period over which the Incident occurred and the relatively modest relief provided for under the PSA (up to $2,200 per business), as discussed further below. The PSA recognizes the need in the claims process for individualized fact finding regarding cessation of operations and losses by businesses by requiring the submission of supporting proof. (*See* Claims Protocol § 5.2; Bus. Loss Subclass Claim Form, pt. III, PSA, Ex. D-3 (D.E. 373-7)).

In any event, as with the other subclasses, notice is to be sent to all businesses located within or geographically contiguous to the Recommended Evacuation Zone before their evacuation and loss status is known. (*See* PSA § 6.1.1). Individualized fact finding regarding cessation of operations and losses to determine subclass membership can then be handled appropriately in the claims process under the PSA.

18

## C.     Rule 23(a) Requirements

### 1. <u>Numerosity</u>

As noted above, numerosity requires that a class be so large that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Fourth Circuit has held that "[t]here is no mechanical test for determining whether in a particular case the requirement of numerosity has been satisfied." *Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35 (4th Cir. 1978). Numerosity must "be resolved in the light of the facts and circumstances of the particular case." *Id.*

Plaintiffs allege in their complaint that while the exact number of evacuees is not known, the estimated total number of evacuees exceeds 13,000. (4th Compl. ¶¶ 18, 49). In their memorandum and the preamble to the PSA, plaintiffs estimate more specifically that the Incident resulted in the evacuation of between approximately 10,200 and 12,000 residents in 3,900 households in the Recommend Evacuation Zone, and 900 residents in 300 households in the Secondary Evacuation Zone. (Pls.' Mem. at 3 (cites 12,000 figure); PSA § 2 at 2 (cites 10,200 figure)). They also estimate that the Incident caused the closing of approximately 542 businesses. (*Id.*). The court concludes that the number of potential class and subclass members is sufficient to satisfy the numerosity requirement. *See Gunnells*, 348 F.3d at 425 (affirming district court's conclusion that a class of 1400 employees and their families "easily" satisfied the numerosity requirement); *Central Wesleyan*, 6 F.3d at 183 (noting the district court's determination that 480 potential class members would satisfy the numerosity requirement); *Holsey v. Armour & Co.*, 743 F.2d 199 (4th Cir. 1984) (holding that the numerosity requirement was met with a proposed class of 46 to 60); *Thomas v. Louisiana-Pacific Corp.*, 246 F.R.D. 505, 509 (D.S.C. 2007) (approving a class action with of approximately 130 potential plaintiffs).

19

## 2. **Commonality**

To meet the commonality requirement of Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). However, the Rule "does not require that all, or even most issues be common, nor that common issues predominate, but only that common issues exist." *Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1992) (citing *Holsey*, 743 F.2d at 216-217). "When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected." *Newberg* § 3:10. The court, of course, recognizes that the commonality requirement of Rule 23(a)(2) is "'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 147 n.4 (4th Cir. 2001) (quoting *Amchem*, 521 U.S. at 609). However, while "[t]he issue of predominance is often treated by the courts in conjunction with their 23(a)(2) analysis," *Brown v. Cameron-Brown Co.*, 92 F.R.D. 32, 41 (D.C. Va. 1981),[8] it remains appropriate to analyze and discuss compliance with the commonality requirement distinctly in Rule 23(b)(3) cases. *See, e.g., Cox House Moving, Inc. v. Ford Motor Co.*, No. 7:06-1218-HMH, 2006 WL 3230757, at *6, 8 (D.S.C. 6 Nov. 2006) (analyzing commonality requirement separately and prior to reaching predominance question).

As indicated, plaintiffs bring claims of negligence and negligence per se against all defendants and an additional claim of *res ipsa loquitur* against EQIS. Under North Carolina law, the elements

---

[8] The *Brown* court further noted that "[t]he focus of the 23(b)(3) requirement . . . is different. Whereas (a)(2) addresses the issue of whether Rule 23 has any applicability at all to the law suit, (b)(3) addresses the issue of whether Rule 23 certification will have practical utility in the suit, considering the facts, substantive law, procedural due process, and fundamental fairness." *Brown*, 92 F.R.D. at 41-42.

of the negligence cause of action are: the existence of a legal duty or obligation, breach of that duty, proximate cause, and actual loss or damage. *McMurray v. Surety Federal Sav. & Loan Assoc.*, 82 N.C. App. 729, 731, 348 S.E.2d 162, 164 (1986); *see also* N.C. Pattern Jury Inst'n—Civil 102.11 & .19 (1994). A proximate cause is:

> a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Adams v. Mills*, 312 N.C. 181, 192-93, 322 S.E.2d 164, 172 (1984) (quoting *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984)). However, the key inquiry is "'whether the risk of injury, not necessarily in the precise form in which it actually occurs, is within the reasonable foresight of the defendant.'" *Martishius v. Carolco Studios, Inc.*, 355 N.C. 465, 479, 562 S.E.2d 887, 896 (2002) (quoting *Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979)).

For a claim of negligence per se, the duty and breach of duty elements can be supplanted in some circumstances by violation of a statute or regulation intended to protect others. *See Gregory v. Kilbride*, 150 N.C. App. 601, 610, 565 S.E.2d 685, 692 (2002) ("[W]hen a statute imposes a duty on a person for the protection of others, it is a public safety statute and a violation of such a statute is negligence per se."); *Swaney v. Peden Steel Co.*, 259 N.C. 531, 542, 131 S.E.2d 601, 609 (1963) (holding that where there is a criminal penalty for non-compliance with an administrative regulation, the violation of that regulation constitutes negligence per se); *see also Baldwin v. GTE South, Inc.*, 335 N.C. 544, 547, 439 S.E.2d 108, 110 (1994) (holding that the defendant's violation of a DOT regulation prohibiting the placement of a telephone booth within highway rights-of-way was

21

negligence per se because its purpose was to protect the public and because violations of the regulation constituted a misdemeanor); N.C. Pattern Jury Inst'n—Civil 102.12 (1994). For plaintiffs to recover under a theory of *res ipsa loquitur*, they must demonstrate that "[(1)] direct proof of the cause of an injury is not available, [(2)] the instrumentality involved in the accident is under the defendant's control, and [(3)] the injury is of a type that does not ordinarily occur in the absence of some negligent act or omission." *Grigg v. Lester*, 102 N.C. App. 332, 333, 401 S.E.2d 657, 657-58 (1991).

Plaintiffs also seek punitive damages. They are recoverable pursuant to N.C. Gen. Stat. § 1D-15 "if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) Fraud. (2) Malice. (3) Willful or wanton conduct." N.C. Gen. Stat. § 1D-15(a).

Plaintiffs' claims clearly raise legal and factual issues that are common to the proposed class and the various subclasses. Factual issues common to the class and to the specified subclasses include: the cause of the fire (all subclasses), the actions or omissions of defendants with respect to the start of the fire (all subclasses), the extent of the smoke plume generated by the fire (Secondary Evacuation Subclass), the geographical boundaries of the Recommended Evacuation area ordered by local officials (Recommended Evacuation and Business Loss Subclasses), the nature of the evacuation ordered by local officials (Recommended Evacuation and Business Loss Subclasses), the extent to which the evacuation order caused residents to evacuate or businesses to cease operations (all subclasses), the extent to which aspects of the fire other than the evacuation order caused residents to evacuate and businesses to cease operations (all subclasses), and the nature of the harm

22

suffered by individuals who evacuated (Recommended Evacuation and Secondary Evacuation Subclasses). The legal issues common to all the subclasses include: whether defendants had a duty of care to plaintiffs relating to the fire, whether regulations or other provisions of law established such a duty, whether defendants breached any duty they had, whether evacuation was a sufficiently foreseeable consequence of any breach of duty by defendants for the breach to constitute a proximate cause of the evacuation or cessation of business operations, and whether defendants' conduct merits the imposition of punitive damages. The court concludes that the commonality requirement of Rule 23(a)(2) is satisfied with respect to the class and subclasses. *See In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 241 F.R.D. 435, 444 (S.D.N.Y. 2007) (holding that the commonality requirement had been met where class plaintiffs' tort claims against oil and pipeline companies arose "out of a single gasoline release"); *see also Flournoy v. Honeywell Intern., Inc.*, 239 F.R.D. 696, 699 (S.D. Ga. 2006) (holding that the commonality requirement was satisfied in suit by property owners against chemical plant owner for nuisance and trespass based on alleged migration of mercury and PCBs from plant site onto the plaintiffs' properties including issues of how the plant was operated, how the migration of the toxins occurred, as well as the toxicity of mercury and PCBs).

### 3. **Typicality**

The court must next address the extent to which the claims and defenses of the named class members are typical of the claims or defenses of the absent class members. Fed. R. Civ. P. 23(a)(3). "[W]hile the commonality requirement focuses on the claims of the class as a whole, the typicality requirement focuses on the named plaintiff's claim." *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 64 (M.D.N.C. 2008) (citing *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d

23

331, 340 (4th Cir. 1998)). The named plaintiff's "interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). In other words, plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Id.* at 466-67. Generally, the court must determine whether the asserted claims "arise from the same event or practice or course of conduct and are based on the same legal theories as the claims of the unnamed class members." *Rodger v. Elec. Data Sys. Corp.*, 160 F.R.D. 532, 538 (E.D.N.C. 1995). "[T]he appropriate analysis of typicality must involve a comparison of the plaintiffs' claims or defenses with those of the absent class members." *Deiter,* 436 F.3d at 467. However, as the Fourth Circuit has recognized, the necessity of individual damage determinations does not destroy typicality. *Gunnells,* 348 F.3d at 427-28. "In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations." *Id.* at 428.

The parties seek designation of the following individuals and business as representatives of the class and indicated subclasses:

**Recommended Evacuation Subclass:** Suellen Beaulieu, Michael Borden, Betsy Borden, Lisa Carley, Clifford R. Wilder, Tara Wilder, Anne M. Acosta, George Acosta, and Denise Hatzadakis

**Secondary Evacuation Subclass:** Josephine Kelly Cross

**Business Loss Subclass:** Hatzadakis, LLC d/b/a Xios Restaurant

(*See* PSA § 1, 3.37; Jt. Mot. ¶ 2; 4th Compl. ¶¶ 41-48).

It is clear that the claims of the named plaintiffs in the Recommended Evacuation Subclass are typical of the claims of absent subclass members in all material respects. These named plaintiffs all resided in the Recommended Evacuation Zone, evacuated or were denied access to their homes,

24

and suffered the loss of use of their homes. (*See, e.g.*, 4th Compl. ¶¶ 41-46; Beaulieu Dep. (D.E.

355-2) at 35-39; B. Borden Dep. (D.E. 355-4) at 65; M. Borden Dep. (D.E. 355-5) at 109; C. Wilder

Dep. (D.E. 358-4) at 46-47; T. Wilder Dep. (D.E. 358-6) at 32-33; Hatzadakis Dep. (D.E. 357-4) at

40-41; G. Acosta Dep. (D.E. 354-3) at 73; A. Acosta Dep. (D.E. 354-2)at 90-91; L. Carley Dep.

(D.E. 356-2)at 54, 57; Class Rep. Affs., Pls.' Mem., Exs. 11 to 15-B, 17-A to 18-A (D.E. 376-11 to

-15, -17, -18 at 1-3) ¶¶ 3-4). Their claims of negligence, negligence per se, and *res ipsa loquitur*

against defendants therefore parallel those of the absent subclass members.

The court further concludes that the claims of the named plaintiff in the Secondary Evacuation

Subclass, Josephine Cross, are typical of the claims of the absent subclass members she proposes

to represent. As with the representatives in the Recommended Evacuation Subclass, Cross evacuated

her home as a result of the fire, and was denied access to her home during such evacuation. (4th

Compl. ¶ 48; Cross Aff., Pls.' Mem., Ex. 16 (D.E. 376-16) ¶ 4). Cross resided near but outside of

the Recommended Evacuation Zone. (Cross Aff. ¶ 3).

Finally, the court concludes that the claims of the sole named representative of the Business

Loss Subclass, Hatzadakis, LLC d/b/a Xios Restaurant ("Xios"), are typical of those of the absent

subclass members. Xios is located within the Recommended Evacuation Zone and ceased operations

as a result of the fire, purportedly resulting in lost income. (4th Compl. ¶ 47; D. Hatzadakis Aff. for

Hatzadakis, LLC, Pls.' Mem., Ex. 18-B (D.E. 376-18 at 4-6) ¶¶ 3-4). While there will certainly be

variations in the types of businesses within the subclass, if Xios proves that defendants' negligence

was the proximate cause of the recommended evacuation order which impacted the schedule of

operations for its business during the evacuation period, it will have advanced the claims of all

absent business loss subclass members. *See Thomas v. Louisiana-Pacific Corp.*, 246 F.R.D. 505,

513 (D.S.C. 2007) (holding that typicality requirement met for class action for breach of warranty because named plaintiff could advance claims of the absent class members by proving that an exterior trim product used by all class members was unfit for use). The court, of course, recognizes that calculation of damages for each of the businesses will vary depending on the business model of the party (*e.g.*, on-site retail sales, off-site services). However, as indicated above, the need for individualized proof of a named plaintiff's damages does not render the plaintiff's claims atypical.

### 4. **Adequacy**

Rule 23(a)(4) requires that a class representative be capable of fairly and adequately representing the interests of the class. To meet this requirement, plaintiffs must demonstrate that the named class representatives (1) "will vigorously prosecute the interests of the class through qualified counsel" and (2) that they have "common interests with unnamed members of the class." *Olvera-Morales v. Intern. Labor Mgmt Corp.*, 246 F.R.D. 250, 258 (M.D.N.C. 2007) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996)). The importance of the adequacy requirement is based on the principle of due process which "requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard*, 155 F.3d at 338.

### a. *Vigorous Prosecution*

With respect to the requirement of vigorous prosecution, courts have held that it "'involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation . . . .'" *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 721 (11th Cir. 1987) (quoting *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir.1985)). "[C]ourts generally hold that the employment of competent counsel assures vigorous prosecution." *South Carolina Nat. Bank v. Stone*, 139 F.R.D. 325, 331 (D.S.C. 1991) (holding that a named plaintiff's adequacy to represent

26

a class is determined by plaintiff's counsel's ability to vigorously prosecute the matter). Nevertheless, some courts hold that vigorous prosecution also requires that the representatives themselves have "the willingness and ability . . . to take an active role in and control the litigation and to protect the interests of absentees." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001) (citations omitted). The Fourth Circuit has suggested that class representatives need have only some minimal familiarity with the facts of the case. "It is hornbook law . . . that '[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.'" *Gunnells*, 348 F.3d at 430 (citations omitted).[9]

Primary counsel for plaintiffs in this case are as follows: Henry T. Dart, Donald J. Dunn, M. David Karnas, J. Michael Malone, Roger W. Orlando, Jesse S. Shapiro, and Robert E. Zaytoun. Plaintiffs assert that these attorneys have the qualifications, experience, and resources to actively pursue this action. In addition, plaintiffs' counsel each have submitted affidavits testifying to their experience and familiarity with complex civil litigation. (*See, e.g.*, Aff. of Henry T. Dart ("Dart Aff."), Pls.' Mem., Ex. 4 (D.E. 376-5) ¶¶ 5-9).[10] Based on these affidavits and the court's direct

---

[9] As these varying standards for the requirement of vigorous prosecution illustrate, there is inconsistency in the way in which the requirement for adequacy of representation has been both articulated and applied. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 480 n.7 (5th Cir. 2001) ("The task of defining the precise contours of rule 23(a)'s adequacy requirement was largely left to the lower courts after *Hansberry v. Lee*, 311 U.S. 32 . . . (1940). Consequently, there is a lack of uniformity in the various formulations of the requirements for adequacy." (internal citations omitted)). The inconsistency may arise, in part, from the fact that determining the adequacy of a named party's representation "is a question of fact that depends on the circumstances of each case." *McGowan v. Faulkner Concrete Pipe Co.*, 659 F.2d 554, 559 (5th Cir. 1981).

[10] The affidavits by plaintiffs' counsel are appended as Exs. 4-10 to plaintiffs' memorandum at D.E. 376-5 to -10 and 377. Aside from biographical information, each of the affidavits is essentially the same. For ease of reference, the court is citing to the first-filed of the affidavits, that of attorney Dart, with the understanding that the other affidavits

27

observations of the manner in which these counsel have handled various matters in this action to date, the court concludes that they are qualified to vigorously prosecute this action on behalf of the proposed class and subclasses. *See* Fed. R. Civ. P. 23(g)(1)(A). The court will also recommend that the court approve plaintiffs' request that these attorneys be appointed as class counsel pursuant to Rule 23(g).

The court's review of the record further establishes that there is meaningful participation by the named plaintiffs. They have answered interrogatories, appeared for depositions (*see* D.E. 229, 233 to 240), submitted affidavits showing their participation in and familiarity with the case (*see* Pls.' Mem., Exs. 11 to 18-B (D.E. 376-11 to -18) ¶¶ 5-13), and met with counsel (*see, e.g.*, A. Costa Dep. at 236-38 (recounting two to three weeks total time spent on the lawsuit, at least five meetings with attorneys and "[q]uite a few phone calls")).

Further, the deposition testimony of the named plaintiffs indicates their understanding of their role and obligations as class representatives. For example, Suellen Beaulieu, a proposed representative of the Recommended Evacuation Subclass, made the following statement in her deposition regarding her understanding of her obligation as a class representative:

Q:     What is the group that you are representing? How do you understand the group that you're representing to be? Who are they? Without giving names, just –

A:     Okay. The group that I'm representing were forced to evacuate their homes as a result of the explosion in Apex. And they were deprived, as I was, of the use of my home. My safety. My safe environment. They were put through a stressful situation of being awakened in the middle of the night. Forced to leave. They were exposed to a hazardous environment that we don't really know yet still what was all involved in that haze and smoke that came from

---

of plaintiffs' counsel support the same point stated.

> that fire. And the concern and the continuing concern of what that might have
> for us in the future, what impact that might have at -- that exposure might have
> for us in the future. And I think there are many similar people, and I think I
> qualify to represent those folks because they went through the same thing I did.
> I don't think it's a giant leap to see that.

(Beaulieu Dep. at 93-94). The deposition testimony of the other class representatives is in accord.

(*See, e.g.*, B. Borden Dep. at 109-10 (understanding that her role as a class representative is to "take

care of" those "who had to leave or had to take their kids and dogs and everybody out of their

neighborhoods"); M. Borden Dep. at 105 (understands that as a class representative he "would typify

the individuals who would be named in the class."); A. Acosta Dep. at 225 (seeing it as her duty to

"represent[] my class to the best of my ability."); L. Carley Dep. at 121 (describing her role as a

representative as "telling my story for the 17,000 other people that were evacuated from the [*sic*]

Apex.").

The court also finds that the named representatives have adequate familiarity with the claims

in this case. The record shows that they are familiar with the circumstances surrounding the fire and

subsequent evacuation, and how such facts are similar to those of the absent class members they

represent. For the most part, they also understand the general nature of the damages that they and

the class members purportedly incurred (*e.g.*, lodging and dining expenses resulting from losing

access to their residences).

### b. *Common Interest*

A second component of the adequacy requirement is that the proposed representative's

interests are aligned with the absent class members. The representative "must possess the same

interest and suffer the same injury shared by all members of the class he represents." *Schlesinger*

*v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974). This commonality of interest is

29

defeated if there exists a conflict of interest between the proposed representative and those he represents. The court must accordingly uncover such conflicts in applying the adequacy requirement. *Amchem*, 521 U.S. at 625. However, "[t]o defeat the adequacy requirement of Rule 23, a conflict 'must be more than merely speculative or hypothetical.'" *Gunnells*, 348 F.3d at 430 (quoting 5 Moore's Federal Practice § 23.25[4][b][ii] (2002)); *see also Serfaty v. Int'l. Automated Sys., Inc.*, 180 F.R.D. 418, 420 (D. Utah 1998) ("Claims regarding theoretical issues that might arise are not sufficient to defeat class certification."); *Robertson v. Nat'l. Basketball Ass'n*, 389 F.Supp. 867 (D.C.N.Y. 1975) ("Class action determination will not be denied, nor will the formulation of subclasses be required in the absence of a showing that the alleged potential conflicts are real probabilities and not mere imaginative speculation.").

The court believes that the interests of the proposed class representatives are aligned with those of the absent class members, as well as the respective absent subclass members. The court's prior discussion shows that these representatives share the same basic interest in this litigation as the absent members and have suffered the same alleged harm—namely, evacuation in the case of individuals and cessation of operations in the case of businesses. The named representatives have expressly stated their interest in having the absent class members appropriately compensated. On the specific question of conflicts of interest, the named plaintiffs have all submitted affidavits stating that they have none and that while they have been advised that they will receive an additional payment from the proposed settlement for their participation as a class representative, they have prosecuted the action on behalf of the entire class with no expectation of remuneration beyond which they might recover for their individual damages. (*See* Class Rep. Affs., Pls.' Mem., Exs. 11 to 18-B (D.E. 376-11 to -18) ¶ 7)).

Despite the evidence of common interest, the court must further consider whether a conflict of interest is created by the express exclusion of claims for personal injury in the complaint. (*See* 4th Compl. ¶ 40). In other words, does the exclusion of personal injury claims from this action create a conflict between the named plaintiffs and any absent class members who may have such claims and might be precluded from pursuing such claims in a subsequent action by the principles of *res judicata*.

The Fourth Circuit opinion addressing this issue most directly is *Sandberg v. Virginia Bankshares, Inc.*, 891 F.2d 1112 (4th Cir. 1989), *rev'd on other grounds,* 501 U.S. 1083 (1991). In *Sandberg*, the Fourth Circuit reversed a district court's denial of class certification which was, in part, based on the fact that 16 of the approximately 2,000 minority stockholder class members were pursuing state court remedies. *Id.*, 891 F.2d at 1119. The court held that "[f]aced with a putative class of approximately 2,000 minority stockholders, it was an abuse of discretion to deny certification on the ground that sixteen members might be eventually barred from relief by *res judicata*." *Id.* The court also noted that the district court's denial of certification on this ground "was clearly inimical to the purposes for which the class action procedure was intended." *Id.*

In *Clark v. Experian Information Solutions, Inc.*, No. Civ.A.8:00-1217-24, 2002 WL 2005709, at *3 (D.S.C. 26 June 2002) ("*Clark II*"), the court applied the holding of *Sandberg*. In the revised amended complaint in that case, the plaintiffs asserted claims for non-compliance with the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* A number of alternative causes of action that members of the proposed class could have brought were not included in the complaint. The court nevertheless held that the named plaintiffs provided adequate representation because "Plaintiffs have demonstrated that only a very small number of 'alternative claims' have been filed." *Id.* The court

31

found dispositive that "over the past three years, twenty-two lawsuits out of a potential class of 40,000 to 100,000 members have been filed against Defendants." *Id.* "Class certification can not be defeated by mere hypothetical conflicts of interest or in the absence of a real showing that the alleged potential conflicts are real probabilities." *Id.*

The court had denied the plaintiffs' first motion for class certification. *Clark v. Experian Information Solutions, Inc.*, No. Civ.A.8:00-1217-24, 2001 WL 1946329, *4 (D.S.C. 19 Mar. 2001) ("*Clark I*"). It did so on the grounds that the named plaintiffs were not adequate representatives because they were seeking only statutory damages, thereby potentially jeopardizing the right of absent class members to seek alternative grounds for relief. As the court acknowledged, it reached a contrary decision on the adequacy of the class representatives in its second decision after discovery had established that the number of excluded claims was small compared to the claims to be included in the class action. 2002 WL 2005709, at *3. Thus, in the Fourth Circuit, courts have looked to the number of excluded claims that are likely to be brought as compared to the number of claims that would be included in the class action in determining whether a conflict exists which defeats the adequacy of representation.

A review of the record in this case as developed by the significant discovery to date reveals that few, if any, class members are likely to have or file personal injury claims. A press release from the North Carolina Department of Environment and Natural Resources ("DENR") (D.E. 192-8) communicating the results of environmental testing done in Apex after the fire provides strong support for this conclusion. The report states that the fire resulted in no offsite contamination. (*Id.* at 1). Specifically, tests of areas both upwind and downwind from the EQ facility showed no

32

"pattern of contamination with chemicals that were found in ashes on the EQ site." (*Id.*) One DENR official summarized the test results as follows:

> What we were looking for was any indication that homes or businesses might have been contaminated with heavy metals or other chemicals from the fire that could present a health risk to Apex citizens," said Robin Smith, assistant secretary for the environment at the N.C. Department of Environment and Natural Resources. "We didn't find that. We found the kind of thing you would find at low levels in any urban area.

(*Id.*) Further, the state epidemiologist concluded that "[w]hile the fire may have caused some short-term respiratory problems, particularly for first responders, luckily its contamination has been contained to the facility site." (*Id.*)

The evidence in the record reveals that the physical effects of the fire constitute little more than minor and transient irritation, with one possible exception. *See, e.g.*, G. Acosta Dep. at 90-91 (had an itchy feeling after sitting down on the furniture); A. Acosta Dep. at 103-05, 109-11, 231-32 (two to three days after fire experienced an itchy feeling, irritable eyes, allergy-like symptoms, but did not seek medical treatment); *see also* declarations of persons in the Secondary Evacuation Zone (D.E. 260) at 7-8 (dog became sick on night of fire and threw up) ; at 33-34, 41-42 (burning eyes and throat and runny nose for several days after fire, sick horse); at 59-60 (coughing, wheezing, burning throat on day after fire started); declarations of persons in the Recommended Evacuation Zone (D.E. 262) at 25-26 (irritated eyes, trouble breathing; eyelids bled intermittently for nine months); (D.E. 263) at 39-40 (coughing, hacking on night of fire; dog experienced severe health problems for over a year); at 35-36 (irritated eyes); (D.E. 264) at 7-10 (health of outdoor cat and dog deteriorated after fire and died two weeks and three months after fire, respectively). The one possible exception involves Levie Hackney, Jr. He experienced respiratory distress as he and his wife were preparing to evacuate their home, which resulted in emergency treatment at the hospital. (L. Hackney Dep. at

33

34-38). However, the relationship between the fire and Mr. Hackney's condition is unclear. According to the Hackneys' deposition testimony, Mr. Hackney has had a heart condition for approximately ten years and experiences occasional fluid build-up in his lungs which results in breathing problems. (N. Hackney Dep. at 105-06; L. Hackney Dep. at 14). Fluid build-up in the lungs was the diagnosis he received following his admission to the hospital on the morning after the fire began. (L. Hackney Dep. at 39). Mr. Hackney had been admitted to the hospital a couple of years earlier for this problem. (*Id.* at 40-41).

In addition, of the 1,968 individuals that filed claims for reimbursement from EQIS only 10 sought reimbursement for medical bills. (Maris Aff. ¶ 10; EQ Industrial's Answer. & Suppl. Answer to Pls.' Interrog. No. 23 (D.E. 193-6, 193-9)). Further, at least two named representatives testified that they had no knowledge of persons who intended to pursue claims for personal injuries. (*See* Beaulieu Dep. at 90-91; B. Borden Dep. at 112-14).

The court concludes that the number of personal injury claims likely to be brought by absent class members is too small compared to the number of claims included within the proposed class to create a conflict of interest rendering the named plaintiffs inadequate representatives of the class and subclasses. The alleged conflict is "merely speculative or hypothetical." *Gunnells*, 348 F.3d at 430 (internal quotations omitted). Further, to the extent that there are class members with such claims they wish to pursue independently, they may opt out of this action in order to do so.[11] *See Gunnells*, 348 F.3d at 432 (noting that the *res judicata* effect of any claim splitting resulting from the certification of the class action was mitigated, in part, by Rule 23(c)(2), which "permits members

---

[11] The court notes that the Hackneys are particularly likely to be aware of the steps necessary to preserve any personal injury claims Mr. Hackney may have because they were formerly named plaintiffs in this action.

of a class maintained under subdivision (b)(3) to opt out of the class, providing an option for those

Plaintiffs who wish to pursue claims against [defendant] requiring more individualized inquiry.")

**D.      Rule 23(b)(3) Requirements**

As indicated, Rule 23(b)(3) sets forth the requirements of predominance and superiority. To

satisfy the predominance requirement, the court must find that "the questions of law or fact common

to class members predominate over any questions affecting only individual members." Fed. R. Civ.

P. 23(b)(3). The superiority requirement ensures that "a class action is superior to other available

methods for the fair and efficient adjudication of the controversy." *Id.* Rule 23(b)(3) provides the

following non-exclusive list of factors to be considered in the determination of both of these

requirements:

> (A) the class members' interests in individually controlling the prosecution or defense
> of separate actions; (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

*Id.* In the present settlement context, of course, the court need not consider trial management issues.

*Amchem*, 521 U.S. at 620. The purpose of subdivision 23(b)(3) is to identify the circumstances "'in

which a class action would achieve economies of time, effort, and expense, and promote . . .

uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results.'" *Amchem*, 521 U.S. at 615 (quoting Rule 23 advisory

committee's notes (1966 amend. subdiv. (b)(3)).

**1. <u>Predominance</u>**

The predominance requirement tests whether the proposed class and subclasses "are

sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, and

35

whether certification would promote judicial efficiency, *id.* at 615. *See Farrar*, 2008 WL 3914471, at *4. The predominance test is similar to the commonality test of Rule 23(a) but, as noted previously, is "more stringent." *Lienhart*, 255 F.3d at 146 n.4. It requires, of course, not only that members of the class and each subclass have issues of law or fact in common, but that these common issues predominate over the individual issues. Fed. R. Civ. P. 23(b)(3). In a mass tort case such as this, where the same evidence would resolve the question of liability for all class members, common issues of law and fact have been held to predominate. *See Sterling v. Velsicol Chemical Corp*, 855 F.2d 1188, 1196-97 (6th Cir. 1988); *see also Blades v. Monsanto*, 400 F.3d 562, 566-67 (8th Cir. 2005); *In re Polyester Staple Antitrust Lit.*, 2007 WL 2111380, No. 3:03-CV-1516, at *27 (W.D.N.C. 19 July 2007) (holding that the predominance requirement was met where most of the evidence plaintiffs intended to present at trial was common to each member of the putative class). On the other hand, "[w]here after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims," the common issues do not predominate. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004).

As the foregoing suggests, to satisfy the predominance requirement the court generally needs to determine only whether the common questions predominate over individual questions as to liability. *Gunnells*, 348 F.3d at 428 (citing 5 Moore's Federal Practice § 23.46[2][a]). The need for individualized determination of the amount of compensatory damages suffered by the putative class members will not alone defeat certification. *Id.* at 429 (collecting cases). "In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations." *Id.* at 428 (citing the

36

advisory committee's note (1966 amend. subdiv. (c)(4)). Since punitive damages are based on defendants' conduct, they do not require individualized proof. *See id.* at 429.

However, for the purpose of identifying the common damage issues, it is important to draw a distinction between the fact of injury and the measure of the resulting damages. As one court has explained, the "[*f*]*act of damage* pertains to the existence of injury, as a predicate to liability; *actual damages* involve the quantum of injury, and relate to the appropriate measure of individual relief." *Martino v. McDonald's Sys., Inc.*, 86 F.R.D. 145, 147 (N.D. Ill. 1980) (emphasis added).

The principal issues common to the class and the indicated subclasses include: whether defendants had a duty to plaintiffs (all subclasses); whether statutes or regulations established such a duty (all subclasses); whether defendants breached any such duty (all subclasses); whether, for any individual in the Recommended or Secondary Evacuation Zone who evacuated in response to the fire, any such breach by defendants was a proximate cause of such evacuation (Recommended and Secondary Evacuation Subclasses); whether, for a business within or contiguous to the Recommended Evacuation Zone which ceased operations in response to the fire, any such breach of duty proximately caused such cessation (Business Loss Subclass); whether evacuation by an individual in the Recommended or Secondary Evacuation Zone in response to the fire is a compensable harm (Recommended and Secondary Evacuation Subclasses); whether cessation of operations by a business within or contiguous to the Recommended Evacuation Zone in response to the fire is a compensable harm (Business Loss Subclass); and whether punitive damages should be awarded against defendants (all subclasses). Many of these issues are complex and implicate extensive information as well as scientific expertise.

37

The individual issues, aside from those on damages, are limited in number. They include: for individuals in the Recommended or Secondary Evacuation Zone, whether they evacuated and, if so, whether they did so in response to the fire (Recommended and Secondary Evacuation Subclasses); and for businesses within or contiguous to the Recommended Evacuation Zone, whether they ceased business operations and, if so, whether they did so in response to the fire (Business Loss Subclass). In contrast to the common issues discussed, these individual issues are relatively simple and straightforward, requiring relatively limited information for their resolution. The court concludes that the common issues predominate over the individual issues.

### 2. Superiority

The superiority test requires the court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 149 (3d Cir. 2008) (internal quotations and citations omitted). The most salient factor bearing on superiority of class certification here is the small value of the individual claims at issue.

The relatively low value is apparent from the nature of these claims—namely, loss of use of one's residence or cessation of business operations for several days. The payments made under the EQ Industrial settlement program confirm this assessment. As of November 2007, the median amount paid to the 594 individuals who had by then submitted claims in that program was about $157. (*See* EQ Industrial's Answer & Suppl. Answer to Pls.' Interrog. No. 23).

The small value of individual claims makes it unlikely that individual plaintiffs would pursue their claims except through the class action mechanism. One reason is that individual class members would likely be unwilling to make the effort necessary to pursue such a claim. They certainly would

38

have little interest in controlling the prosecution of such an action. *See* Fed. R Civ. P. 23(b)(3)(A). In addition, it would be difficult, if not impossible, to retain competent counsel to handle such a case. *See Mace*, 109 F.3d at 344 ("A class action solves this problem [lack of incentive to pursue recovery of small amounts] by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."); *see also Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 161 (1974) ("A critical fact in this litigation is that petitioner's individual stake in the damages award he seeks is only $70. No competent attorney would undertake this complex antitrust action to recover so inconsequential an amount. Economic reality dictates that petitioner's suit proceed as a class action or not at all."); *Newberg*, 4:27 ("When the claims of class members are small, denial of a class action would effectively exclude them from judicial redress."). As confirmation of these findings, the parties cite to the minimal amount of litigation arising from the fire outside this consolidated case, including the current pendency of only one other such case, a non-class action in this court. *Cooper Tools, Inc. v. EQ Indus. Servs., Inc.*, No. 5:08-CV-445-BR; *see also* n. 4 above.

The court also believes that there is no more efficient manner in which to manage the settlement of claims of the putative class than through a class action. The individualized determinations of evacuation or cessation of operations and damages for class members can be easily and efficiently relegated to a proof of claim process supervised by a qualified court-appointed administrator. *See* Fed. R. Civ. P. 23(b)(3)(D), 53(a)(1)(B) (permitting the court to appoint a master to "perform an accounting or resolve a difficult computation of damages"); *see also Newberg*, § 9:55 ("when liability has been determined in favor of the class and a formula for individual proof of damages has been established that is capable of being uniformly applied, the courts have frequently referred the determination and distribution of damages claims to a special master."). Indeed, the

39

PSA provides that claims be processed by a court-appointed Settlement Administrator, whose determinations are ultimately subject to court review. (*See* PSA § 12).

Further, the court does not believe that the claim reimbursement program instituted by EQ Industrial is a superior method of resolving putative class members' claims against defendants. Among other reasons, as previously discussed, this program was organized and operated by EQ Industrial, not by either Allworth or MAE. (*See generally* Maris Aff.). Consequently, the extent to which this program would resolve any of the claims against Allworth or MAE is not clear. Moreover, it does not appear from the description of the program provided to the court by EQIS that any person or entity that obtained reimbursement of out-of-pocket expenses through this program received such reimbursement in exchange for a release of claims with respect to the fire. (*Id.*). Consequently, the program is not equivalent to a legal action which provides a final resolution to claims, as here, where the proposed settlement would terminate all claims of the putative class arising from the fire other than personal injury claims.

Lastly, as indicated, all pending litigation arising from the fire is apparently before this court, consisting of the instant consolidated case and the one other case. There accordingly is no issue of coordinating this litigation with cases in other forums. *See* Fed. R. Civ. P. 23(b)(3)(B), (D). The court therefore concludes that the superiority requirement is satisfied in this case. This final requirement for class certification having been met, the court believes the case should be certified as a class action and this portion of the joint motion allowed.

40

## II. PRELIMINARY APPROVAL OF CLASS SETTLEMENT

### A. Standards for Preliminary Approval

Rule 23 requires court approval of the settlement of the claims of any certified class. Fed R. Civ. P. 23(e). The principal underlying concern is protection of class members whose rights may not have received sufficient consideration in settlement negotiations. *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

Proposed settlements that bind class members, like the proposed settlement here, must be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In applying this standard, the Fourth Circuit has bifurcated the analysis into consideration of fairness, which focuses on whether the proposed settlement was negotiated at arm's length, and adequacy, which focuses on whether the consideration provided the class members is sufficient. *Jiffy Lube*, 927 F.2d at 158-59; *see also In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383-84 (D. Md. 1983).

Courts generally follow a two-step process in reviewing proposed class settlements for approval. *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 827 (E.D.N.C. 1994). First, at the preliminary approval stage, the court determines whether the proposed settlement is "'within the range of possible approval'" or, stated differently, whether there is "'probable cause'" to give notice of the proposed settlement to class members. *Id.* (quoting *Armstrong v. Board of School Directors*, 616 F.2d 305, 314 & n. 13 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)). Second, if preliminary approval is given and class notice is sent, the court conducts a fairness hearing at which all interested persons may be heard and then makes a final determination on approval. *Horton*, 855 F. Supp. at 827; Fed. R. Civ. P. 23(e)(2). The

41

determination on approval of a proposed settlement lies within the court's discretion. *Jiffy Lube*, 927 F.2d at 158.

As indicated, this case is in the preliminary approval stage. The question presented is therefore whether the settlement is within the range of possible final approval.

## B.    Fairness

Factors relating to the fairness of a proposed settlement are: (1) the posture of the case at the time the proposed settlement was reached, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the settlement negotiations, and (4) counsel's experience in the type of case at issue. *Jiffy Lube*, 927 F.2d at 158-59; *Horton,* 855 F. Supp. at 828. Applying these factors, the court finds that the settlement falls within the range of possible final approval with respect to fairness. In other words, the settlement could reasonably be determined to have been reached through good faith bargaining at arm's length.

With respect to the posture of the case, it was being actively litigated when the settlement was reached. Indeed, the case has been aggressively prosecuted and defended since its inception. The matters litigated include the bifurcation of discovery into certification-based and merits-based (which was denied), other discovery issues, class certification, and dismissal of certain claims and defendants. (*See, e.g.*, D.E. 97 at 4-6, 116 at 4-6, 137, 179, 181, 314, 331, 335). The proceedings have required over 12 conferences or hearings before the court. (*See, e.g.*, D.E. post 28, 87, 112, 129, 147, post 151, post 163, post 214, post 266, post 280, post 318, post 347, post 349). Similarly, there have been almost 400 separately docketed filings or other events in the case.

As to discovery, it has been substantial, thereby facilitating an informed decision by the parties regarding settlement. Discovery began after entry of the court's case management order in

42

November 2007 (D.E. 116) and has resulted in the exchange of over 50,000 pages of documents. (*See* Pls.' Mem. at 21). The parties also conducted more than 20 depositions, including 3 of expert witnesses. (*See id.*). The discovery extended to liability issues in light of the court's decision not to bifurcate discovery. (*See, e.g.*, Dart Aff. ¶ 10). The discovery supplemented extensive investigation by the parties that is apparent from the record. (*See* Pls.' Mem. at 22).

Among the salient circumstances of the settlement negotiations is their extended nature. They began in the summer of 2007 (*See, e.g.*, Dart Aff. ¶ 12), and concluded as to EQIS in September 2008 (*see* Ltr. to Court (D.E. 284)), and as to the remaining defendants in February 2009 (*see* Ltr. to Court (D.E. 346)). During the first year, the negotiations included three sessions with experienced North Carolina mediator Robert Beason. (Pls.' Mem. at 21). The parties' subsequent negotiations included numerous conference calls and in-person sessions in various locations. (*See, e.g.*, Dart Aff. ¶ 12). Once agreement in principle was reached, the task of putting the agreement in writing required about a month of additional negotiations.

The settlement negotiations also appear clearly to have been adversarial. Indeed, plaintiffs represent that they were not only at arm's length and without collusion (*see, e.g., id.*), but contentious and at times heated (Pls.' Mem. at 21). EQIS' counsel made similar representations at the hearing on the prior version of the PSA. (Settle./Cert. Hrg. Transcript (D.E. 327) at 36:20-24). These representations are consistent with the tenor of counsel's filings and in-court presentations on contested matters, which have demonstrated zealous pursuit of their respective clients' interests.

Notably, as indicated, MAE and Allworth did not initially join in the settlement that EQIS had reached with plaintiffs. This circumstance tends further to demonstrate the arm's length nature of the settlement negotiations.

43

Regarding the expertise of counsel, the court has already found above that plaintiffs' lead attorneys have the experience in this type of case, along with the other qualifications, needed to serve as counsel for the proposed class. The court notes that plaintiffs' counsel express the opinion that the settlement is "fair, adequate and reasonable." (*See, e.g,* Dart Aff. ¶ 13); *see also Isley v. Bayh,* 75 F. 3d 1191, 1200 (7th Cir. 1996) (court is "entitled to give consideration to the opinion of competent counsel that the settlement [is] fair, reasonable and adequate"). The court believes that defendants' counsel has similar experience and qualifications. The experience of counsel for both sides is evident in their written submissions and in-court presentations in this case, including the intricacies and comprehensiveness of the proposed settlement. The key factors relating to fairness identified by the courts therefore all indicate that the settlement here falls within the range of possible final approval.

C.      **Adequacy**

Before turning to its analysis of the adequacy of the settlement, an overview of the settlement terms is in order. The principal terms of the settlement are, of course, set forth in the PSA itself, but there are ten exhibits setting out additional terms. These include an exhibit addressing allocation of the settlement funds, the Common Fund Protocol for Distribution of the Settlement Funds ("Distrib. Protocol") (PSA, Ex. F (D.E. 374-3)), and another the process for reviewing claims, the Claims Protocol previously referenced.

The settlement provides for EQIS' insurer and MAE and Allworth to pay $7.85 million into a Common Settlement Fund ("CSF"). The CSF, which is to be under the ultimate control of the court, will be administered by a court-appointed Settlement Administrator, who will also administer settlement notice and the other aspects of the settlement. (*See, e.g.*, PSA § 12; Claims Protocol §

44

2.2). The settlement funds are to be held by Wells Fargo Bank, N.A. as escrow agent. (*Id.*, Ex. G, Am. Escrow Agree. (D.E. 374-4)). The PSA also provides for court appointment of a Guardian ad Litem to represent the interests of class members who are minors or lack legal capacity, and to make a recommendation to the court on the fairness of the settlement to such persons. (PSA § 13).

The payments from the CSF to class members, which equal $4,442,000 and represent 56.6% of the total settlement amount, are to be allocated as follows:

(1)     $3,150,000 (40.1% of the total) to members of the Recommended and Secondary Evacuation Subclasses, payable in the amount of up to $750 to each household, net of any deduction for payments made under the EQIS settlement program and perfected third-party claims (Distrib. Protocol ¶¶ 8-10);

(2)     $1,192,000 (15.2%) to members of the Business Loss Subclass, payable in the amount of up to $2,200 for each subclass member, net of any deduction as with the evacuation subclass payments (Distrib. Protocol ¶¶ 12-14); and

(3)     $100,000 (1.3%) to a Class Representative Participation Award Sub-fund to compensate nine of the named plaintiffs in the amount of $11,000 each and $1,000 for recently named plaintiff Josephine Cross for their efforts in this litigation (Distrib. Protocol ¶ 5).

The payments for attorneys' fees and costs, which equal $3,408,000 and represent 43.1% of the total, are to be allocated as follows:

(1)     $2,983,000 (38.0%) to an Attorneys' Fees Sub-fund to pay fees to plaintiffs' counsel (Distrib. Protocol ¶ 4); and

(2)     $425,000 (5.1% of total) to a Cost Sub-fund to pay litigation costs (Distrib. Protocol ¶ 2).

If there are any funds remaining after the foregoing payments, half are payable to a Cy Pres Sub-fund for the public benefit of the citizens of the Town of Apex, up to a maximum of $80,000, and the other half to EQIS' insurer and the other defendants (Distrib. Protocol ¶¶ 22-24).

In analyzing the adequacy of these terms, relevant factors to be considered include: (1) the relative strength of the plaintiffs' case on the merits, (2) any difficulties of proof or strong defenses the plaintiffs would likely encounter if the case were to go to trial, (3) the expected duration and expense of additional litigation, (4) the solvency of the defendants and the probability of recovery on a litigated judgment, and (5) the degree of opposition to the proposed settlement. *Jiffy Lube*, 927 F.2d at 158; *Horton*, 855 F. Supp. at 829-30. Applying these factors, the court finds that the settlement falls within the range of possible final approval with respect to adequacy of the consideration provided plaintiffs.

Regarding the first three factors, it is apparent from the record that the settlement terms reflect plaintiffs' counsel's consideration of the strength of their case, and the delay and cost of proceeding to trial balanced against the certainty, relative promptness, and amount of relief the settlement provides. (*See, e.g.*, Dart Aff. ¶¶ 13-15; Pls.' Mem. at 24-26; Settle./Cert. Hrg. Transcript at 17:9-20:2). More specifically, while plaintiffs' counsel voice confidence in the strength of their case, they also acknowledge that proceeding to trial would take substantial time and money without a guaranteed recovery and that defense counsel have confidence in their case. (*See, e.g.*, Dart Aff. ¶¶ 13-15; Pls.' Mem. at 24). The record indicates that the amount of recovery by individual evacuees and businesses is meaningful relative to the extent of the damages purportedly sustained and the amount allocated to attorneys' fees and costs. The court therefore finds that the balance struck in the settlement among the first three factors is within the range of final approval.

46

Looking to the other factors bearing on adequacy, no issue has been raised regarding the collectibility of a litigated judgment against defendants. In addition, plaintiffs' counsel represent that no objections to the proposed settlement have been received from putative class members. (Pls.' Mem. at 25). Needless to say, notice of the settlement has not yet been provided to the class as a whole and the potential for objections remains.

The PSA also provides the release of defendants from "all claims for compensatory and/or punitive damages arising out of the Incident, other than personal injury claims." (PSA § 3.4). The release therefore encompasses claims not asserted in the current version of the complaint, such as trespass and nuisance. The courts have held that a release may properly include such non-asserted claims when, as in this case, they arise from the same facts underlying the claims which are asserted. *See, e.g., Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.*, 396 F. 3d 96, 107 (2d Cir. 2005); *In re Corrugated Container Antitrust Litigation*, 643 F. 2d 195, 221-22 (5th Cir. 1981); 4 *Newberg* § 12:15. With respect to adequacy, the court finds that the release of the real property-related claims such as trespass and nuisance falls within the range of final approval, especially in light of the evidence suggesting that property damages were generally minimal.

The court concludes that the key factors relating to adequacy all support preliminary approval of the settlement. Having already determined that preliminary approval is warranted as to fairness, the court finds that there is probable cause to give notice of the proposed settlement to class members.

In reaching these determinations regarding preliminary approval of the settlement, the court emphasizes that it is not making any finding that the settlement is "fair, reasonable, or adequate"

47

within the meaning of Rule 23(e) or expressing any opinion regarding the merits of the case. The definitive determination regarding whether the settlement meets the requirements for final approval must await the fairness hearing.

## III. APPROVAL OF CONTENT AND METHOD OF CLASS NOTICE

### A. Standards for Approval

In a case such as this, Rule 23 requires that class members be given notice of both class certification and settlement, and establishes requirements for the content and method of such notice. With respect to certification, Rule 23(c)(2)(B) requires that for any class certified under Rule 23(b)(3), as here, the court must direct a notice to class members stating the following:

| (i) | the nature of the action; |
|---|---|
| (ii) | the definition of the class certified; |
| (iii) | the class claims, issues, or defenses; |
| (iv) | that a class member may enter an appearance through an attorney if the member so desires; |
| (v) | that the court will exclude from the class any member who requests exclusion; |
| (vi) | the time and manner for requesting exclusion; and |
| (vii) | the binding effect of a class judgment on members under Rule 23(c)(3). |

Fed. R. Civ. P. 23(c)(2)(B). This information must be "clearly and concisely state[d] in plain, easily understood language." *Id.* Moreover, the notice provided class members must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable notice." *Id.*

A separate provision of Rule 23 governs notice of settlement. *Id.* (e)(1). While the rule does not spell out the required contents of the settlement notice, it must "fairly apprise the prospective

48

members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975) (internal quotations omitted). The notice must also be neutral, making clear that the court is not stating an opinion on the merits of the case or the amount of the settlement. *Id.* The court is to "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

## B.  Content of the Proposed Notice

As to content, the proposed notice (PSA, Ex. E (D.E. 373-8)) addresses both certification and settlement, which is permissible. *See* Federal Judicial Center, Manual for Complex Litigation, Fourth, § 21.633 pp. 321-22 (2004); *see also In re Corrugated Container*, 643 F. 2d at 223 (approving the district court's combination of notice of class action with notice of proposed settlement). In addition, the proposed notice generally provides the requisite information as to both certification and settlement. It sets out: the definition of the proposed class and subclasses (Notice at 1-2); the procedure and rights associated with making a claim under the settlement, appearing at the fairness hearing (termed the "Final Fairness Hearing" in the proposed notice), and opting out of the settlement (*id.* at 2-4); the background of the litigation (*id.* at 4); a summary of the settlement terms (*id.* at 4-5); the reasons for the settlement (*id.* at 5-6); and contact information for follow-up inquiries (*id.* at 6). Each notice is to be accompanied by a claim form and return envelope. (PSA § 6.1). For the most part, the notice is stated in appropriate language.

By setting out claim submission rights and procedures and being accompanied by a claim form and return envelope, the notice anticipates approval of the settlement. This approach obviates a

49

second notice to class members in the event the settlement is given final approval notifying them of settlement approval and transmitting claim forms, and the delay a second notice would entail. Courts have permitted this type of combined notice in appropriate cases. *See* 4 *Newberg* § 11:34; *see also In re Corrugated Container*, 643 F. 2d at 223 n.42 (approving the inclusion of a claim form with the combined notice of class action and proposed settlement).

There are, however, several provisions in the proposed notice which the court believes should be modified. The provisions in question are as follows:

1. <u>Class Definition</u>. As discussed above, the court believes the most appropriate formulation of the class definition is that set forth in the joint motion. The definition in the proposed notice, which appears as the first paragraph of text on page 1, differs from this formulation in two notable respects. First, the definition in the notice sets out in a separate sentence after the subclass definitions the listing of the excluded entities, rather than within the class definition itself. The court does not deem this difference to be material. Second, the definition in the notice does not mention the exclusion of claims for personal injuries, although the exclusion is mentioned elsewhere in the notice. The court believes the personal injury exclusion should be included in the class definition for completeness. IT IS THEREFORE RECOMMENDED that the class definition be modified by adding the phrase "other than personal injuries" so that it reads in it covers "All natural persons . . . who seek compensation for damages other than personal injuries from a fire . . . ."

2. <u>Explanation of the Fairness Hearing</u>. There are two principal provisions describing the fairness hearing: the third bulleted paragraph on page 2 describes the purpose of the hearing and a paragraph on page 4 describes the right to participate in it. The paragraph on page 2 is presently

deficient because it speaks of the hearing in the plural (*i.e.*, "Court hearings are scheduled") and does not identify the proceedings discussed as the "Final Fairness Hearing," as the paragraph on page 4 does. While the same date, time, and location will be provided in both paragraphs, the deficiencies in the paragraph on page 2 may prevent a reader from realizing that it deals with the same proceeding that is the subject of the paragraph on page 4. IT IS THEREFORE RECOMMENDED that the first sentence in the paragraph on page 2 be modified to read: "A court hearing, called the Final Fairness Hearing, is scheduled . . . ."

3. <u>Disclosure by Opt outs of Intent to Sue</u>. The proposed notice requires that a class member state if he intends to sue any of the defendants: "In order to opt out of the Settlement Class, you must do so in writing, . . . stating affirmatively that you are opting out of the Settlement Class and *stating whether or not you intend to bring your own individual claim against one or more of the Defendants*." (Notice at 3) (emphasis added). Compliance with this requirement is made a condition of opting out: "Failure to timely opt out in the manner set forth above means that you will be a member of the Settlement Class . . . ." (*Id.*).

In their memorandum, plaintiffs do not explain the purpose of requiring disclosure of the intent to sue. Certainly, the number of opt outs is an indicator of support for the settlement and the PSA confers on defendants the right to withdraw from the settlement based on the number of opt outs. (PSA § 15.1). However, this withdrawal provision makes no reference to the intent of opt outs to sue. There may be reasons extraneous to the settlement why the parties and their counsel would be interested in potential litigation by opt outs.

51

The court does not believe, however, that the right of a class member to opt out can properly be conditioned on disclosure of their intent to sue. Such disclosure places an undue burden on this right and should be optional, if provided for at all. IT IS THEREFORE RECOMMENDED that the first sentence quoted above be broken into two sentences reading in relevant part as follows: "In order to opt out of the Settlement Class, you must do so in writing, . . . stating affirmatively that you are opting out of the Settlement Class. If you wish, you may also state whether or not you intend to bring your own individual claim against one or more of the Defendants."

4. <u>Disclosure by Objectors of Supporting Evidence</u>. The proposed notice requires that an objector to the settlement not only state the nature of and reasons for the objection, but also "attach[] any documents to support the objection or any other evidence the objecting person intends to offer, and, if applicable identify[] by name and address all witnesses the objecting party intends to call in support of the objection, summarizing the proposed testimony of each witness." (Notice at 3). The proposed notice also provides that non-compliant objections "will not" be considered by the court: "Non-written, untimely, . . . or otherwise non-compliant objections . . . *will not* be considered by the Court." (*Id.*) (emphasis added). The justification for the submission of the supporting information by objectors is to avoid unfair surprise to the parties at the fairness hearing. (*See* Settle./Cert. Hrg. Transcript at 26:7-23).

Unfair surprise is, of course, a two-way street. Objectors should not be exposed to unfair surprise any more than those supporting the settlement should. IT IS THEREFORE RECOMMENDED that:

(a) 13 business days prior to the date scheduled for the fairness hearing, counsel for the parties be required to file a pre-hearing statement which describes all documents and other evidence they intend to offer at the fairness hearing (including docket entry numbers for documents already in the record), identifies by name and address all witnesses they intend to call at the hearing, summarizes the testimony each witness is expected to give, and includes as attachments copies of all documents and other evidence not identified by docket entry number in the statement;

(b) by the same date, counsel for the parties be required to deliver to the Settlement Administrator a copy of the pre-hearing statement and copies of all exhibits they intend to offer; and

(c) beginning no later than 10 business days before the date scheduled for the fairness hearing, the Settlement Administrator be required to make the pre-hearing statement and all the exhibits counsel for the parties intend to offer available on the Settlement Administrator's website and, upon request, to provide paper copies of the statement and exhibits to any person to whom class notice is sent, subject to payment of reasonable copying costs by the requester.

In addition, the notice should be modified to include notification of the availability of the parties' pre-hearing statement and exhibits. IT IS THEREFORE RECOMMENDED that the following two sentences be added at the end of the section entitled "How to object to the proposed settlement" on page 4 of the proposed notice: "A statement describing the exhibits and witness testimony the parties to the Settlement intend to offer in support of the Settlement at the Final Fairness Hearing, along with copies of all such exhibits, will be available on the Settlement Administrator's website (the address for which is below) beginning on (INSERT DATE TEN BUSINESS DAYS BEFORE FINAL FAIRNESS HEARING). Paper copies of these documents

53

may also be requested from the Settlement Administrator, but are subject to payment of reasonable copying costs."

Additionally, it is appropriate that the court retain discretion to hear objections even if they are non-compliant in some respect. Plaintiffs acknowledged at the hearing on preliminary approval of the prior version of the PSA that they recognized this authority of the court. (*See id.* at 27:4-24). IT IS THEREFORE RECOMMENDED that the sentence on page 3 of the proposed notice regarding non-compliance quoted above be modified to read in relevant part as follows: "Non-written, untimely, . . . or otherwise non-compliant objections . . . may not be considered by the Court."

5. <u>Notice of Right to Counsel</u>. The proposed notice contains a one-sentence statement regarding the right of class members to retain their own counsel: "You may enter an appearance through counsel if you so desire, at your own expense." (Notice at 4). This language parrots that of Rule 23(c)(2)(B)(iv), and the court is concerned that a lay person may not understand it given the specialized meaning of the legal terms "appearance" and "through counsel."

IT IS THEREFORE RECOMMENDED that the following section be substituted for the one-sentence advise of right to counsel quoted above:

**Your right to hire a lawyer**

The Court has appointed a group of lawyers, called Class Counsel, to represent Class Members. You will not be charged for these lawyers. Instead, they will be paid out of the Common Settlement Fund if the settlement is given final Court approval. If you want to be represented by your own lawyer, you may hire one at your expense.

6. <u>Amount of Attorneys' Fees</u>. The proposed notice states the amount of the requested attorneys' fees solely as a percentage of the CSF. (Notice at 5). Attorneys' fees appear to be the only payment from the CSF that is not expressed as a dollar amount. This treatment of attorneys'

54

fees makes meaningful comparison of them to the other payments more difficult and imposes on putative class members the task of themselves calculating the dollar amount of the attorneys' fees if they wish to make a dollar-to-dollar comparison. The reason for use of the percentage is presumably apprehension that some putative class members may perceive the dollar amount as unduly high. Class members are, however, entitled to clear notice of such a significant part of the settlement, and class counsel properly have the burden of demonstrating that they are entitled to the requested fees. The court does not believe the lack of forthrightness regarding the amount of attorneys' fees implicit in use of the percentage figure is justifiable. IT IS THEREFORE RECOMMENDED that the first sentence in the first full paragraph on page 5 of the proposed notice be revised to read in relevant part: "Class Counsel will apply for: (1) an attorneys' fee of $2,983,000.00, which equals 38% of the Common Settlement Fund; . . . ."

7. <u>Other Provisions</u>. On page 6 of the proposed notice, IT IS RECOMMENDED that the following changes be made:

a. "Plaintiff Management Committee" should be revised to read "Plaintiffs' Management Committee"; and

b. Senior District Judge Britt should be substituted for Magistrate Judge Gates as the judicial officer approving the notice.

Throughout the proposed notice IT IS RECOMMENDED that the same term, "attorneys' fees," be used to refer to such fees. The proposed notice currently contains several variations of this term.

55

## C.    Proposed Method of Notice

As to the method of notice, the parties propose to give notice through several different avenues. The notice will be mailed to all residences within the Recommended and Secondary Evacuation Zones, and to all businesses within or contiguous to the Recommended Evacuation Zone. In addition, the notice will be published in the Raleigh *News & Observer* and courtesy copies mailed to any private attorneys known to represent members of the class. (PSA § 6.1.1). A website will provide information regarding the settlement and make claim forms available for review and downloading. (*Id.* § 6.1.2). There will also be a toll-free number for inquiries regarding the settlement. (*Id.*). The dissemination of the notice, including the maintenance of the website and toll-free number, will be managed by the Settlement Administrator. (*Id.*).

The parties propose a schedule for dissemination of the notice and the subsequent proceedings. The proposed schedule is summarized in a timeline attached as an exhibit to plaintiffs' memorandum (Pls.' Mem., Ex. 19, Timeline (D.E. 376-19)).

Under the proposed schedule, notice is to be mailed immediately after preliminary approval of the settlement and published within a week after mailing. (PSA § 6.1.1). The agreed deadline for opt outs and objections is 30 days from the publication date (PSA § 6.2.1); the proposed date for the fairness hearing about 30 days later (*see* Timeline); and the agreed deadline for submission of claims 31 July 2009 (PSA § 6.1.3). Under the Class Action Fairness Act of 2005 the earliest date by which an order approving the settlement can be issued is 2 July 2009, as discussed in the next section below. *See* 28 U.S.C. § 1715(d). Claims would be paid about 30 days after the claims submission deadline, assuming the settlement has been given final approval by then, and a final

56

report by the Settlement Administrator (*see* Claims Protocol § 9) filed with the court about 2 weeks later. (*See* Timeline). The proposed schedule thus spans five and a half months from preliminary approval of the settlement to the Settlement Administrator's final report.[12]

The court finds that the agreed periods for opting out and objecting are adequate, although they are likely to be substantially shorter than the period permitted for submission of claims. In addition, the court finds no impropriety in the fairness hearing being held prior to the claims submission deadline. There appears to be sufficient time for submission of claims prior to the fairness hearing for the court to be able to assess adequately the response of the class to the settlement. The court otherwise finds that the proposed method of giving notice is adequate and should be approved.

_____

[12] The schedule, based on time from preliminary approval, is as follows:

**Proposed Settlement Schedule**

| Days after Prelim. Approval /Date | Event |
| --- | --- |
| — | Court ruling on certification and preliminary approval of settlement |
| 8 days | Mailing of notice (PSA § 6.1.1) |
| 15 days | Publication of notice (PSA § 6.1.1) |
| 45 days | Deadline for opt outs and objections (PSA § 6.2.1) |
| 48 days | Deadline for filing Class Counsel's motion for fees and costs |
| 75 days | Final Fairness Hearing |
| 2 July 2009 | Earliest date for issuance of final order of approval (28 U.S.C. § 1715(d)) |
| 31 July 2009 | Deadline for submitting proof of claim forms (PSA § 6.1.3) |
| 150 days | Payment of claims |
| 165 days | Deadline for Settlement Administrator's final report to the court |

57

## IV.  OTHER MATTERS

### A.  Notice under the Class Action Fairness Act of 2005

The Class Action Fairness Act of 2005, 28 U.S.C. § 1711-15, requires, in relevant part, that within ten days after a proposed settlement in a class action under Rule 23 dealing with matters subject to regulation is filed in court, each defendant participating in the proposed settlement shall serve on the Attorney General of the United States and the appropriate state regulatory officials a notice providing specified information and documents regarding the proposed settlement. 28 U.S.C. §§ 1711(2), (6); 1715(a), (b).  Defendants served the requisite notice on 2 April 2009.  (*See* § 1715 Notice (D.E. 383-2)).  The statute further provides that an order giving final approval to the proposed settlement may not be issued earlier than 90 days after service of the notice.  28 U.S.C. § 1715(d). Therefore, as indicated, any order of final approval of the proposed settlement may not be issued before 2 July 2009.

### B.  Appointment of Settlement Administrator

The parties propose that James L. Griggs, President of Litigation Settlement Services in Houston, Texas be appointed as Settlement Administrator.  (*See* PSA § 12.1).  They have submitted as an exhibit to plaintiffs' memorandum an affidavit by Mr. Griggs describing his qualifications and familiarity with the settlement in this case along with a listing of cases handled.  (Pls.' Mem., Ex. 3 (D.E. 376-4)).  The court finds that the parties have adequately demonstrated Mr. Griggs' qualifications to serve as Settlement Administrator and that he should be appointed to that position.

**C.    Appointment of Guardian Ad Litem**

The parties propose that attorney Daniel T. Barker of the Wake County bar be appointed as Guardian ad Litem. (*See* PSA § 13.1). They have submitted as exhibits to plaintiffs' memorandum an affidavit and curriculum vitae of Mr. Barker describing his qualifications and familiarity with the settlement in this case. (Pls.' Mem., Exs. 1 & 2 (D.E. 376-2, -3)). The court finds that the parties have adequately demonstrated Mr. Barker's qualifications to serve as Guardian ad Litem and that he should be appointed to that position.

**D.    Stay Pending Proceedings on Settlement**

Included in the relief the parties seek is a stay of litigation proceedings in this case pending completion of proceedings on the proposed settlement. (*See* Proposed Order, PSA, Ex. C (D.E. 373-4) ¶ 13). The court believes such a stay is appropriate and should be allowed.

<u>**CONCLUSION**</u>

IT IS RECOMMENDED, for the foregoing reasons, that the court enter an order providing as follows:

1.      The parties' joint motion for certification of the settlement classes and preliminary approval of the class settlement is ALLOWED IN PART AND DENIED IN PART on the terms provided herein;

2.      This case is conditionally certified as a class action, pursuant to Rule 23(a) and (b)(3), for purposes of the settlement provided for in the PSA.

3.      The certified class and subclasses are defined as follows:

59

Class: All natural persons, whether minor or adult, and Businesses including those falling within one or more of the following sub-classes, including any person or entity claiming by, through or under a Class Member (as defined in the PSA), who seek compensation for damages or losses related to the Incident other than personal injuries but excluding those persons or Businesses who would otherwise be Class Members, but who or which are: (i) EQIS, Allworth, MAE, Released Entities, or any of their employees, agents, Insurers, contractors, and subcontractors, including employees of EQIS', Allworth's, and MAE's agents, contractors or subcontractors, (ii) the Court and Court personnel and their immediate families, (iii) the attorneys who have made appearances for any of the Parties; and (iv) Opt Outs from the class.

Subclass 1—Recommended Evacuation Subclass: All natural persons, including minors and adults, who, on October 5, 2006 resided within the geographic boundaries of the area of the Recommended Evacuation Zone (as defined and designated in Exhibit B-1 to the PSA) and who evacuated in response to the Incident.

Subclass 2—Secondary Evacuation Subclass: All natural persons, including minors and adults, who, on October 5, 2006 resided outside the geographic boundaries of the Recommended Evacuation Zone, but within the geographical boundaries of the Secondary Evacuation Zone (as defined and designated in Exhibit B-2 to the PSA), and who evacuated in response to the Incident.

Subclass 3—Business Loss Subclass: All Businesses that were physically located within or geographically contiguous to the Recommended Evacuation Zone (as defined and designated in Exhibit B-1 to the PSA) on October 5, 2006 that were forced to cease business operations in response to the Incident and sustained provable economic losses as a result of the Incident.

4.      The following are appointed as representatives of the class and the indicated subclasses:

**Recommended Evacuation Subclass:** Suellen Beaulieu, Michael Borden, Betsy Borden, Lisa Carley, Clifford R. Wilder, Tara Wilder, Anne M. Acosta, George Acosta, and Denise Hatzadakis

**Secondary Evacuation Subclass:** Josephine Kelly Cross

**Business Loss Subclass:** Hatzadakis, LLC d/b/a Xios Restaurant

60

5. The following are appointed as class counsel, pursuant to Rule 23(g): Henry T. Dart, Donald J. Dunn, M. David Karnas, J. Michael Malone, Roger W. Orlando, Jesse S. Shapiro, and Robert E. Zaytoun;

6. The settlement provided for in the PSA is preliminarily approved pursuant to Rule 23(e), subject to the terms of this order;

7. The form of the notice to the class attached as Exhibit E to the PSA, as revised in accordance with Section III.B of the Memorandum and Recommendation on the parties' joint motion, is approved;

8. The method of dissemination of notice to the class provided for in Sections 6.1.1 and 6.1.2 and the other provisions of the PSA, including the exhibits thereto, is approved, and dissemination of notice shall be made in accordance with such provisions and applicable orders of the court;

9. Counsel of record for plaintiff in *Cooper Tools, Inc. v. EQ Indus. Servs., Inc.*, No. 5:08-CV-445-BR shall be included by the Settlement Administrator among those to be sent notice as provided herein;

10. James L. Griggs of Litigation Settlement Services is appointed Settlement Administrator and as such shall disseminate notice to the class, receive and process proof of claim forms and opt outs, and carry out all other functions of the Settlement Administrator as set forth in Section 12 and the other provisions of the PSA, including the Proof of Claims Processing Protocol, the Common Settlement Fund Disbursement Protocol, and the other exhibits to the PSA, and applicable orders of the court;

61

11. Daniel T. Barker is appointed Guardian ad Litem to represent the members of the class who are minors or who lack capacity and, as such, shall make an independent investigation, on behalf of class members who are minors or who lack capacity, into the terms and provisions of the PSA and, based on his independent investigation, make a recommendation to the court at the fairness hearing as to the fairness of the PSA with respect to such class members, in accordance with Section 13 and the other provisions of the PSA, including the exhibits thereto, and applicable orders of the court, and file a written and signed statement of his recommendation at least five business days before the scheduled date for the hearing;

12. Any member of the class who elects to opt out of the class must do so no later than 30 days after the date of publication of the notice to the class as provided in Section 6.1.1 of the PSA by following the procedures set forth in the notice and Section 6.2.2 of the PSA, except that, in accordance with the notice as approved herein, class members shall not be required as a condition of opting out to disclose whether or not they intend to bring a separate claim against any of the defendants, although they may be asked to make such disclosure;

13. Any member of the class who elects to object to the settlement in any respect, including any payments provided for in the PSA, must do so no later than 30 days after the date of publication of the notice to the class as provided in Section 6.1.1 of the PSA by following the procedures set forth in the approved notice and Section 6.2.2 of the PSA;

14. The fairness hearing pursuant to Rule 23(e)(2) shall be held on a date and at a time to be specified in Courtroom 2 in the Terry Sanford Federal Building and Courthouse, 310 New Bern Avenue, Raleigh, North Carolina.

15.     Senior District Judge Britt shall hold a telephone conference with counsel on a date and at a time to be specified for the purpose of selecting the date and time for the fairness hearing and the date for opt outs and objections to be included in the class notice. Counsel shall make the necessary arrangements for a single conference line and at least one day before the conference shall provide the chambers of Judge Britt the number and any password needed to join the conference.

16.     The parties shall file a motion for final approval of the settlement no later than 30 days before the date scheduled for the fairness hearing.

17.     Class counsel shall file a motion for payment of attorneys' fees and non-taxable costs, pursuant to Rule 23(h), no later than 30 days before the date scheduled for the fairness hearing.

18.     (a)     Thirteen business days before the date scheduled for the fairness hearing, counsel for the parties shall file a pre-hearing statement which describes all documents and other evidence they intend to offer at the fairness hearing (including docket entry numbers for documents already in the record), identifies by name and address all witnesses they intend to call at the hearing, summarizes the testimony each witness is expected to give, and includes as attachments copies of all documents and other evidence not identified by docket entry number in the statement;

(b)     by the same date, counsel for the parties shall deliver to the Settlement Administrator a copy of the pre-hearing statement and copies of all exhibits they intend to offer; and

(c)     beginning no later than 10 business days before the date scheduled for the fairness hearing, the Settlement Administrator shall make the pre-hearing statement and all the exhibits counsel for the parties intend to offer available on the Settlement Administrator's website and, upon request, shall provide paper copies of the statement and exhibits to any person to whom class notice is sent, subject to payment of reasonable copying costs by the requester.

19. Litigation proceedings in this case are STAYED pending completion of the proceedings on the settlement.

IT IS ORDERED that:

1. The parties shall file a revised proposed notice incorporating the changes provided for in Section III.B. above within ten business days after the filing of this Memorandum and Recommendation; and

2. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten business days, or such other period as the court specifies, to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this 20th day of April, 2009.

James E. Gates
United States Magistrate Judge

# APPENDIX A—Contents of PSA

| Section | Description | Page |
|---|---|---|
| 1 | Preamble | 1 |
| 2 | Recitals | 1 |
| 3 | Definitions | 5 |
| 4 | Settlement | 18 |
| 5 | Preliminary Approval by the Court and Settlement Class Certification | 22 |
| 6 | Notice and Fairness Hearing | 23 |
| 7 | Release and Assignment | 27 |
| 8 | No Admission of Liability | 30 |
| 9 | Representations and Warranties | 31 |
| 10 | Final Order and Judgment, Dismissal with Prejudice | 33 |
| 11 | Stay Orders, Exclusive Remedy, and Jurisdiction | 33 |
| 12 | Role of Settlement Administrator | 35 |
| 13 | Minors and Incompetents | 35 |
| 14 | Class Counsel's Fees and Expenses | 36 |
| 15 | Rights of Withdrawal | 37 |
| 16 | Consequences of Withdrawal | 38 |
| 17 | Other Obligations of the Parties | 39 |

# APPENDIX B—Exhibits to PSA

| Ex. | D.E. | Description |
|-----|------|-------------|
| A | 373-3 | Proof of Claims Processing Protocol |
| B-1 | 374-2 | Geographic Boundaries of Recommended Evacuation Zone |
| B-2 | 375-2 | Geographic Boundaries of Secondary Evacuation Zone |
| C | 373-4 | Proposed Order |
| D-1 | 373-5 | Resident Evacuation Proof of Claim Form—Recommended. Evacuation Zone |
| D-2 | 373-6 | Resident Evacuation Proof of Claim Form—Secondary Evacuation Zone |
| D-3 | 373-7 | Business Proof of Claim Form |
| E | 373-8 | Proposed Notice of Class Certification and Settlement |
| F | 374-3 | Common Settlement Fund Distribution Protocol |
| G | 374-4 | Amended Escrow Agreement |

# APPENDIX C—Exhibits to Plaintiffs' Memorandum

| Ex. | D.E. | Description |
|-----|------|-------------|
| 1 | 376-2 | Affidavit of Daniel T. Barker, Esq., Proposed Settlement Administrator |
| 2 | 376-3 | Curriculum Vitae of Daniel T. Barker, Esq. |

*************

| | | |
|-----|------|-------------|
| 3 | 376-4 | Affidavit of James L. Griggs, Proposed Guardian ad Litem |

*************

| | | |
|-----|------|-------------|
| 4 | 376-5 | Affidavit of Henry T. Dart, Esq., Class Counsel |
| 5 | 376-6 | Affidavit of Donald J. Dunn, Esq., Class Counsel |
| 6 | 376-7 | Affidavit of Matthew David Karnas, Esq., Class Counsel |
| 7 | 376-8 | Affidavit of J. Michael Malone, Esq., Class Counsel |
| 8 | 376-9 | Affidavit of Jesse S. Shapiro, Esq., Class Counsel |
| 9 | 376-10 | Affidavit of Robert E. Zaytoun, Esq., Class Counsel |
| 10 | 377 | Affidavit of Roger W. Orlando, Esq., Class Counsel |

*************

| | | |
|-----|------|-------------|
| 11 | 376-11 | Affidavit of Suellen Beaulieu, Class Representative |
| 12 | 376-12 | Affidavit of Betsy Borden, Class Representative |
| 13 | 376-13 | Affidavit of Michael Borden, Class Representative |
| 14 | 376-14 | Affidavit of Lisa Carley, Class Representative |
| 15-A | 376-15, pp. 1-3 | Affidavit of Randy Wilder, Class Representative |
| 15-B | 376-15, pp. 4-6 | Affidavit of Tara J. Wilder, Class Representative |
| 16 | 376-16 | Affidavit of Josephine Cross, Class Representative |
| 17-A | 376-17, pp. 1-3 | Affidavit of Anne Acosta, Class Representative |
| 17-B | 376-17, pp. 4-6 | Affidavit of George Acosta, Class Representative |
| 18-A | 376-18, pp. 1-3 | Affidavit of Denise Hatzidakis, Class Representative |
| 18-B | 376-18, pp. 4-6 | Affidavit of Denise Hatzidakis on behalf of Hatzidakis, LLC, Class Representative |

*************

| | | |
|-----|------|-------------|
| 19 | 376-19 | Proposed Settlement Timeline |

*************

| | | |
|-----|------|-------------|
| — | 383 | Defs.' Notice of Filing of Notice of Proposed Class Action Settlement Pursuant to 28 U.S.C. § 1715 |